William B. Thomas (No. 039456)
McDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2400
Houston, TX 77002
713-337-5580 (phone) / 713-337-8850 (fax)
william.thomas@mhllp.com
            -and-
Christina E. Ponig (*Admitted Pro Hac Vice*)
FLETCHER HELD, PLLC
808 Travis Street, Suite 1553
Houston, Texas 77002
713-255-0422 (phone) / 713-255-0419 (fax)
cmaccio@fletcherheld.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| **JENNIFER EVANCHO,**<br><br>        Plaintiff,<br>vs.<br><br>**CITY OF TUCSON, a municipal corporation; PIMA COUNTY, a political subdivision of the State of Arizona; JAN LESHER, in her official capacity as Pima County Administrator; STEVE KOZACHIK, in his official capacity as Director of Pima Animal Care Center; DOES 1 through 10, in their individual and official capacities as Animal Control Officers, Supervisors, and employees of the City of Tucson and/or Pima County responsible for the seizure, detention, and threatened destruction of Sergeant Snuggles**,<br><br>        Defendants. | CIVIL ACTION _____<br><br>**VERIFIED ORIGINAL COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AND VERIFIED APPLICATION FOR INJUNCTIVE RELIEF** |

Plaintiff Jennifer Evancho ("Evancho" or "Plaintiff"), by and through her undersigned counsel, brings this action against the above-named Defendants and alleges as follows:

## I.    INTRODUCTION

This lawsuit arises from a searing injustice. For nine months the City of Tucson and Pima County have torn a beloved family member from Plaintiff's home through unrelenting

governmental overreach, procedural abuse, and constitutional violations.

Sergeant Snuggles is an Anatolian Shepherd who had never shown aggression. He was a loyal guardian, playmate, and emotional anchor for the Evancho family. What began as a single, entirely provoked incident on October 7, 2025 has been twisted into a prolonged campaign of unlawful seizure, void process, and threatened destruction. Defendants have stripped Plaintiff of her clearly established Fourth and Fourteenth Amendment rights, extracted thousands of dollars under the constant threat of her dog's death, and compounded the harm by propagating a false narrative—even as the victim who provoked the bite has repeatedly stepped forward to set the record straight.

Snuggles is not a vicious animal. He is a cherished companion: a "baby boy" to Plaintiff, a brother to her children, a calming presence for the family's other dogs, and a source of security and joy in a home that abuts a wildlife corridor. The incident was not an unprovoked attack. It was a split-second reaction by a dog intensely focused on coyotes and another loose dog, under stress from a female companion in heat, and triggered when Plaintiff's mother approached from behind without Snuggles realizing she was there. In the victim's own words, it was "friendly fire"—a mistake born of circumstance, not malice. Yet Defendants seized him anyway.

They subjected him and his owner to a fundamentally defective hearing that violated every principle of fair notice and meaningful process. In a grotesque inversion of justice, the City prosecutor insisted that the same lax evidentiary rules reserved for traffic-ticket hearings should govern the proceeding that would decide whether a beloved family dog would live or die. Defendants used the wrong code section, the wrong burden of proof, and no evidentiary guardrails. They relied on breed evidence Arizona law expressly forbids. They invented an impossible "guarantee" standard found nowhere in statute. They bypassed every graduated remedy in favor of the most irreversible sanction. And then—after Plaintiff posted bond and perfected her appeal—they procured a post-jurisdictional "amended" order that is void under Arizona law because, among other things, the issuing court had already been divested of jurisdiction.

2

Defendants have since held Snuggles in prolonged, day-by-day unlawful detention while billing Plaintiff escalating fees simply to keep her own property alive. Even after receiving a detailed demand letter exposing the void orders and the constitutional defects, they continue to detain him, threaten his destruction, and extract money under color of a process and an order that cannot lawfully support their actions.

Rather than release him, the City and the County have turned Plaintiff's effort to recover her dog into a game of institutional keep-away. The City procured the destruction order and defends it in court, yet now claims its hands are tied because Snuggles is "not in [its] custody." The County holds Snuggles in its kennel, yet claims its hands are tied by the very order the City procured—and could disclaim or decline to enforce at will. Each points to the other. Neither will act. Snuggles pays for the finger-pointing with every additional day of confinement. That runaround is not a defense—it *is* the violation. The Constitution does not permit two governments to deprive a family of its property indefinitely while each hides behind the other.

The Fourth Amendment forbids unreasonable seizures of "effects." Seizing, holding, and threatening to destroy a family dog without genuine, evidence-based justification—especially on a provoked first bite resting on forbidden breed evidence and a void order—is unreasonable. The Fourteenth Amendment forbids depriving any person of property without due process of law. The process here was a sham: wrong notice, wrong rules, wrong decision-maker, wrong burden, missing findings, and an after-the-fact amendment issued after jurisdiction had been divested. When government officials not only violate these rights but then spread false narratives to the public and elected officials to defend their conduct, the violation becomes arbitrary and conscience-shocking.

Plaintiff has no adequate remedy at law for the ongoing constitutional deprivations, the threat of permanent loss, or the daily emotional devastation inflicted on her and her family. Money cannot restore the irreplaceable bond between a family and its loyal companion animal—a bond the Ninth Circuit has recognized carries special weight and cannot be treated as ordinary chattel.

Federal court intervention is the only remedy that can halt this injustice before it becomes irreversible. Plaintiff brings this action to vindicate her clearly established constitutional rights, to end the unlawful seizure and detention, to stop the threatened destruction, and to restore Snuggles to the home where he belongs.

In this action Plaintiff does not ask this Court to review, vacate, or set aside any state-court order. She seeks injunctive relief to end Defendants' ongoing constitutional violations by requiring them to return Snuggles to his family and prohibiting them from carrying out the threatened euthanasia. She also seeks damages for the injuries she has suffered and continues to suffer. The facts demand it.  The Constitution requires it.  Justice compels it.

## II.    JURISDICTION AND VENUE

1.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and (4) (civil rights actions). Plaintiff's claims arise under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

2.    This Court has supplemental jurisdiction over any pendent state-law claims under 28 U.S.C. § 1367(a).

3.    Venue is proper in the United States District Court for the District of Arizona, Tucson Division, under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Pima County, Arizona; all Defendants reside in or do business in Pima County; and the property at issue (Sergeant Snuggles) is located in Pima County.

## III.    PARTIES

4.    Plaintiff Jennifer Evancho is a resident of Pima County, Arizona. She is the owner and devoted guardian of Sergeant Snuggles. She brings this action individually and on behalf of her family's interest in Snuggles' life, companionship, and return.

5.    Defendant City of Tucson is a municipal corporation organized under the laws of the State of Arizona. At all relevant times, it acted under color of state law through its animal control officers, prosecutors, and other employees and agents. It maintains policies, customs, and practices governing dangerous-animal proceedings, animal seizures,

detentions, and dispositions, including the policies and practices that caused the constitutional violations alleged herein. It is sued for its own unconstitutional policies, customs, and practices under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and for the conduct of its final policymakers and employees. The City of Tucson may be served with process through the Tucson City Clerk, 255 W. Almeda Stl, Tucson, Arizona, 86701.

6. Defendant Pima County is a political subdivision of the State of Arizona. It operates the Pima Animal Care Center ("PACC"), where Snuggles has been detained since shortly after his seizure. At all relevant times, Pima County acted under color of state law through its animal-care employees, supervisors, and agents responsible for Snuggles' continued detention, care, billing, and the threatened implementation of any destruction order. It maintains policies, customs, and practices governing the detention and disposition of animals seized by or on behalf of the City of Tucson or under municipal orders. It is sued under *Monell* for its policies, customs, and practices that caused the constitutional violations, and for the conduct of its employees acting in their official capacities. Defendant Pima County may be served with process through the Clerk of the Board of Supervisors, 130 W. Congress St., 1st Floor, Tucson, Arizona 85701.

7. Defendant Jan Lesher is Pima County Administrator. Defendant Lesher is named solely in her official capacity and solely for purposes of declaratory and injunctive relief. No claim for damages is asserted against her individually. Lesher can be served with service of process at Pima County Administration Building, 130 W. Congress St., Administrator's Office, Tucson, Arizona 85701.

8. Defendant Steve Kozachik is Director of PACC. Defendant Kozachik is named solely in his official capacity and solely for purposes of declaratory and injunctive relief. No claim for damages is asserted against him individually. Kozachik can be served with service of process at Pima Animal Control Center, 4000 N. Silverbell, Road, Tucson, Arizona 85745.

9. Defendants DOES 1 through 10 are individuals sued in their individual and

5

official capacities. They are or were, at all relevant times, Animal Control Officers, supervisors, managers, or other employees or agents of the City of Tucson and/or Pima County (including PACC) who participated in, authorized, ratified, or failed to prevent: (a) the seizure of Snuggles on or about October 7, 2025 (Does 1–2 and/or their supervisors); (b) Snuggles' continued day-to-day detention, care, and housing at PACC or other facilities from October 2025 through the present (Does 3–6); (c) the decision to pursue destruction, to bill Plaintiff escalating kennel and boarding fees, to require and maintain the supersedeas bond, and/or to threaten or prepare to carry out euthanasia (Does 7–10 and/or their supervisors); and (d) the implementation or ratification of the policies, customs, and practices alleged herein.

10.     Plaintiff is informed and believes, and on that basis alleges, that the true names and capacities of Does 1 through 10 are presently unknown. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Each Doe is sued individually for his or her personal involvement in the constitutional violations and in his or her official capacity for purposes of injunctive and declaratory relief. The conduct of each Doe was undertaken under color of state law and pursuant to the policies, customs, or practices of the City of Tucson and/or Pima County.

## IV.    FACTUAL ALLEGATIONS

### A.    Sergeant Snuggles and the Evancho Family

11.     Sergeant Snuggles ("Snuggles") is an Anatolian Shepherd dog whom Plaintiff and her family welcomed into their home when he was approximately nine months old. He had previously suffered a broken pelvis as a five-week-old puppy after being stepped on by a cow; the breeder rehabilitated him and ensured he was fully healed before allowing placement. Declaration of Jennifer Evancho ("Evancho Decl.") attached as **Exhibit A**, at ¶¶3-4.

12.     Plaintiff's family already had one Anatolian Shepherd, Coyoki (a female then approximately 14 months old), who guarded their livestock, property, and family on rural land in Pima County abutting a dry backwash that serves as a corridor for wildlife, including

coyotes, bobcats, mountain lions, and javelina. Coyoki had been attacked by a coyote while protecting chickens, and the family sought a companion guard dog to increase safety for the animals, property, and family. *Id.* at ¶¶4-5.

13.    Snuggles was named by Plaintiff's children, who observed his affectionate nature and said he loves to snuggle with them. Plaintiff's husband added "Sergeant" to reflect his role as a protector, consistent with the family's military background. From the moment he arrived, Snuggles brought immediate joy to the Evancho family. He and Coyoki became inseparable playmates and partners in guarding the property; Coyoki stopped chasing chickens once Snuggles arrived, and the two spent hours running and playing together. *Id.* at ¶¶5-6.

14.    Snuggles quickly became far more than a guard dog. He was a gentle, loving, and intuitive family member—"like a son" to Plaintiff and her husband and "a brother" to the children. He would follow family members around the property, sit and beg for pets, lay his head gently on laps when they sat on the couch, and lie next to the children when they played on the ground. He has an extraordinary ability to sense when someone was sad or stressed; he would approach, lie down beside them, and provide comfort through his calm presence. Plaintiff would hug him, kiss his head, and thank him for being part of the family. *Id.* at ¶¶6-7.

15.    Snuggles also has a remarkable calming effect on other animals. When the family's elder dog, Rallye, experienced anxiety and began pacing near the end of his life, Snuggles would go to him, sit beside him until Rallye would lay down, and then snuggle with him. *Id.* at ¶¶7-8.

16.    Snuggles provided critical security and peace of mind. With wildlife frequently on the property, Plaintiff felt safer at night knowing Snuggles and Coyoki were by her side. At night the dogs came inside; and Snuggles often slept near the Plaintiff's bed, offering comfort and a sense of protection. Plaintiff and her children expressed their love daily: "You are the sweetest boy in the world, I love you so much *Id.* at ¶¶8-9.

7

17.     In short, Snuggles is an irreplaceable, beloved member of the Evancho family whose seizure, prolonged separation, and threatened destruction have caused—and continue to cause—profound and irreparable harm to Plaintiff and her family.

**B.     The October 7, 2025 Incident–A Negligently Provoked, First-Time Bite with No Prior History; Seizure and Initial Detention**

18.     Prior to October 7, 2025, Snuggles had never bitten or attempted to bite any person or animal. He had no history of aggression. Plaintiff had "never had any concerns with him" and had "never [seen] a growl [or] snarl." Hr'g Tr. (Nov. 24, 2025), attached as **Exhibit B**, at 106:15-25.

19.     On October 7, 2025, Snuggles bit Plaintiff's mother, Clara Gastelum, causing injury. This was a single, isolated incident—the first and only bite in his life. Ex. A at ¶10.

20.     As she admits, Ms. Gastelum negligently provoked the bite under a confluence of highly dysregulating stressors. On that day, Snuggles (then an intact young male) was already distressed: a female dog (Coyoki) was in heat, he had not eaten for days, other dogs were barking, coyotes were active in the area, and he was startled by Plaintiff's mother inadvertently while in this heightened state. Plaintiff's mother has conceded that she inadvertently startled Snuggles in this distressed state and negligently provoked the incident. Ex. B at 71:25-72:4; *see also* 81:3–12; 83:20-84:1, 91:1-17.

21.     On October 7, 2025, Defendants (Does 1–2 and/or their supervisors) seized Snuggles and took him into custody. City representatives advised Plaintiff that, as standard procedure, Snuggles would be returned in ten days. He was not returned. He has now been detained for more than nine months. Evancho Decl., Ex. A, at ¶11.

22.     Defendants detained Snuggles well beyond any lawful quarantine or initial holding period. The detention has now lasted more than nine months (from October 7, 2025, through the present).

**C.     The Defective November 24, 2025 Hearing and Resulting Order**

23.     Nearly a month after the seizure, the City of Tucson filed a Petition and Order to Show Cause. The City noticed the matter as a § 4-11 proceeding seeking destruction

8

under § 4-11(f)(3). See Petition and Order to Show Cause, attached as **Exhibit C**.

24. The contested hearing was held on November 24, 2025, before Magistrate Sarah L. Mayhew of the Tucson City Court. The City was represented by prosecutor Roni Byrne; Plaintiff was represented by counsel Janet Altschuler.

25. At the outset of the hearing, fundamental disputes arose over the governing rules. When defense counsel invoked the rule excluding witnesses, the City insisted that no such rule applied because "the rules of evidence do not apply in this case." (Ex. B 7:10-12; 7:24-25.) The prosecutor repeatedly asserted that Local Rule 16 (applicable only to civil traffic, infraction, and parking proceedings) eliminated evidentiary rules. (Ex. B at 7:2-9.) The magistrate, who candidly stated she was "not normally an animal forfeiture judge" and was "trying to look this up," ultimately ruled—guided by the City—that the hearing would "proceed without the rule of exclusion." (*Id*. 8:12-15, 9:5-9; 10:6-7, 13-14.)

26. The hearing was conducted informally and recorded only by audio, consistent with the administrative procedures of Tucson City Code § 4-13.[1]

### 1. The City's evidence

27. The City's evidence centered entirely on breed. A PACC dental veterinarian with no specialized training in dog behavior emphasized Anatolian Shepherds' "strong bite force" (720–750 psi versus 250 psi for a German Shepherd) and refused to support a behavior plan because she could not "state perfectly" that the incident would not recur. Extensive questioning tied concerns directly to Snuggles' perceived breed. (*Id*. 54:20; 55:7–9; 55:17–56:5; 60:11–14; 60:24–61:3; 98:2-3.)

28. The City offered zero evidence of any propensity to endanger humans without provocation—the statutory element required under Arizona law. In fact, the responding officer confirmed there were no prior bite reports for Snuggles and that he showed no aggression when leashed and loaded into the truck for transport. Ex. B at 13:1-15, 28:2-5, 28:18–29:4.

---

[1] Exhibit B is the transcription of that audio recording. Jennifer Evancho arranged and paid for the transcription.

29.     The City also presented hearsay-within-hearsay testimony from an officer who admitted she had "never spoke[n] to" the victim herself. *Id.* 45:24–46:7

30.     Under Arizona law, a "vicious animal" is one with "a propensity to attack . . . human beings without provocation." A.R.S. § 11-1001(16); see also A.R.S. § 11-1025(G)(4). "Propensity" requires a settled pattern or tendency, not a single incident. See James v. Cox, 130 Ariz. 152, 154 (1981). Provocation is an element the government must prove or that constitutes a complete defense in appropriate circumstances. A.R.S. §§ 11-1014.01(D)(1), 11-1027. Arizona law categorically forbids any decision-maker from considering breed in determining viciousness. A.R.S. § 11-1025(C).

31.     Neither the City nor the County satisfied these statutory requirements. There was no pattern or propensity; the single bite was provoked by the victim; and Defendants' case rested overwhelmingly on Snuggles' Anatolian Shepherd breed and attributed "bite force" (720–750 psi), evidence Arizona law expressly prohibits. (Ex. B. at Id. 54:20; 55:7–9; 55:17–56:5; 60:11–14; 60:24–61:3, 98:2-3.) From the outset, Defendants' actions lacked any reasonable basis in fact or law to treat Snuggles as a dangerous animal warranting seizure, prolonged detention, or destruction. The incident was a provoked first bite with zero prior history, and Arizona law forbids reliance on the breed-based evidence that Defendants used to justify their actions.

### 2. *Plaintiff's evidence.*

32.     Plaintiff presented compelling defense evidence: Clara Gastelum (the bite victim) testified that she had inadvertently startled Snuggles and negligently provoked the isolated incident. (*Id.* at 71:25-72:4.) Dr. Vanya Moreno, a certified dog behavior expert with a Ph.D. in ecology and evolutionary biology and nearly three decades of experience, explained the confluence of stressors that dysregulated Snuggles on that day, confirmed the bite was provoked by the victim, and outlined a concrete, workable behavior plan. She "wholeheartedly believe[d] that he'll be safe with those kids." (*Id.* 79:3–5, 79:10-15, 79:22-24; 81:3–12. 83:20–23; 82:11–83:13, 83:20-84:1, 91:1-17; 88:17; 92:8–12.)

33.     Blase and Jennifer Evancho testified to the family's deep commitment to

Snuggles and willingness to follow any reasonable behavior plan. Plaintiff stated she had "never had any concerns with him" and there had "never been a growl, snarl." *Id.* 106:15-25.

34.  In closing, the City argued it had satisfied its clear-and-convincing burden while simultaneously insisting evidentiary rules did not apply. (Compare *id.* 108:1-5 with 7:24-25.)  The defense emphasized that the bite "wasn't unprovoked. It wasn't unexplained." (*Id.* 111:3–4.)

35.  The magistrate found Snuggles to be a "vicious or destructive animal" pursuant to § 4-7, with a "propensity to destroy or cause damage" and as "an animal that bites." She noted the highly distressed situation but rested the destruction order on the expert's inability to "guarantee" future behavior and the victim's trauma. The magistrate ordered forfeiture and "humane destruction" and stayed destruction pending appeal, setting a $3,600 bond "to perfect the appeal." (*Id.* 112:12–24, 113:13–22; 115:7, 116:17–18, 117:8–15)

36.  The November 24, 2025 Minute Entry and subsequent written order directed destruction "pursuant to Tucson City Code § 4-13." A true and correct copy of the November 24, 2025 Destruction Order is attached hereto as Exhibit D.

37.  This order was fundamentally defective on multiple independent grounds:

a.  Tucson City Code § 4-13 is an administrative track that assigns dangerousness determinations to a hearing officer (not a magistrate), proceeds informally with no rules of evidence and admissible hearsay, applies a preponderance standard, and authorizes only non-destructive remedies (compliance orders for spay/neuter, microchip, confinement, muzzling, signage, insurance). **Section 4-13 does not authorize merits destruction**. The State itself later conceded that "the Court's authority to order forfeiture and humane destruction of Sergeant Snuggles cannot be based on" § 4-13.

b.  The City noticed the case under § 4-11 (civil forfeiture track requiring clear-

11

and-convincing evidence, written findings of fact and conclusions of law, and civil evidentiary rules) but tried and obtained an order under § 4-13 procedures.

c.  The magistrate considered and relied upon breed and "bite force" evidence that A.R.S. § 11-1025(C) expressly forbids any decision-maker from considering.

e.  The magistrate imposed an invented and impossible "guarantee" standard—that the owner must prove the dog will never bite again—found nowhere in the ordinance or Arizona statutes. This self-refuting standard would justify destruction of nearly every dog that has ever bitten and drove the gravest possible remedy.

f.  The proceeding bypassed the graduated, lesser remedies the ordinance itself prescribes in favor of the single irreversible sanction of death.

g.  Required written findings under the applicable clear-and-convincing standard were absent or inadequate.

38.  These defects were not harmless technicalities. They denied Plaintiff the process the U.S. Constitution requires before the government may permanently destroy her property. Under *Mathews v. Eldridge*, 424 U.S. 319 (1976), the private interest (a beloved, decade-long family companion facing irreversible death) is at its zenith; the risk of error was enormous and was realized; and the government forfeited any interest in public safety it could claim by conducting a lawless process that did not remotely comply with notice and other due process requirements under the U.S. Constitution.

**D.     The Void December 11, 2025 "Amended" Order**

39.  The City and County's violations of Plaintiff's constitutional rights continued after the November 24, 2025, hearing.

40.  On December 4, 2025, Plaintiff posted the $3,600 supersedeas bond to stay the November 24, 2025 order and perfect her appeal rights. Ex. A. at ¶12.

41.  On December 10, 2025, Plaintiff timely filed her Petition for Special Action in Pima County Superior Court (Case No. C20258606), the designated channel for review of a City Court destruction order under Tucson City Code § 4-13(d)(10). *Id.* at ¶13.

12

42.     On December 11, 2025—one day after Plaintiff perfected her special action and after the City Court had been divested of jurisdiction—the magistrate issued an "amended" order re-labeling the basis as § 4-11. The amended order recited findings under § 4-7, stated that Snuggles "is ordered to be surrendered to PACC for humane destruction," and purported to change the legal foundation after the hearing had closed and the city court had been divested of jurisdiction. A true and correct copy of the December 11, 2025 Amended Destruction Order is attached hereto as **Exhibit E.**

43.     Under Arizona law, once a supersedeas bond is posted and review is perfected, the lower court is immediately and self-executingly divested of jurisdiction to alter the order under review except in furtherance of that review. *See Whitfield Transp., Inc. v. Brooks*, 81 Ariz. 136 (1956); *Application of Lavis*, 96 Ariz. 316 (1964). Swapping the statutory basis for destruction after the hearing has closed and after jurisdiction has been divested is the antithesis of acting "in furtherance" of review; it was a transparent attempt to defeat appellate scrutiny.

44.     Under Arizona law, an order entered without jurisdiction "has no legal effect." See *Shinn v. Arizona Bd. of Exec. Clemency*, 254 Ariz. 255 (2022). Plaintiff does not ask this Court to set aside or vacate that order; she relies on its voidness only defensively, to establish that Defendants cannot invoke it as lawful authority for their own conduct. The December 11, 2025 amended order is a legal nullity that cannot cure the original order's defects or supply § 4-11 authority that was never properly invoked or adjudicated.

45.     Because the December 11 order is void, Defendants have no lawful authority to continue detaining Snuggles or threaten his destruction. No reasonable officer could believe a void order supplies such authority. The continued, day-by-day detention is therefore an ongoing, unjustified seizure that Defendants must justify anew each day it continues.

46.     Even after significant public pressure, County Administrator Lesher and PACC officials, including Director Steve Kozachik, continued to propagate a materially

false or grossly misleading version of the October 7, 2025 incident to the Pima County Board of Supervisors. In a June 6, 2026 memorandum to the Board, Director Kozachik asserted, among other things, that there had been "several interactions" with Snuggles preceding the bite, that Snuggles continued attacking the victim while she was on the ground, and that the victim had stated she "would not return to the house if Snuggles returned" and "worried for the kids' safety." See Steve Kozachik Memorandum to Pima County of Supervisors (dated June 6, 2026), transmitted by Defendant Lesher, attached as **Exhibit H.**

47.    In response to Director Kozachik's memorandum, in a June 9, 2026 letter to the Board, the victim herself, Clara Gastelum, directly disputed these assertions as false and provided her own detailed account confirming that the incident was a single provoked and instinctive reaction with immediate de-escalation once she called Snuggles' name. She accused PACC officials of knowingly spreading a false narrative. See Letter from Clara Garcia Gastelum to the Pima County Board of Supervisors, attached as **Exhibit I**.

48.    Pima County's conduct further demonstrates bad faith, ongoing deliberate indifference to Plaintiff's constitutional rights, and the arbitrary nature of Defendants' continued detention and threatened destruction of Snuggles.

**E.    Ongoing Unlawful Detention, Financial Burdens, and Irreparable Emotional Harm (July 2026)**

49.    As of the filing of this Complaint, Snuggles remains in Defendants' custody at PACC or another facility more than nine months after his seizure. Defendants continue to threaten his destruction pursuant to the defective November 24, 2025 order and/or the void December 11, 2025 amended order.

50.    To prevent Defendants from euthanizing Snuggles while she pursues her state-court challenge, Plaintiff was required to post the $3,600 supersedeas bond. She has also been forced to pay approximately $16,000 (and counting) in kennel, boarding, and related fees to keep Snuggles alive and housed during the unlawful detention. These fees continue to accrue daily. Plaintiff should not have had to "buy back" her own property's

14

survival from a process that was constitutionally defective and, as to the November 24, 2025 and December 11 orders, void.

51.    The prolonged separation has devastated Plaintiff and her family. Plaintiff constantly worries about Snuggles' physical condition, mental state, and well-being in extended kennel confinement. She fears he believes she has abandoned him, that he wonders why she put him in the truck and has not come to find him, and that he thinks she does not love him or want him anymore. She prays daily for his return and dreams of the day she can hug him again and tell him how hard she fought for his life. Ex. A at ¶¶14-15.

52.    The family has suffered additional losses and ongoing fear. Plaintiff's elder dog Rallye passed away just 14 days after Snuggles' seizure, compounding the grief. Coyoki, now without her companion and playmate, guards the property alone; Plaintiff and her children constantly worry she will be attacked by coyotes. The family dynamic has changed: Plaintiff spends far less time with her children because her mind is consumed with trying to save Snuggles and navigate the legal process. *Id.* at ¶¶15-16.

53.    Snuggles was not just a guardian of livestock and property; he was Plaintiff's "baby boy." Losing him—or living under the constant threat of losing him—has taken a huge emotional toll. Plaintiff has cried for months and continues to do so at times. One mistake, under the unique and highly dysregulating circumstances of a single provoked incident, should not characterize an otherwise gentle, loving dog or sentence him to death. Snuggles is an amazing dog who gives a tremendous amount of love; he deserves another chance. *Id.* at ¶¶16.

54.    These injuries—emotional distress, the ongoing burden of fees and bond, the constant threat of irreversible loss, and the daily constitutional violation of an unlawful seizure—are concrete, particularized, and redressable by the relief sought here. They flow directly from Defendants' unconstitutional conduct.

55.    On or about July 6, 2026, Plaintiff's counsel sent a detailed pre-litigation demand letter to the Pima County Attorney and the City of Tucson prosecutor who procured the December 11, 2025, void order.  Plaintiff copied the prosecutor's supervisors, Alan

Merritt and Roi Lusk, the Deputy City Attorney and City Attorney, respectively. A true and correct copy of the demand letters are attached hereto as **Exhibits F & G**. The letter set forth the constitutional violations detailed above and demanded the immediate return of Sergeant Snuggles together with an end to the threatened destruction. Pima County responded that its hands are tied because an order remains in place. The City of Tucson prosecutor initially responded that she was on vacation but would get back to counsel later in the week.

56. On July 13, 2026, in response to Plaintiff's letter, the City's Prosecutor responded: "I have been advised by my superiors that we will not comply with your requests at this time as the matter is before the Court of Appeals and the animal is not in our custody." Email from M. Worman (dated July 24, 2026), attached as **Exhibit H** (emphasis added).

57. Upon information and belief, the superior that ratified the City of Tucson's unconstitutional conduct and ongoing deprivation of property is the City Attorney himself, Roi Lusk.

58. At all times relevant, Snuggles has remained in the physical custody of Defendant Pima County and its agency, the Pima Animal Care Center ("PACC"). The City of Tucson has expressly disclaimed custody, stating in writing on July 14, 2026 that Snuggles is "not in [its] custody." The duty and power to release Snuggles therefore rest with the County Defendants.

59. The only instrument any Defendant has ever identified as authority to seize and hold Snuggles is the City of Tucson's destruction order. But that order is void. As alleged above, the city court was divested of jurisdiction when Plaintiff perfected review by filing her petition for special action on December 10, 2025 and posting a supersedeas bond on December 4, 2025; the December 11, 2025 "amended" order was entered without jurisdiction and is void *ab initio*. A void order confers no authority on any Defendant to seize, detain, or dispose of Snuggles.

60. The November 24, 2025, order authorizes no destruction. The City has conceded that Tucson City Code § 4-13—the provision on which the order rested—

16

authorizes no destruction, and the supersedeas bond independently stays any destruction of Snuggles pending review.

61. To the extent any Defendant relies on a "vicious" or "aggressive" characterization based on the evidence presented at the November 24, 2025 hearing, breed and "bite force" are barred from consideration by A.R.S. § 11-1025(C).

62. As explained above, the November 24, 2025 proceeding was constitutionally defective and the order void for the reasons stated herein. Further, no Defendant has initiated any civil forfeiture proceeding against Snuggles under A.R.S. Title 13, Chapter 39. Nor could such a proceeding lie. Snuggles is a family pet. He is not contraband, proceeds of any offense, or an instrumentality of any crime, and therefore is not "property subject to forfeiture" within the meaning of A.R.S. § 13-4304.

63. The County Defendants' continued possession of Snuggles is therefore a seizure and detention of Plaintiff's property that rests on no valid legal instrument and is supported by no process of any kind. The deprivation is ongoing and accrues anew each day the County withholds him.

**F.    The City–County Runaround: Each Defendant Blames the Other to Evade Responsibility**

64. Snuggles remains confined because each Defendant disclaims the power to release him and points to the other. Neither position is tenable. Together, the two positions operate to deprive Plaintiff of her property indefinitely while leaving no Defendant willing to accept responsibility for the deprivation.

65. The City of Tucson procured the destruction order and remains the party defending it, yet now asserts that its hands are tied and that Snuggles is "not in [its] custody." The City nonetheless retains the power to end the deprivation at any time—by withdrawing or declining to enforce the void order, consenting to Snuggles's release, or agreeing to preserve him—and has refused to do so. Ex. J, Email from C. Ponig and W. Thomas to M. Worman (July 14, 2026).

66. The County, in turn, asserts that its "hands are tied" by the very order the City

procured, and that it therefore cannot release Snuggles—an act to which the City could readily consent. Yet the County holds Snuggles in its exclusive physical custody and is subject to an independent statutory duty to release him under A.R.S. § 11-1014, a duty that does not depend on the City's cooperation.

67.     The result is a circular runaround: the City points to the County's custody, and the County points to the City's order, each using the other as a shield to avoid releasing an animal that neither is willing to defend holding. That mutual abdication does not diminish either Defendant's responsibility—it establishes it. Each Defendant is a moving force behind the continuing deprivation: the City as the procurer of the void order who refuses to relinquish or disclaim it, and the County as the custodian who refuses to release. Neither may escape liability by pointing to the other, and only an order of this Court directed to both will end the deprivation.

68.     Defendants' refusal to take any corrective action despite being placed on clear and specific notice of the void November 24, 2025 and December 11, 2025 orders and the fundamentally defective process confirms that the ongoing Fourth and Fourteenth Amendment violations will continue absent judicial intervention. This inaction further supports the necessity of preliminary and permanent injunctive relief to prevent irreparable harm to Plaintiff and Snuggles. See Exhibit A at ¶¶14-17.

**G.     Defendants' Conduct Violated Clearly Established Constitutional Rights**

69.     Binding Ninth Circuit precedent holds that seizing, holding, and destroying a dog are all "seizures" under the Fourth Amendment that must be reasonable. Whether an animal actually posed a danger is a question of fact for the jury. A reasonable official in Tucson was on notice that he could not seize, hold, and threaten to kill a dog absent a genuine, evidence-based dangerousness justification under the process that the law requires.

70.     Federal courts have repeatedly held that permanently disposing of an owner's animal without adequate notice and a meaningful hearing states a procedural due process claim. The procedural defects here were severe: wrong notice, wrong procedural track, suspended evidentiary rules, wrong burden, missing findings, prohibited evidence, and an

invented "guarantee" standard. These defects denied Plaintiff the process the Constitution requires under *Mathews v. Eldridge*.  They effectively constituted no notice under binding precedent of the Ninth Circuit.

71.     If these defects were not enough on their own, they culminated in the entry of destruction orders that are void on their face—one because the referenced ordinance does not authorize merits-destruction and the other because, among other things, the city court was divested of jurisdiction when it entered the order.

72.     When a deprivation flows from the government's established procedures (not a random rogue act) and pre-deprivation process was feasible and foreseeable, the government must provide that process up front; a later lawsuit is not enough. *See Zinermon v. Burch*, 494 U.S. 113 (1990); *Logan v. Zimmerman Brush Co*., 455 U.S. 422 (1982). Arizona's dangerous-dog statutes and ordinances define the very process that is "due." By ignoring those state-defined procedures, Defendants denied Plaintiff the process the Constitution guarantees.

73.     The November 24, 2025 and December 11, 2025 orders are void. Officials cannot reasonably rely on a void order for immunity or authority. An official cannot reasonably believe a court order supplies lawful authority when the issuing court had no power to enter it. The voidness supplies an independent basis for injunctive relief.

74.     Defendants' conduct was not a reasonable judgment call. It rested on prohibited breed evidence, ignored conceded provocation and the complete absence of propensity evidence, imposed an extra-legal "guarantee" standard, and proceeded through a jurisdictional nullity after Plaintiff exercised her appellate rights. No reasonable officer could have believed this conduct was lawful.

**H.     Defendants' Refusal to Disclose Snuggles' Condition or Whereabouts Compounds the Irreparable Harm and Independently Warrants Injunctive Relief**

75.     Since Snuggles was seized on October 7, 2025, Defendants have refused to provide Plaintiff—his lawful owner—with any information whatsoever concerning his health, condition, care, or location. Plaintiff has made at least twenty requests to PACC to

ascertain basic information about Snuggles' condition and welfare and to secure vital health, veterinary, and administrative care records.  She has repeatedly requested confirmation that Snuggles is alive, is being adequately housed and fed, and has not been harmed, euthanized, or transferred. Defendants have not responded. Plaintiff has likewise submitted a formal request to Defendant Pima County under Arizona's Public Records Law, A.R.S. § 39-121 *et seq.*, seeking records reflecting Snuggles' intake, custody, veterinary care, and disposition.  Pima County's only response was that "there is no available timeline on when the request will be finalized." Defendants have failed to produce a single responsive record, in disregard of their statutory obligation to respond "promptly." A.R.S. § 39-121.01(E). Their failure to comply can accurately be characterized as a refusal to do so.

76.    This information blackout is itself a source of irreparable harm. Because Snuggles remains under a threatened destruction order and entirely within Defendants' control, Plaintiff has no means of knowing whether the very injury this Court is asked to prevent has already occurred or is imminent. Defendants' silence deprives Plaintiff of the ability to monitor Snuggles' welfare, to detect and respond to any deterioration in his condition, or to obtain timely relief before an irreversible act. A party facing the potential destruction of a living animal cannot be left to guess, from day to day, whether the subject of the litigation still exists. Money damages cannot remedy the loss of a beloved family pet, and the same is true of the loss of the opportunity to prevent that harm through timely knowledge of his condition.

77.    The relief Plaintiff seeks on this point is narrow and imposes no meaningful burden on Defendants, who already possess the information. Plaintiff asks the Court to order Defendants to (1) confirm in writing, within 24 hours, that Snuggles is alive and disclose his current location and physical condition; (2) provide reasonable, periodic written updates (including proof of life) on his condition and care during the pendency of this action; (3) permit a welfare inspection of Snuggles by Plaintiff or Plaintiff's designated veterinarian on reasonable notice; and (4) preserve all records concerning Snuggles' custody, care, and condition. Requiring Defendants simply to disclose what they already know, and to preserve

records they are legally obligated to keep, works no hardship and serves the public interest in transparency and in the humane, accountable treatment of an animal held in government custody. The balance of hardships tips sharply in Plaintiff's favor.

## I.     Defendants' "It Is Out of Our Hands" Position

### 1.   The Finger-Pointing

78.     Both the City and the County claim the continued seizure and threatened destruction of Snuggles are, in so many words, "out of their hands" and that only a court can decide his fate. On July 14, 2026, the City refused Plaintiff's demands, declaring that "the matter is before the Court of Appeals." The County, which holds Snuggles in its kennel and has confirmed receipt of Plaintiff's written demand, likewise refuses to release him, insisting its hands are tied by the pending proceedings. Each points to the other. Neither will act. Snuggles pays for the runaround with every additional day of confinement.

### 2.   The Position Is False

79.     Defendants' position misdescribes the adversary system. Courts adjudicate the disputes parties choose to place before them. They do not force destruction on parties who jointly agree to a different resolution. No court in this matter can—or would—order Snuggles destroyed over the parties' stipulation to release him, vacate the order, or modify it. The continued deprivation is controlled by Defendants' own litigation choices, not compelled by any court.

### 3.   The Lawful Off-Ramps Defendants Could Take Tomorrow

80.     Notwithstanding the lawlessness and illegality of Defendants' actions and the void orders they have procured—claims arising from which Plaintiff does not waive—at every stage Defendants have had, and still have, multiple lawful, ordinary ways to end this deprivation without waiting for any court to "decide":

(a) a stipulation or joint motion to vacate the destruction order under Ariz. R. Civ. P. 60(b), including Rule 60(b)(4), under which a void judgment *must* be set aside and may be attacked at any time—Defendants could simply stipulate, confess, or decline to oppose vacatur;

21

(b) Plaintiff's Motion to Vacate now pending in Superior Court, which Defendants could stipulate to or decline to oppose *today* rather than resist it;

(c) the prosecuting authority's discretion to move to dismiss or withdraw the destruction remedy at any time;

(d) consent to a modified order or consent decree returning Snuggles under strict containment conditions—relief courts routinely approve in lieu of destruction; and

(e) the County's independent statutory authority to release Snuggles under A.R.S. § 11-1014—an executive act that requires *no* court's leave at all.

81.    These mechanisms are ordinary. Parties settle, stipulate to vacatur, and dismiss orders every single day. Defendants' suggestion that they are helpless spectators to a process they themselves initiated and continue to control is false—and contrary to ordinary practice.  See Ex. J, Email from C Ponig and W Thomas to M. Worman (July 14, 2026).

### 4.  *Because the Order Is Void, the Refusal Is Especially Telling*

82.    Defendants' refusal is even more damning because the underlying orders are void. A void order is subject to mandatory vacatur and may be challenged at any time. Defendants could confess its invalidity whenever they chose. The City has already conceded, in writing, that Tucson City Code § 4-13—the very provision on which the destruction order rests—authorizes *no* destruction at all. And they are aware that the December 11, 2025 order is void due to the city court's divestiture of jurisdiction when that court entered the order. Insisting that "the court must decide" the fate of an order Defendants know to be defective is not neutrality. It is a deliberate choice to prolong a deprivation Defendants know to be unlawful.  It is a deliberate decision by Defendants to compound their illegal and lawless conduct.

### 5.  *What the Refusal Proves — Municipal Liability*

83.    Defendants' refusal to use any of the lawful off-ramps available to them—after being placed on detailed written notice of the voidness of the order and the unconstitutionality of the process from its inception—is affirmative evidence supporting

22

Plaintiff's municipal-liability claims:

(a) it establishes that the continuing deprivation results from Defendants' own deliberate decisions, not from any external legal compulsion, and is therefore the "moving force" behind the injury;

(b) it demonstrates that the City's and the County's final policymakers—City Attorney Roi Lusk and County Administrator Jan Lesher—have made a conscious, informed choice to persist with knowledge of the illegality, supporting Plaintiff's single-decision and ratification theories and establishing deliberate indifference to Plaintiff's constitutional rights; and

(c) it is probative of a policy, custom, and practice of adjudicating dangerous-dog seizures and destruction orders through a process Defendants know to be constitutionally defective, and of reflexively disclaiming responsibility to avoid correcting it.

84. In short, Defendants' "our hands are tied" refrain is not a description of legal necessity. It is evidence of a deliberate, repeated choice to persist in conduct they know to be unlawful.

## V.   CLAIMS FOR RELIEF

**A.   COUNT I: 42 U.S.C. § 1983—Violation of the Fourth Amendment (Unreasonable Seizure)**

85. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as if fully set forth herein.

86. The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, protects against unreasonable seizures of "effects," including dogs. Seizing, holding, and threatening to destroy a dog are all "seizures" that must be reasonable.

87. Defendants seized Snuggles on October 7, 2025, and have continued to detain him for more than nine months. The continued detention is a separate, ongoing seizure that Defendants must justify anew each day.

88. Defendants' seizure and continued detention were and are unreasonable.

23

There was and is no reasonable basis to conclude Snuggles posed a danger warranting seizure or prolonged detention: the incident was a single, provoked first bite with no prior history; Arizona law forbids consideration of the breed evidence on which Defendants relied; there was no evidence of statutory propensity to attack humans without provocation; and the December 11, 2025 order purporting to authorize destruction is void for lack of jurisdiction and the November 24, 2025 order is void as ultra vires.

89. Defendants' threatened destruction of Snuggles is likewise an unreasonable seizure. Destruction is the most complete and irreversible seizure possible. It cannot be justified on this record.

90. The individual Defendants (Does 1–10) personally participated in the unreasonable seizure and continued detention by seizing Snuggles, maintaining his custody, authorizing or ratifying continued detention and threatened destruction, and/or implementing the policies and practices that caused these violations. Their conduct violated clearly established Fourth Amendment rights of which a reasonable officer would have known.

91. The municipal Defendants (City of Tucson and Pima County) are liable under *Monell* because the constitutional violations were caused by their policies, customs, and practices, including but not limited to: (a) the policy and custom of using § 4-13 administrative procedures (no evidence rules, preponderance standard, hearing officer) for cases seeking destruction; (b) the policy and custom of permitting or encouraging reliance on breed and "bite force" evidence in violation of A.R.S. § 11-1025(C); (c) the policy and custom of seeking post-hearing amendments to orders to defeat appellate review when the city court is divested of jurisdiction; (d) the failure to train officers and decision-makers on the constitutional requirements for animal seizures and destructions and on Arizona statutory limits; and (e) the custom of extracting escalating boarding fees from owners to maintain possession of animals held under defective or void processes.

92. The County Defendants' ongoing seizure and detention of Snuggles—property of Plaintiff—is an unreasonable seizure in violation of the Fourth Amendment and

24

a deprivation of property without due process of law in violation of the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

93. The continuing deprivation is jointly caused. The City is a moving force as the procurer of the void order who refuses to withdraw it or consent to release, and the County is a moving force as the custodian who refuses to release Snuggles. Each Defendant retains the independent ability to end the deprivation and has declined to exercise it. No Defendant may avoid liability under § 1983 by attributing the deprivation to the other.

94. Plaintiff does not seek review or reversal of any state-court judgment. She challenges Defendants' independent, ongoing conduct in seizing and detaining her property, and their threatened conduct with respect to it. Plaintiff's out-of-pocket losses—including the supersedeas bond and the boarding and kennel fees paid to keep Snuggles alive during his unlawful detention—are recoverable as compensatory damages under § 1983

95. As a direct and proximate result of Defendants' unreasonable seizures, Plaintiff has suffered and continues to suffer damages, including but not limited to the loss of use and companionship of Snuggles, emotional distress, the costs of the supersedeas bond and ongoing kennel fees, and other out-of-pocket and non-economic losses.

**B. COUNT II: 42 U.S.C. § 1983—Violation of the Fourteenth Amendment (Procedural Due Process)**

96. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as if fully set forth herein.

97. The Fourteenth Amendment prohibits states from depriving any person of life, liberty, or property without due process of law. A dog is "property" protected by the Due Process Clause. Permanent destruction of an owner's dog requires notice and a meaningful hearing appropriate to the gravity of the deprivation. Defendants have deprived Plaintiff of her protected property interest in Snuggles by seizing him, detaining him for more than nine months, and threatening his permanent destruction, without providing the process the Constitution requires.

98. The process provided was constitutionally inadequate under *Mathews v.*

25

*Eldridge*, 424 U.S. 319 (1976). The private interest is at its zenith (a beloved family companion facing irreversible death). The risk of error was enormous and was realized (wrong notice, wrong procedural track, suspended evidentiary rules, wrong burden, missing findings, prohibited evidence, invented "guarantee" standard, and void orders). The government's interest would have been fully served by its own graduated remedies and by providing constitutionally adequate pre-deprivation process. Instead, the government has forfeited the right to claim any government interest through its lawless conduct and extensive violations of Plaintiff's constitutional rights.

99. Independent of these procedural defects, Defendants also deprived Plaintiff of property without due process by conditioning the survival and return of Snuggles on payment. To prevent his destruction and keep him alive while she contested Defendants' actions, Plaintiff was forced to post a $3,600 supersedeas bond and to pay approximately $16,000 (and counting) in kennel and boarding fees—money exacted as the price of avoiding an unlawful deprivation and of housing property Defendants are unlawfully detaining. The government may not condition the preservation or return of property on payment it could not lawfully demand, nor retain sums exacted under a process that was constitutionally defective and, as to the November 24, 2025 and December 11, 2025 orders, void. Where money is exacted on the basis of an invalidated legal proceeding, due process requires its return; forcing Plaintiff to pay, and any refusal to refund, violates the Fourteenth Amendment. This coerced exaction is an unconstitutional condition imposed on Plaintiff's protected property interest.

100. Defendants' established procedures (the City's dangerous-animal ordinance framework and its application) created the deprivation. The pre-deprivation process was feasible and foreseeable. By failing to follow the very procedures Arizona law establishes as the process that is "due," Defendants violated Plaintiff's federal procedural due process rights.

101. The individual Defendants personally participated in and caused the due process violation through their direct involvement in the defective hearing, the issuance and

amendment of the void orders, the continued detention, and/or the ratification of the unconstitutional policies and practices. Their conduct violated clearly established due process rights.

102. Defendants are liable under *Monell* for the same policies, customs, and practices alleged herein, which caused the procedural due process violation.

103. The continuing deprivation is jointly caused. The City is a moving force as the procurer of the void order who refuses to withdraw it or consent to release, and the County is a moving force as the custodian who refuses to release Snuggles. Each Defendant retains the independent ability to end the deprivation and has declined to exercise it. No Defendant may avoid liability under § 1983 by attributing the deprivation to the other.

104. Plaintiff does not seek review or reversal of any state-court judgment. She challenges Defendants' independent, ongoing conduct in seizing and detaining her property, and their threatened conduct with respect to it. Plaintiff's out-of-pocket losses—including the supersedeas bond and the boarding and kennel fees paid to keep Snuggles alive during his unlawful detention—are recoverable as compensatory damages under § 1983.

105. As a direct and proximate result, Plaintiff has suffered and continues to suffer the damages.

**C.     COUNT III: 42 U.S.C. § 1983—Violation of the Fourteenth Amendment (Substantive Due Process / Arbitrary Deprivation and Ongoing Unlawful Detention)**

106. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as if fully set forth herein.

107. The Fourteenth Amendment's Due Process Clause protects against arbitrary, conscience-shocking deprivations of protected interests, including property.

108. Plaintiff pleads this substantive-due-process claim in the alternative. Where a specific constitutional provision governs Defendants' conduct, Plaintiff relies on that provision and does not ask the Court to duplicate her Fourth Amendment seizure claim under the rubric of substantive due process. This Count is directed principally at conduct the Fourth Amendment does not address: Defendants' extraction of the supersedeas bond

and escalating boarding fees as the price of keeping Snuggles alive, and their knowing propagation of a false narrative to the Board of Supervisors to justify the continued deprivation—arbitrary and oppressive conduct that shocks the conscience.

109.    Defendants' conduct shocks the conscience and violates substantive due process. They seized and have detained Snuggles for more than nine months, and continue to threaten his destruction, on the basis of a single provoked first bite, in reliance on evidence Arizona law forbids, through a procedurally defective hearing that used the wrong burden and rules, for which Plaintiff received no notice, and pursuant to orders that are void on their face. They have extracted escalating payments from Plaintiff as the price of keeping her dog alive under this unlawful regime. This course of conduct is arbitrary, irrational, and fundamentally unfair.

110.    The December 11, 2025 amended order is void. Defendants' continued detention and threatened destruction pursuant to a void order, after Plaintiff had already perfected her appellate rights, is arbitrary governmental action that bears no reasonable relation to any legitimate governmental interest and violates substantive due process.

111.    Defendants further shocked the conscience by profiting from their own unlawful conduct—extracting a bond and escalating boarding fees from Plaintiff as the price of keeping her dog alive under a void order and a defective process, and continuing to bill her each day the unlawful detention persists. Conditioning the life and return of Plaintiff's property on payments the government had no lawful basis to demand is arbitrary, oppressive, and fundamentally unfair, and bears no reasonable relation to any legitimate governmental interest. To the extent the exaction is analyzed as a monetary condition on a constitutional right, it independently offends the unconstitutional-conditions doctrine.

112.    The individual Defendants' personal participation in and ratification of this arbitrary conduct violated clearly established substantive due process rights.

113.    The municipal Defendants are liable under Monell for the policies, customs, and practices that authorized, encouraged, or failed to prevent this arbitrary deprivation.

114.    As a direct and proximate result, Plaintiff has suffered and continues to suffer

28

the damages alleged in paragraph 65, including ongoing emotional distress and financial burdens caused by the arbitrary and conscience-shocking nature of Defendants' conduct.

## VI.    MONELL MUNICIPAL LIABILITY & RATIFICATION

### A.    MUNICIPAL LIABILITY (42 U.S.C. § 1983): CITY OF TUCSON AND PIMA COUNTY

115.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

### 1.    *Legal standard*

116.    A municipality is a "person" subject to suit under 42 U.S.C. § 1983 and is liable when the execution of its own policy, custom, or practice inflicts the constitutional injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–94 (1978). A municipality cannot be held liable on a *respondeat superior* theory; liability attaches only for the entity's own deliberate conduct that is the moving force behind the violation.

117.    Municipal fault may be shown in any of several independent ways, pleaded here in the alternative: (a) an express policy or a longstanding custom or practice; (b) a single decision by an official with *final policymaking authority*, which is itself municipal "policy,"; (c) ratification by a final policymaker of a subordinate's act and its basis; or (d) a failure to train or supervise amounting to deliberate indifference. Whether a particular official is a "final policymaker" is a question of state and local law, specific to the function at issue.

### 2.    *The City of Tucson*

118.    The City, acting under color of state law, set in motion and has persisted in the seizure, prolonged detention, and threatened destruction of Snuggles under a process and an order that are void as a matter of law. The constitutional deprivations were not the isolated act of a line employee. They were caused by, and carried out pursuant to, the City's policies and the decisions of its final policymakers: the City noticed the proceeding under one Code section and adjudicated it under another that authorizes no destruction (Tucson City Code §§ 4-11, 4-13); it obtained a destruction order citing the wrong provision; and,

after Plaintiff posted a supersedeas bond and perfected review, it entered a post-jurisdictional "amended" order swapping the legal basis—an act beyond the city court's authority and therefore void.

119.   The City is therefore liable under *Monell* for (i) its policy and practice of pursuing dangerous-animal seizures and destruction orders through the defective §§ 4-11/4-13 process described above; (ii) the decisions of its final policymakers to obtain, and to persist in enforcing and refusing to withdraw, an order void for want of jurisdiction; and (iii) its ratification of that conduct. Each was a moving force behind the continuing deprivation of Plaintiff's Fourth and Fourteenth Amendment rights and her resulting out-of-pocket losses.

### 3.    *Pima County*

120.   Pima County, through the Pima Animal Care Center, has detained Snuggles continuously since shortly after his October 7, 2025 seizure and has billed Plaintiff escalating boarding fees as the price of keeping him alive. The County is liable under *Monell* for its own policies, customs, and practices governing the detention and disposition of animals seized by or on behalf of the City—including a policy or practice of continuing to detain, and preparing to destroy, an animal on the basis of municipal orders without regard to whether those orders have ever been valid, in force, or has been stayed, and without any independent process afforded to the owner. The County's continued detention is a distinct, ongoing deprivation for which it is independently responsible; it may not shelter behind the City's void order.

121.   Pima County acted through officials with final policymaking authority for the detention and disposition of animals held at PACC, and it has ratified the unconstitutional deprivation. Whether a particular official is a final policymaker for the County is a question of Arizona and local law and of the specific function at issue. After receiving Plaintiff's demand, the County Attorney—through the officials responsible for PACC's custodial and disposition decisions—made the affirmative, informed choice to continue detaining Snuggles and to decline his release, adopting as the County's own position that it would

hold the animal on the basis of a municipal order without regard to that order's validity and without affording any independent process. The County's recent routing of public inquiries about Snuggles to a civil-asset-forfeiture detective, though no forfeiture proceeding exists, further reflects a County custom of treating Plaintiff's family pet as forfeitable property without process.

122.   It is the height of irony that the Pima County Attorney has publicly joined a national coalition dedicated to combating "federal overreach" and unlawful exercises of governmental power,[2] all while officials within her very office—and her fellow Pima County colleagues and the City Attorney's office—are engaged in the very same conduct against Plaintiff: the knowing enforcement of a void order, the deprivation of constitutional rights without due process, and other clear abuses of authority that exceed any lawful mandate. One might have hoped that a prosecutor so attuned to the dangers of governmental excess would first address the overreach occurring within her own jurisdiction before decrying it elsewhere. Apparently, constitutional limits on power are a principle of convenience, not conviction.

**B.    MUNICIPAL LIABILITY (42 U.S.C. § 1983): RATIFICATION BY FINAL POLICYMAKER (CITY OF TUCSON)**

123.   Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

124.   Municipal liability attaches through ratification where an official with final policymaking authority approves both a subordinate's decision and the basis for it; that approval is a deliberate choice chargeable to the municipality. In the Ninth Circuit, ratification requires that the authorized policymaker make a conscious, affirmative choice to endorse the subordinate's act *and* its improper basis, with knowledge of the alleged constitutional violation; a mere failure to overrule or discipline, without more, does not

---

[2]   Pima County attorney joins national coalition against federal overreach, https://www.kvoa.com/news/local/pima-county-attorney-joins-national-coalition-against-federal-power/article_757cbce0-83f8-4878-a797-7d05b76fac0b.html (last visited Jan. 28, 2026).

suffice.

125. On July 14, 2026, Principal Assistant Prosecuting City Attorney Mari L. Worman wrote to Plaintiff's counsel: "I have been advised by my superiors that we will not comply with your requests at this time as the matter is before the Court of Appeals and the animal is not in our custody." A true and correct copy is attached as **Exhibit J**. Plaintiff's "requests," set out in the July 6, 2026 demand letter described below, were that the City consent to Snuggles' release under A.R.S. § 11-1014, take no step toward his destruction or transfer, and preserve all records under a litigation hold. On information and belief, the "superiors" who directed non-compliance are Deputy City Attorney Alan L. Merritt and Tucson City Attorney Roi Lusk.

126. Those officials had been placed on direct written notice. On July 6, 2026—eight days before the refusal—Plaintiff's counsel served a detailed demand letter on the Tucson City Attorney's Office by email, expressly copied to City Attorney Roi Lusk and Deputy City Attorney Alan L. Merritt. Exhibit F. That letter laid out, in painstaking detail and with supporting authority, the precise grounds establishing that the destruction orders are void: the city court's loss of jurisdiction upon Plaintiff's perfection of review and posting of the supersedeas bond (rendering the December 11, 2025 "amended" order void when entered); the City's own written concession that § 4-13 "does not authorize destruction" thus rendering the November 24, 2025 order void, exposing the notice-and-charge defect; and the reliance on breed and breed-attributed "bite force," evidence A.R.S. § 11-1025(C) forbids. The letter also expressly demanded that the City preserve all records under a litigation hold and take no step to euthanize Snuggles, and it asked the office to confirm in writing whether it represented the individual officials in their personal as well as official capacities.

127. With that knowledge, the City's final policymakers made the affirmative, informed choice to refuse: they would not consent to release, would not confirm the capacity of their representation, and would not commit to preserve evidence, and instead directed—through Ms. Worman—that the City "will not comply."

32

128. The City's ratification was not a passive failure to intervene. Presented with (a) the jurisdictional defect rendering the December 11 order void, (b) the significant notice and process defects in the underlying proceeding, and (c) Plaintiff's specific requests to withdraw the order, consent to release, and preserve evidence, the City—through officials with final policymaking authority—elected to persist. By adopting the subordinate's conduct and its stated basis as the City's own official position, the City of Tucson ratified that conduct.

129. The City's ratification was a moving force behind, and proximately caused, the continuing deprivation of Plaintiff's Fourth and Fourteenth Amendment rights—including the ongoing unlawful seizure and threatened destruction of Snuggles and the out-of-pocket losses Plaintiff has incurred to preserve him during the unlawful detention. Because the deprivation resulted from the decision and ratification of officials exercising final policymaking authority for the City, the City of Tucson is liable under 42 U.S.C. § 1983.

## C. MUNICIPAL LIABILITY (42 U.S.C. § 1983): PIMA COUNTY'S DECISION TO DETAIN AND REFUSE RELEASE—AND, IN THE ALTERNATIVE, RATIFICATION

130. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

131. A single decision by an official with final policymaking authority is itself municipal "policy." A municipality is independently liable when a final policymaker, with knowledge of a constitutional violation, makes a conscious and affirmative choice to approve both a subordinate's act and the basis for it. Mere failure to overrule or discipline is not enough. Whether a particular County official holds final policymaking authority over the release and disposition of impounded animals is a question of Arizona and local law.

132. Pima County, through the Pima Animal Care Center, has held Snuggles in continuous custody since shortly after his October 7, 2025 seizure. On July 6, 2026, Plaintiff's counsel served a written demand on the County (Exhibit G), placing the County

33

on clear notice of the same fatal defects already detailed to the City: the city court's loss of jurisdiction upon Plaintiff's perfection of review and posting of the supersedeas bond; the resulting voidness of the December 11, 2025 "amended" order; the City's written concession that Tucson City Code § 4-13 authorizes no destruction whatsoever; and Defendants' reliance on breed and "bite force" evidence that A.R.S. § 11-1025(C) expressly forbids. The demand expressly sought Snuggles' release under A.R.S. § 11-1014.

133. Despite that notice, the County has refused to release Snuggles. It has continued to detain him. And it has continued to assess escalating boarding and kennel charges against Plaintiff. This is not passive. The continued detention, the refusal of the statutory release demand, and the ongoing imposition of fees are each affirmative exercises of the County's custodial authority.

134. *Primary Theory—Direct Liability*. The County's decision to continue detaining Snuggles and to refuse his release—made by the County official or body vested with final authority over the disposition and release of impounded animals—is itself the County's policy and an independent basis for municipal liability. Because the detention is the County's own act as custodian, the County's liability does not depend on ratification of any other actor's conduct.

135. *Alternative Theory—Ratification*. To the extent the initial seizure or detention is attributed to a subordinate, the County's final policymaker, with actual knowledge of the constitutional defects from Plaintiff's demand, made a conscious and affirmative choice to approve both the detention and its unlawful basis—by refusing the release demand, persisting in the detention, and continuing to charge Plaintiff—and thereby ratified that conduct.

136. This is not the mere failure to overrule or discipline. It is affirmative and ongoing: the refusal of a specific statutory release demand, coupled with continued detention and the active assessment of fees, is a deliberate decision to persist with knowledge of the violation. The County's "hands are tied" justification does not defeat

liability. It confirms the deliberate choice to persist.

137.    The County's decision and ratification were a moving force behind, and proximately caused, the continuing deprivation of Plaintiff's Fourth and Fourteenth Amendment rights — including the ongoing unlawful detention of Snuggles and the out-of-pocket losses Plaintiff has incurred to preserve him. Because the deprivation resulted from the decision and ratification of the official(s) exercising final policymaking authority for the County, Pima County is liable under 42 U.S.C. § 1983.

## VII.    THIS COURT'S JURISDICTION IS NOT BARRED BY ABSTENTION, THE ROOKER-FELDMAN DOCTRINE, OR PRECLUSION

138.    This action is not barred by the Rooker-Feldman doctrine, which is confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. The doctrine has no application here for two independent reasons. First, there is no final state-court judgment: Plaintiff perfected review by posting a supersedeas bond and filing her special action, the destruction order is stayed, and the matter remains pending on appeal. In the Ninth Circuit, Rooker-Feldman applies only where the federal suit is filed after the state proceedings have "ended," and a state proceeding has not "ended" while it remains pending on appeal.

139.    Second, Plaintiff does not complain of any error by the Arizona courts and seeks no review or reversal of any state-court order; she challenges Defendants' own ongoing conduct—their continued detention and threatened destruction of Snuggles. A suit targeting the wrongful conduct of an adverse party, rather than an erroneous state-court decision, is not a forbidden *de facto* appeal. That Plaintiff's claims may require the Court to conclude that the November 24, 2025 and December 11, 2025 orders are void does not implicate the doctrine, because a federal plaintiff may present an independent claim even if it denies a legal conclusion a state court reached.

140.    *Younger* abstention likewise does not apply. *Younger* is a narrow exception

35

to the district court's "virtually unflagging" obligation to exercise the jurisdiction given to it, reserved for three exceptional categories of state proceedings: ongoing criminal prosecutions, certain civil-enforcement proceedings "akin to a criminal prosecution," and civil proceedings involving orders uniquely in furtherance of the state courts' ability to perform their judicial functions. A municipal dangerous-animal proceeding fits none of them. It is not a criminal prosecution; it does not sanction Plaintiff for a wrongful act but adjudicates the status of an animal, particularly on a provoked, first-time incident; and it involves no order in aid of the state courts' judicial functions. Because the proceeding falls outside all three categories, the presence of an important state interest cannot itself support abstention.

141. Even if a *Younger* category could be thought to apply, abstention would not warrant dismissal of this action. *Younger* does not authorize dismissal of Plaintiff's claims for damages; at most such claims are stayed pending completion of the state proceeding. Next, even where a municipal enforcement proceeding is at issue, a Fourth Amendment claim challenging the reasonableness of a seizure is severed from any abstention and proceeds.

142. Abstention is independently inappropriate because Defendants have proceeded in bad faith. With knowledge of the jurisdictional defects voiding the December 11 and November 24, 2025 orders and after receiving Plaintiff's demand, Defendants' officials propagated a materially false narrative of the October 7, 2025 incident to the Pima County Board of Supervisors—assertions the bite victim herself came forward, in writing, to refute—in order to justify their continued detention and threatened destruction of Snuggles. Bad faith and harassment are recognized exceptions to *Younger*.

143. Nor is this action barred by claim or issue preclusion. Under 28 U.S.C. § 1738, a state-court judgment receives the preclusive effect it would have under Arizona law, and Arizona preclusion requires, among other elements, a final judgment on the merits and an identity of the parties or their privies. Neither requirement is satisfied. The City of Tucson has conceded in the Court of Appeals, Division II, that no final judgment exists. In addition,

Plaintiff's federal constitutional and § 1983 claims—including her *Monell* and damages claims—were neither raised nor could have been litigated in the municipal dangerous-animal proceeding. Finally, to the extent any Defendant contends the destruction order is preclusive, that order remains under appellate review, and its validity is the very matter now pending before the Lower Court of Appeals in the Superior Court and the Arizona Court of Appeals.

## VIII.     GROUNDS FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

144.    Plaintiff realleges and incorporates by reference all preceding paragraphs. As part of this verified pleading, Plaintiff applies under Federal Rule of Civil Procedure 65 for two forms of injunctive relief to prevent the irreversible destruction of Sergeant Snuggles and to end the ongoing unlawful seizure of Plaintiff's property: a temporary restraining order preserving the status quo, and a preliminary injunction. Both forms of relief are directed solely at Defendants' own ongoing and threatened conduct, and neither asks this Court to review, set aside, or enjoin enforcement of any state-court order.

### A.     Temporary Restraining Order Is Warranted (Fed. R. Civ. P. 65(b)).

145.    A temporary restraining order preserves the status quo and prevents immediate and irreparable harm during the brief period needed to convene a preliminary-injunction hearing. The movant must make the same four-factor showing that governs a preliminary injunction—a likelihood of success on the merits, a likelihood of irreparable harm, that the balance of equities tips in her favor, and that relief serves the public interest, *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)—and, where the order is sought without notice, must additionally satisfy the requirements of Rule 65(b)(1).

146.    A restraining order is warranted here. The threatened euthanasia of Snuggles is imminent and, once carried out, irreversible; no later judgment could restore him. Defendants have refused Plaintiff's demand to return Snuggles and to forgo his destruction. The continued, day-by-day detention is itself an ongoing seizure that inflicts fresh injury each day it persists, compounded by Snuggles' behavioral and psychological deterioration

and by the active distemper outbreak at the facility where he is held. This is precisely the immediate, irreparable injury a temporary restraining order exists to prevent.

147. The narrow relief sought—an order prohibiting all Defendants from euthanizing, destroying, or otherwise harming Snuggles—preserves the status quo for the short time needed to hold a preliminary-injunction hearing and imposes no cognizable burden on Defendants, who have no legitimate interest in destroying an animal on grounds Arizona law forbids. Should destruction become imminent before Defendants can be heard, Plaintiff will seek the order on the verified showing and written attorney certification required by Rule 65(b)(1); in all events, the order is warranted on notice. The requested restraint runs only against Defendants' threatened conduct and does not disturb any state-court order.

**B.    A Preliminary Injunction Is Warranted (Fed. R. Civ. P. 65(a)).**

*1.    Release and Return of Snuggles to Plaintiff*

148. Plaintiff also seeks a preliminary injunction as a prohibitory order barring the destruction of Snuggles during the pendency of this action and directing his return to Plaintiff—or his transfer to a placement of her choosing on reasonable conditions—to end the ongoing seizure. The prohibitory relief requires only the ordinary *Winter* showing. To the extent the Court deems the second requested relief as the mandatory relief, though subject to a heightened standard, it is warranted because the law and facts clearly favor Plaintiff.

149. First, Plaintiff is likely to succeed on the merits. Seizing, holding, and destroying a dog are Fourth Amendment seizures that must be reasonable, and there was no reasonable basis to treat Snuggles as dangerous on a single provoked bite proved through breed evidence Arizona law forbids. The permanent destruction of Plaintiff's property was pursued without the notice, hearing, correct burden of proof, or findings due process requires, the December 11, 2025 order on which Defendants rely is void for lack of jurisdiction, and the November 24, 2025 order is premised on an ordinance that authorizes no merits-destruction, leaving Defendants no lawful authority for the continued detention

or the threatened destruction.

150. Second, Plaintiff will suffer irreparable harm absent relief. Snuggles is a unique, irreplaceable family companion whose destruction cannot be undone or remedied by money; the ongoing unlawful detention is a continuing deprivation of Plaintiff's property and constitutional rights that no damages award fully repairs; and the deprivation of constitutional rights is itself irreparable injury. *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

151. Third and fourth, the balance of equities and the public interest favor relief. Plaintiff's interest in the life and companionship of her dog, and in the vindication of her constitutional rights, is profound; Defendants have no legitimate interest in continuing an unlawful seizure, in holding Snuggles under a void order, or in extracting payments under a defective process. Where the government is the opposing party these factors merge, the public interest always favors the enforcement of constitutional rights.

152. The mandatory component—Snuggles' return—is properly granted because the void order and the absence of any lawful basis to hold him make Plaintiff's right clear, and because the continuing seizure inflicts serious, accruing harm. Because an order preserving an animal's life and returning him to secure home conditions imposes no monetary loss on Defendants, and because Plaintiff has exhausted her resources to keep Snuggles alive, any security under Rule 65(c) should be nominal or excused.

### 2.    *Disclosure of Information*

153. Additionally, throughout Snuggles' detention, Defendants have refused to provide Plaintiff, his lawful owner, with any information concerning his health, condition, care, location, or continued survival, and have failed to respond to Plaintiff's written requests, including a request for public records under A.R.S. § 39-121 *et seq.* This refusal is not an isolated lapse but a continuing course of conduct that has persisted despite repeated demand.

154. Plaintiff has no adequate remedy at law for this ongoing deprivation. Because Snuggles is a living animal held entirely within Defendants' control and under a threatened

destruction order, Defendants' refusal to disclose his condition inflicts a continuing, irreparable injury that damages cannot repair: Plaintiff is denied any means of confirming that Snuggles is alive and well or of acting to protect him before an irreversible harm occurs.

155.    The balance of hardships and the public interest both favor permanent relief. Defendants already possess the information and are legally obligated to preserve and disclose it; requiring them to do so imposes no cognizable burden, while serving the public interest in transparency and in the humane, accountable treatment of an animal held in government custody. Absent a injunctive relief, Defendants' pattern of nondisclosure will continue.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jennifer Evancho respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

**A.    Injunctive Relief (TRO, Preliminary and Permanent):**

(1)    A temporary restraining order and preliminary and permanent injunction prohibiting all Defendants, their officers, agents, employees, and all persons acting in concert with them from euthanizing, destroying, or otherwise harming Sergeant Snuggles;

(2) A temporary restraining order and preliminary and permanent injunction requiring all Defendants to immediately return Sergeant Snuggles to Plaintiff's custody and control, or, in the alternative, to transfer him to a facility or placement of Plaintiff's choosing pending final resolution of all proceedings, under such reasonable conditions as the Court may impose to protect public safety (conditions Plaintiff is prepared to meet and has always been willing to meet);

(3)    A temporary restraining order and preliminary and permanent injunction requiring all Defendants to (1) confirm in writing that Snuggles is alive and disclose his current location and physical condition; (2) provide reasonable, periodic written updates (including proof of life) on his condition and care during the pendency of

this action for so long as he remains in Defendants' custody; (3) permit a welfare inspection of Snuggles by Plaintiff or Plaintiff's designated veterinarian on reasonable notice; and (4) preserve all records concerning Snuggles' custody, care, and condition.

(4)     A temporary restraining order and preliminary and permanent injunction prohibiting all Defendants from continuing to detain Snuggles or from billing or collecting any further fees or charges related to his detention; and

(5)     A temporary restraining order and preliminary and permanent injunction prohibiting all Defendants from spoliating and destroying evidence germane to this matter, the care and confinement and condition of Snuggles since October 7, 2025 to the present;

(5)     Such other injunctive or equitable relief as the Court deems just and proper to remedy the ongoing constitutional violations and prevent irreparable harm.

B.  **Declaratory Judgment:** A judgment declaring that all Defendants violated Plaintiff's rights under the Fourth and Fourteenth Amendments by seizing, detaining, and threatening to destroy Sergeant Snuggles without constitutionally adequate justification or process, and that Defendants lack lawful authority to continue detaining Sergeant Snuggles or to carry out his destruction.

C.  **Compensatory Damages:** An award of compensatory damages against the City of Tucson and Pima County, jointly and severally, in an amount to be determined at trial, including but not limited to:

(1)     The $3,600 supersedeas bond and all kennel, boarding, and related fees paid to date (approximately $16,000 and continuing to accrue);

(2)     The approximately $15,000 in professional rehabilitation and training costs necessary to restore Snuggles to as close to his pre-violation condition as possible;

(3)     Emotional distress damages, including the profound anguish caused by the seizure of a beloved family companion, more than nine months of forced separation, the constant threat of irreversible death, and the ordeal of fighting to keep Snuggles

41

alive; and

(4)   All other out-of-pocket losses and consequential damages caused by Defendants' unconstitutional conduct.

D. **Punitive Damages:** An award of punitive damages against the individual Defendants (Does 1–10) in an amount sufficient to punish and deter, because their conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff's clearly established constitutional rights.

E. **Attorney's Fees and Costs:** An award of reasonable attorney's fees and costs under 42 U.S.C. § 1988 and any other applicable authority.

F. Such other and further relief as the Court deems just and equitable.

DATED this July 17, 2026.

/s/ Christina E. Ponig
*Christina Ponig*
Christina E. Ponig *(Admitted Pro Hac Vice)*
*-and-*
*William B. Thomas* [AZ Bar. No. 039456]
MCDOWELL HETHERINGTON, LLP
*Attorneys for Jennifer Evancho*

42