Christina E. Ponig (*Admitted Pro Hac Vice*)
FLETCHER HELD, PLLC
808 Travis Street, Suite 1553
Houston, Texas 77002
713-255-0422 (phone) / 713-255-0419 (fax)
cmaccio@fletcherheld.com
-and-
William B. Thomas (State Bar No. 039456)
McDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2400
Houston, TX 77002
713-337-5580 (phone) / 713-337-8850 (fax)
william.thomas@mhllp.com

Attorneys for Plaintiff Jennifer Evancho

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| Jennifer Evancho,<br><br>Plaintiff,<br>vs.<br><br>City of Tucson, a municipal corporation; Pima County, a political subdivision of the State of Arizona; Jan Lesher, in her official capacity as Pima County Administrator; Steve Kozachik, in his official capacity as Director of Pima Animal Care Center; Officer Mills, Badge No. 3424, in her individual capacity; Officer Estrella, Badge No. 3298, in his individual capacity; Officer J. Jacobus, Badge No. 3369, in his individual capacity, Does 1 through 10, in their individual and official capacities as Animal Control Officers, Supervisors, and employees of the City of Tucson and/or Pima County responsible for the seizure, detention, and threatened destruction of Sergeant Snuggles,<br><br>Defendants. | No. 4:26-cv-00363-RM<br><br>**VERIFIED FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983** |

Plaintiff Jennifer Evancho ("Evancho" or "Plaintiff"), by and through her undersigned counsel, files this Verified First Amended Complaint against the above-named Defendants and alleges as follows:

# I. INTRODUCTION

1. Plaintiff Jennifer Evancho brings this action under 42 U.S.C. § 1983 to end the ongoing seizure of her dog, Sergeant Snuggles, and to recover damages for the seizure, detention, and threatened destruction of that property. The Declaration of Jennifer Evancho accompanies this First Amended Complaint at Exhibit A.

2. On October 7, 2025, officers took Sergeant Snuggles from Plaintiff's property without a warrant. They presented a Pima County "Quarantine Transport Agreement," struck through the block authorizing seizure, and set a quarantine release date of October 17, 2025. Plaintiff attempted to redeem him before that date. He was not released before or after that date. He has remained in the custody of Pima Animal Care Center since that day.

3. No judicial order or ordinance authorized the taking or the detention between October 7 and November 24, 2025. Tucson City Code § 4-10 permits impoundment only of an animal found in plain view or taken under a search warrant on probable cause of specific, defined conditions. A.R.S. § 11-1014(A) requires pound confinement of an unvaccinated biting dog; Defendants recorded the same day that he was current on vaccines. The later City Court orders, which remain on appeal in Arizona Court of Appeals No. 2 CA-CV 2026-0137, are not the source of the October 7 seizure and are not the claims Plaintiff asks this Court to review.

4. Rather than release him, the City and the County have turned Plaintiff's effort to recover her dog into a game of institutional keep-away. The City procured the destruction order and defends it in court, yet now claims its hands are tied because Snuggles is "not in [its] custody." The County holds Snuggles in its kennel, yet claims its hands are tied by the very order the City procured—and could disclaim or decline to enforce at will. Each points to the other. Neither will act. Snuggles pays for the finger-pointing with every additional day of confinement. That runaround is not a defense—it *is* the violation. The Constitution does not permit two governments to deprive a family of its property indefinitely while each hides behind the other.

5. The Fourth Amendment forbids unreasonable seizures of "effects." Seizing,

holding, and threatening to destroy a family dog without genuine, evidence-based justification is unreasonable. This includes warrantless seizures, which are *per se* unreasonable. The Fourteenth Amendment forbids depriving any person of property without due process of law. When government officials not only violate these rights but then spread false narratives to the public and elected officials to defend their conduct, the violation becomes arbitrary and conscience-shocking.

6. Plaintiff also challenges, on their face, the Tucson City Code provisions that authorize destruction of a companion animal without the individualized evaluation the same Chapter requires before a muzzle order, that treat property damage alone as a predicate for killing an animal, and that permit destruction of a forfeited animal with no criteria, no stay pending review, and no notice. Those provisions are municipal policy. Plaintiff continues to own a second dog on the same property and which could become subject to the same Code.

7. Since their wrongful seizure of Snuggles Defendants have held him in prolonged, day-by-day unlawful detention while billing Plaintiff escalating fees simply to keep her dog alive. Even after receiving a detailed demand letter exposing the constitutional defects of the entire process to which Plaintiff has been subjected, Defendants continue to detain Snuggles, threaten his destruction, and extract money under color of a process and an order that cannot lawfully support their actions.

8. Plaintiff has no adequate remedy at law for the ongoing constitutional deprivations, the threat of permanent loss, or the daily emotional devastation inflicted on her and her family. Money cannot restore the irreplaceable bond between a family and its loyal companion animal—a bond the Ninth Circuit has recognized carries special weight and cannot be treated as ordinary chattel.

9. Plaintiff does not ask this Court to reverse, vacate, or sit in review of any Arizona court order. She seeks (1) an order ending Defendants' own ongoing seizure and detention of her property which they procured through a warrantless seizure and through a constitutionally defective process, (2) prospective injunctive relief against enforcement of

the challenged Code provisions, and (3) damages.

## II. JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and (4) (civil rights actions). Plaintiff's claims arise under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

11. Venue is proper in the United States District Court for the District of Arizona, Tucson Division, under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district; all Defendants reside in or do business in this judicial district; and the property at issue (Sergeant Snuggles) is located in this judicial district.

12. Plaintiff does not ask this Court to review, vacate, set aside, or declare invalid any order of any Arizona court. The claims pled here arise from Defendants' own conduct: the warrantless taking on October 7, 2025; the detention after the October 17, 2025 release date that Defendants themselves set; the written notices Defendants prepared and served; the Tucson City Code provisions the City enacted and continues to enforce; and Defendants' refusal to exercise release authority independently conferred by A.R.S. § 11-1014. Those claims can be adjudicated without disturbing any state-court determination. Questions concerning the November 24 and December 11, 2025 City Court orders are before the Arizona Court of Appeals, Division Two, No. 2 CA-CV 2026-0137. Plaintiff reserves, and does not waive, any claim that depends on those orders being vacated or reversed, and will seek leave to amend if that occurs.

## III. PARTIES

13. Plaintiff Jennifer Evancho is a resident of Tucson, Pima County, Arizona. She is the owner and devoted guardian of Sergeant Snuggles. She brings this action individually and on behalf of her family's interest in Snuggles' life, companionship, and return.

14. Defendant City of Tucson is a municipal corporation organized under the laws of the State of Arizona. At all relevant times, it acted under color of state law through its animal control officers, prosecutors, and other employees and agents. It maintains policies,

customs, and practices governing dangerous-animal proceedings, animal seizures, detentions, and dispositions, including the policies and practices that caused the constitutional violations alleged herein. It is sued for its own unconstitutional policies, customs, and practices under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and for the conduct of its final policymakers and employees. The City of Tucson has appeared in this action through counsel.

15. Defendant Pima County is a political subdivision of the State of Arizona. It operates the Pima Animal Care Center ("PACC"), where Snuggles has been detained since shortly after his seizure. At all relevant times, Pima County acted under color of state law through its animal-care employees, supervisors, and agents responsible for Snuggles' continued detention, care, billing, and the threatened implementation of any destruction order. It maintains policies, customs, and practices governing the detention and disposition of animals seized by or on behalf of the City of Tucson or under municipal orders. It is sued under *Monell* for its policies, customs, and practices that caused the constitutional violations, and for the conduct of its employees acting in their official capacities. Defendant Pima County has appeared in this action through counsel.

16. Defendant Jan Lesher is Pima County Administrator. Defendant Lesher is named solely in her official capacity and solely for purposes of declaratory and injunctive relief. No claim for damages is asserted against her individually. Lesher can be served with service of process at Pima County Administration Building, 130 W. Congress St., Administrator's Office, Tucson, Arizona 85701.

17. Defendant Steve Kozachik is Director of PACC. Defendant Kozachik is named solely in his official capacity and solely for purposes of declaratory and injunctive relief. No claim for damages is asserted against him individually. Kozachik can be served with service of process at Pima Animal Care Center, 4000 N. Silverbell Road, Tucson, Arizona 85745.

18. Defendant Officer Mills, badge number 3424, is an animal control officer employed by Pima County and/or the City of Tucson. Officer Mills responded to Plaintiff's

property on October 7, 2025, presented Plaintiff with the Quarantine Transport Agreement described herein, took custody of the animal, and transported him to PACC. Officer Mills is sued in individual capacity.

19. Defendant Officer Estrella, badge number 3298, is an animal control officer employed by Pima County and/or the City of Tucson. Officer Estrella responded to Plaintiff's property on October 7, 2025 and participated in the seizure of the animal. Officer Estrella is sued in individual capacity.

20. Defendant Officer J. Jacobus, badge number 3369, is a Field Services Officer employed by Pima County and/or the City of Tucson. Officer Jacobus executed and served the Impoundment and Bond Notice described herein on October 11, 2025. Officer Jacobus is sued in individual capacity.

21. Officer Mills and Officer Estrella are sued in their individual capacities for the October 7, 2025 taking and transport alleged in Count I(A). Officer Jacobus is sued in his or her individual capacity for executing and serving the October 11, 2025 Impoundment and Bond Notice alleged in Count I(A). Punitive damages are sought against these individual Defendants only. No official-capacity damages claim is asserted against them.

22. Defendants DOES 1 through 10 are individuals sued in their individual and official capacities. They are or were, at all relevant times, supervisors or managers of the City of Tucson and/or Pima County (including PACC) who participated in, authorized, ratified, or failed to prevent: (a) the seizure of Snuggles on or about October 7, 2025; (b) Snuggles' continued day-to-day detention, care, and housing at PACC or other facilities from October 2025 through the present; (c) the decision to pursue destruction, to bill Plaintiff escalating kennel and boarding fees, to require and maintain the supersedeas bond, and/or to threaten or prepare to carry out euthanasia; and (d) the implementation or ratification of the policies, customs, and practices alleged herein.

23. Plaintiff is informed and believes, and on that basis alleges, that the true names and capacities of Does 1 through 10 are presently unknown. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Each Doe is sued

individually for his or her personal involvement in the constitutional violations and in his or her official capacity for purposes of injunctive and declaratory relief. The conduct of each Doe was undertaken under color of state law and pursuant to the policies, customs, or practices of the City of Tucson and/or Pima County.

## IV. FACTUAL ALLEGATIONS

### A. Sergeant Snuggles and the Evancho Family

24. Sergeant Snuggles ("Snuggles") is an Anatolian Shepherd dog whom Plaintiff and her family welcomed into their home when he was approximately nine months old. Declaration of Jennifer Evancho ("Evancho Decl.") attached as **Exhibit A**, at ¶¶3.

25. Plaintiff's family already had one Anatolian Shepherd, Coyoki (a female then approximately 14 months old), who guarded their livestock, property, and family on rural land in Pima County abutting a dry backwash that serves as a corridor for wildlife, including coyotes, bobcats, mountain lions, and javelina. Coyoki had been attacked by a coyote while protecting chickens, and the family sought a companion guard dog, Snuggles, to increase safety for the animals, property, and family. *Id.* at ¶¶4-5. Snuggles provided critical security and peace of mind. With wildlife frequently on the property, Plaintiff felt safer at night knowing Snuggles and Coyoki were by her side.

26. Snuggles was named by Plaintiff's children, who observed his affectionate nature and said he loves to snuggle with them. Plaintiff's husband added "Sergeant" to reflect his role as a protector, consistent with the family's military background. From the moment he arrived, Snuggles brought immediate joy to the Evancho family. He and Coyoki became inseparable playmates and partners in guarding the property; Snuggles quickly became far more than a guard dog. He was a gentle, loving, and intuitive family member—"like a son" to Plaintiff and her husband and "a brother" to the children.

27. In short, Snuggles is an irreplaceable, beloved member of the Evancho family whose seizure, prolonged separation, and threatened destruction have caused—and continue to cause—profound and irreparable harm to Plaintiff and her family.

### B. The October 7, 2025 Incident–A Negligently Provoked, First-Time Bite with No Prior History; Seizure and Initial Detention

28. Prior to October 7, 2025, Snuggles had never bitten or attempted to bite any person or animal. He had no history of aggression. Plaintiff had "never had any concerns with him" and had "never [seen] a growl [or] snarl." Hr'g Tr. (Nov. 24, 2025), attached as **Exhibit B**, at 106:15-25.

29. On October 7, 2025, Snuggles bit Plaintiff's mother, Clara Gastelum, causing injury. This was a single, isolated incident—the first and only bite in his life. Ex. A at ¶10.

30. Ms. Gastelum negligently provoked the bite under a confluence of highly dysregulating stressors. On that day, Snuggles (then an intact young male) was already distressed: a female dog (Coyoki) was in heat, he had not eaten for days, other dogs were barking, coyotes were active in the area, and he was startled by Plaintiff's mother inadvertently while in this heightened state. Plaintiff's mother has conceded that she inadvertently startled Snuggles while he was in this state and provoked the incident. Ex. B at 71:25-72:4; *see also* 81:3–12; 83:20-84:1, 91:1-17.

31. Before any officer arrived at the property, Plaintiff had confined Snuggles within the fenced enclosure on the east side of the property. Defendants recorded that the responding fire captain reported "the dog was confined in a high horse fenced yard on the property," and recorded their own observation of "a large male Anatolian Shepard brown brindle/white walking the fence line confined in what appeared to be a horse pasture enclosure on the east side." Ex. K at 2-3/26.

32. At approximately 7:37 a.m. on October 7, 2025, Defendants Mills and Estrella arrived at the property.

33. No officer sought a search warrant before taking the animal, and no officer applied for one.

34. Officer Mills and Estrella told Plaintiff that the animal "will need to go to PACC for a precautionary 10-day quarantine," and recorded that statement in their report. Ex. K at 2/26.

35. The officers then presented Plaintiff with a preprinted Pima County Animal Care form captioned “QUARANTINE TRANSPORT AGREEMENT.” Ex. K at 9/26

36. The block of that form reciting authority “to come upon my property and seize the animal” is struck through with an X, left blank, and signed by no one. The block by which an owner elects not to redeem the animal is likewise blank and unsigned.

37. The single block Plaintiff executed reads: “I WILL REDEEM this animal on the release date at the Pima Animal Care Center and will pay all pound fees due. I understand that my animal may be euthanized if not redeemed by 5:00 pm on the quarantine release date.” *Id.*

*38.* In a bolded, preprinted field, the form fixes the “Quarantine release date: 10/17/25.” The form is signed and dated October 7, 2025 at 12:00 p.m., and bears badge numbers 3424 and 3298. *Id.*

39. The only jeopardy the instrument discloses arises from the owner's own failure to appear. Nothing on the form states, suggests, or warns that the animal would be withheld from Plaintiff if she did appear.

40. No officer entered the fenced enclosure to take the animal. Defendants recorded that “Jennifer was willing and able to walk Sargent Snuggles on a leash to the PACC truck and assisted,” and that the transport occurred “with no incident.” Ex. K at 2-3/26.

41. A.R.S. § 11-1014(A) requires pound or veterinary confinement of “[a]n unvaccinated dog or cat that bites any person.” For a properly vaccinated animal, the statute provides that it “may be confined and quarantined at the home of the owner.”

42. Snuggles was currently vaccinated against rabies at the time of the seizure. Ex. N. In the same log entry that records the transport, Defendants wrote that “Officer Mills received emails from Pegasus Veterinary Center indicating that Sargent Snuggles is up to date on vaccines.” Ex. K at 3/26. Defendants removed the animal first, confirmed on the same day that the statutory predicate for pound confinement was absent, and took no action to release him.

43. Tucson City Code § 4-10(a) authorizes impoundment only of an animal found "in plain view, or pursuant to a valid search warrant" on probable cause of specific, defined conditions.

44. Plaintiff called PACC to redeem Snuggles on October 10, October 11, and October 13. Ex. K at 3-7/26. Snuggles was not released.

45. On the evening of October 10, 2025, she was informed by an animal control officer that "they" had decided not to release Snuggles and would be destroying him instead. Ex. A at ¶13. She begged the officer not to destroy Snuggles. *Id.* The officer informed Plaintiff that the decision came from someone "higher up on the food chain." *Id.*

46. On October 11, 2025, Defendant Jacobus executed and served on Plaintiff a preprinted "Impoundment and Bond Notice." Ex. K at p. 11 of PDF; *see also* Ex. P.

47. That instrument recites "Jurisdiction: Tucson." It identifies the impoundment as made pursuant to Tucson City Code § 4-10; the boxes for Pima County Code 6.04.150 and South Tucson 3-11 are not checked. It sets the bond as "BOND AMOUNT REQUIRED: City of Tucson $1,325.00," with the Pima County and South Tucson lines blank. It gives the venue as Tucson City Court. *Id.*

48. None of the four boxes on that form identifying a ground for impoundment—"in distress," "in danger," "vicious, dangerous or destructive," or "a danger to the safety of any person or other animal"—is checked. The period box is unchecked. The license number field is blank. *Id.*

**C. The November 24, 2025 Hearing and December 11, 2025 Order**

49. On or about November 2025, the City of Tucson filed a Petition and Order to Show Cause in Tucson City Court. **Exhibit C.** A hearing was held on November 24, 2025. Plaintiff appeared with counsel, presented witnesses, and cross-examined the City's witnesses. **Exhibit B.**

50. The magistrate entered an order directing forfeiture and destruction and stayed destruction pending appeal upon posting of a $3,600 bond. **Exhibit D.** Plaintiff posted that bond on December 4, 2025, and on December 10, 2025 filed a petition for

special action in Pima County Superior Court, Case No. C20258606.

51. On December 11, 2025, the magistrate issued a further written order. **Exhibit E.** The validity of the November 24 and December 11 orders is the subject of the appeal now pending in the Arizona Court of Appeals, Division Two, No. 2 CA-CV 2026-0137. Plaintiff does not ask this Court to review or set aside those orders.

52. Those later orders do not authorize, relate back to, or cure the October 7, 2025 taking or the detention after October 17, 2025. A seizure is justified under the Fourth Amendment only while the government's justification holds force. Thereafter, the government must cease the seizure or secure a new justification. Neither happened in this case.

53. Even after significant public pressure, County Administrator Lesher and PACC officials, including Director Steve Kozachik, continued to propagate a materially false or grossly misleading version of the October 7, 2025 incident to the Pima County Board of Supervisors. In a June 6, 2026 memorandum to the Board, Director Kozachik asserted, among other things, that there had been "several interactions" with Snuggles preceding the bite, that Snuggles continued attacking the victim while she was on the ground, and that the victim had stated she "would not return to the house if Snuggles returned" and "worried for the kids' safety." See Steve Kozachik Memorandum to Pima County of Supervisors (dated June 6, 2026), transmitted by Defendant Lesher, attached as **Exhibit H.**

54. In response to Director Kozachik's memorandum, in a June 9, 2026 letter to the Board, the victim herself, Clara Gastelum, directly disputed these assertions as false and provided her own detailed account confirming that the incident was a single provoked and instinctive reaction with immediate de-escalation once she called Snuggles' name. She accused PACC officials of knowingly spreading a false narrative. See Letter from Clara Garcia Gastelum to the Pima County Board of Supervisors, attached as **Exhibit I**.

55. Pima County's conduct further demonstrates bad faith, ongoing deliberate indifference to Plaintiff's constitutional rights, and the arbitrary nature of Defendants'

continued detention and threatened destruction of Snuggles.

56. The orders entered on December 11, 2025 and November 24, 2025, are the subject of an appeal pending in 2 CA-CV 2026-0137.

**D. Ongoing Unlawful Detention, Financial Burdens, and Irreparable Emotional Harm (July 2026)**

57. As of the filing of this Complaint, Snuggles remains in Defendants' custody at PACC or another facility nearly one year after his seizure. Defendants continue to threaten his destruction pursuant to orders procured through a constitutionally defective process.

58. To prevent Defendants from euthanizing Snuggles while she pursues her state-court challenge, Plaintiff was required to post the $3,600 supersedeas bond. She has also been forced to pay approximately $16,000 (and counting) in kennel, boarding, and related fees to keep Snuggles alive and housed during the unlawful detention. These fees continue to accrue daily. Plaintiff should not have had to "buy back" her own property's survival from a process that was constitutionally defective.

59. The prolonged separation has devastated Plaintiff and her family. Plaintiff constantly worries about Snuggles' physical condition, mental state, and well-being in extended kennel confinement.. Ex. A at ¶¶14-15. Plaintiff and her children constantly worry they will be attacked by coyotes. The family dynamic has changed: Plaintiff spends far less time with her children because her mind is consumed with trying to save Snuggles and navigate the legal process. *Id.* at ¶¶15-16.

60. Snuggles was not just a guardian of livestock and property; he was Plaintiff's "baby boy." Losing him—or living under the constant threat of losing him—has taken a huge emotional toll. Plaintiff has cried for months and continues to do so at times.

61. These injuries—emotional distress, the ongoing burden of fees and bond, the constant threat of irreversible loss, and the daily constitutional violation of an unlawful seizure—are concrete, particularized, and redressable by the relief sought here. They flow directly from Defendants' unconstitutional conduct.

**E. Sergeant Snuggles' Condition in Defendants' Custody**

62. The medical history records produced by Pima County in response to a public records request documents approximately thirty clinical encounters. Twenty-five recite the same reason for the encounter: "SHELTER STRESS." Ex. O.

63. Trazodone, a psychoactive medication, was begun on the day of intake. On November 24, 2025—the same day as the destruction hearing—the dose was escalated "due to behavior in kennel," and was thereafter sustained continuously through at least August 18, 2026.

64. On April 1, 2026, Defendants recorded that the animal's "APS hold extended due to becoming more stressed/anxious," and began a second psychoactive medication, gabapentin, on a standing order. That order was reordered on May 15, 2026 "for shelter stress (very stressed in kennel)," and again on July 22, 2026. *See also* **Exhibit M** (kennel card).

65. Trazodone and gabapentin are dosed by weight. The last weight recorded anywhere in the medical history is October 13, 2025. The weight field is blank at every encounter thereafter, including at the dose escalation, at the addition of the second medication, and at each reorder.

66. On January 5, 2026, Snuggles was logged as "seemed lethargic in kennel, not acting like himself." He required oral sedation together with injectable dexmedetomidine and hydromorphone to permit examination. Radiographs showed moderate to marked gastric distension.

67. Neither the Activity Report nor the medical history records any communication to Plaintiff concerning the January 5, 2026 episode, at the time or afterward.

68. On November 2, 2025, Defendants recorded a directive that "[p]er prosecutor Roni Byrne … we are NOT to reach out to them," and that "if the owner comes to PACC for any reason, we are unable to speak with her." Ex. K at 7/26. Defendants adhered to that directive for more than nine months. This directive was ostensibly due to the fact that Plaintiff was represented by legal counsel. *Id.* However, when Plaintiff represented herself

*pro se*, Defendants refused to give her any information and the prosecutor at the time insisted that the Plaintiff seek information about Snuggles' welfare through the courts. Ex. A at ¶22.

69. Plaintiff learned of the January 5, 2026 gastric-distension episode on August 24, 2026, when these records were produced—nearly eight months after it occurred, and while she was paying for the animal's care.

70. In nearly a year of continuous daily custody, the records document no bite, no lunge, no threat display, and no aggression of any kind by Snuggles.

71. The complete behavioral file Defendants produced is one page, footed "Page 1 of 1," containing a single entry made on the day of intake. That entry records that the animal "[t]olerated ketch pole restraint, walked on ketch pole to kennel. Calm, unknown if dog reactive. Did not attempt to bite staff during vaccinations. Very nervous and scared." Ex. L.

72. No evaluation of Snuggles has been conducted by any Defendant, or by anyone else, at any time from October 7, 2025 to the present.

73. To prevent Defendants from destroying Snuggles, Plaintiff was required to post the $3,600 bond. She has also paid approximately $16,000 in kennel, boarding, and related fees to keep him alive and housed. Those fees continue to accrue.

74. From October 7, 2025 to the filing of this Amended Complaint, no Defendant has conducted the individualized behavioral evaluation Tucson City Code § 4-13(c)(2) requires before the City may impose even a muzzle restriction. The City nonetheless sought, and obtained, an order of destruction under a different section that requires no evaluation at all.

75. On or about July 6, 2026, Plaintiff's counsel sent a detailed pre-litigation demand letter to the Pima County Attorney and the City of Tucson prosecutor who prosecuted the proceeding in Superior Court. Plaintiff copied the prosecutor's supervisors, Alan Merritt and Roi Lusk, the Deputy City Attorney and City Attorney, respectively. A true and correct copy of the demand letters are attached hereto as **Exhibits F & G**. The

letter set forth the constitutional violations detailed above and demanded the immediate return of Sergeant Snuggles together with an end to the threatened destruction. Pima County responded that its hands are tied because an order remains in place. The City of Tucson prosecutor initially responded that she was on vacation but would get back to counsel later in the week.

76. On July 13, 2026, in response to Plaintiff's letter, the City's Prosecutor responded: "I have been advised by my superiors that we will not comply with your requests at this time as the matter is before the Court of Appeals and the animal is not in our custody." Email from M. Worman, attached as **Exhibit J** (emphasis added).

77. At all times relevant, Snuggles has remained in the physical custody of Defendant Pima County and its agency, the Pima Animal Care Center ("PACC"). The City of Tucson has expressly disclaimed custody, stating in writing on July 14, 2026 that Snuggles is "not in [its] custody." The duty and power to release Snuggles therefore rest with the County Defendants.

78. The only instrument any Defendant has ever identified as authority to seize and hold Snuggles is the City of Tucson's destruction order, which the City of Tucson procured through extensive violation of Plaintiff's constitutional rights.

79. The County Defendants' continued possession of Snuggles is a seizure and detention that rests on no valid legal instrument and is supported by no process of any kind. The deprivation is ongoing and accrues anew each day the County withholds him.

**F. The City–County Runaround: Each Defendant Blames the Other to Evade Responsibility**

80. Snuggles remains confined because each Defendant disclaims the power to release him and points to the other. Neither position is tenable. Together, the two positions operate to deprive Plaintiff of her property indefinitely while leaving no Defendant willing to accept responsibility for the deprivation.

81. The City of Tucson procured the destruction order and remains the party defending it, yet now asserts that its hands are tied and that Snuggles is "not in [its]

custody." The City nonetheless retains the power to end the deprivation at any time—by withdrawing or declining to enforce the order, consenting to Snuggles's release, or agreeing to preserve him—and has refused to do so. **Exhibit J**, Email from C. Ponig and W. Thomas to M. Worman (July 14, 2026).

82. The County, in turn, asserts that its "hands are tied" by the very order the City procured, and that it therefore cannot release Snuggles—an act to which the City could readily consent. Yet the County holds Snuggles in its exclusive physical custody and is subject to an independent statutory duty to release him under A.R.S. § 11-1014, a duty that does not depend on the City's cooperation.

83. The result is a circular runaround: the City points to the County's custody, and the County points to the City's order, each using the other as a shield to avoid releasing an animal that neither is willing to defend holding. That mutual abdication does not diminish either Defendant's responsibility—it establishes it. Each Defendant is a moving force behind the continuing deprivation: the City as the procurer of the order who refuses to relinquish or disclaim it, and the County as the custodian who refuses to release. Neither may escape liability by pointing to the other, and only an order of this Court directed to both will end the deprivation.

84. Defendants' refusal to take any corrective action despite being placed on clear and specific notice defects concerning notice and process described above confirms that the ongoing Fourth and Fourteenth Amendment violations will continue absent judicial intervention. This inaction further supports the necessity of preliminary and permanent injunctive relief to prevent irreparable harm to Plaintiff and Snuggles. See Exhibit A at ¶¶14-17.

**G. Defendants' Conduct Violated Clearly Established Constitutional Rights**

85. Binding Ninth Circuit precedent holds that seizing, holding, and destroying a dog are all "seizures" under the Fourth Amendment that must be reasonable. Whether an animal actually posed a danger is a question of fact for the jury. A reasonable official in Tucson was on notice that he could not seize, hold, and threaten to kill a dog absent a

warrant or genuine, evidence-based dangerousness justification under the process that the law requires.

86. When a deprivation flows from the government's established procedures (not a random rogue act) and pre-deprivation process was feasible and foreseeable, the government must provide that process up front; a later lawsuit is not enough. Arizona's dangerous-dog statutes and ordinances define the very process that is "due." By ignoring those state-defined procedures, Defendants denied Plaintiff the process the Constitution guarantees.

### H. Defendants' Refusal to Disclose Snuggles' Condition or Whereabouts Compounds the Irreparable Harm and Independently Warrants Injunctive Relief

87. Defendants' silence on Snuggles' condition deprives Plaintiff of the ability to monitor his welfare, to detect and respond to any deterioration in his condition, or to obtain timely relief before an irreversible act. A party facing the potential destruction of a living animal cannot be left to guess, from day to day, whether the subject of the litigation still exists. Money damages cannot remedy the loss of a beloved family pet, and the same is true of the loss of the opportunity to prevent that harm through timely knowledge of his condition.

88. The relief Plaintiff seeks on this point is narrow and imposes no meaningful burden on Defendants, who already possess the information. Plaintiff asks the Court to order Defendants to (1) confirm in writing, within 24 hours, that Snuggles is alive and disclose his current location and physical condition; (2) provide reasonable, periodic written updates (including proof of life) on his condition and care during the pendency of this action; (3) permit a welfare inspection of Snuggles by Plaintiff or Plaintiff's designated veterinarian on reasonable notice; and (4) preserve all records concerning Snuggles' custody, care, and condition. Requiring Defendants simply to disclose what they already know, and to preserve records they are legally obligated to keep, works no hardship and serves the public interest in transparency and in the humane, accountable treatment of an animal held in government custody. The balance of hardships tips sharply in Plaintiff's favor.

**I. Defendants' "It Is Out of Our Hands" Position**

***1. The Finger-Pointing***

89. Both the City and the County claim the continued seizure and threatened destruction of Snuggles are, in so many words, "out of their hands" and that only a court can decide his fate. On July 14, 2026, the City refused Plaintiff's demands, declaring that "the matter is before the Court of Appeals." The County, which holds Snuggles in its kennel and has confirmed receipt of Plaintiff's written demand, likewise refuses to release him, insisting its hands are tied by the pending proceedings. Each points to the other. Neither will act. Snuggles pays for the runaround with every additional day of confinement.

***2. The Position Is False***

90. Defendants' position misdescribes the adversary system. Courts adjudicate the disputes parties choose to place before them. They do not force destruction on parties who jointly agree to a different resolution. No court in this matter can—or would—order Snuggles destroyed over the parties' stipulation to release him, vacate the order, or modify it. The continued deprivation is controlled by Defendants' own litigation choices, not compelled by any court.

***3. The Lawful Off-Ramps Defendants Could Take Tomorrow***

91. At every stage Defendants have had, and still have, multiple lawful, ordinary ways to end this deprivation without waiting for any court to "decide." Such mechanisms are ordinary. Parties settle, stipulate to vacatur, and dismiss orders every single day. Defendants' suggestion that they are helpless spectators to a process they themselves initiated and continue to control is false—and contrary to ordinary practice. See **Ex. J.**

92. In short, Defendants' "our hands are tied" refrain is not a description of legal necessity. It is evidence of a deliberate, repeated choice to persist in conduct they know to be unlawful.

## V. CLAIMS FOR RELIEF

**A. COUNT I: 42 U.S.C. § 1983—Violation of the Fourth Amendment (Unreasonable Seizure)**

93. Plaintiff realleges and incorporates by reference the paragraphs of Sections I

through IV as if fully set forth herein.

***1. The October 7, 2025 taking and the detention after October 17, 2025 (Against Officers Mills, Estrella, and Jacobus in their individual capacities; the City of Tucson; and Pima County) ("Count I.A")***

94. The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, protects against unreasonable seizures of "effects," including dogs. Seizing, holding, and threatening to destroy a dog are all "seizures" that must be reasonable.

95. On October 7, 2025, Officers Mills and Estrella took Sergeant Snuggles without a warrant. The animal was confined in a fenced enclosure. The officers did not enter that enclosure. They told Plaintiff the animal "will need to go to PACC for a precautionary 10-day quarantine," presented a form on which the seizure block was struck through, and obtained her signature only on a promise to redeem him on October 17, 2025. That instrument did not authorize a seizure for destruction, for a vicious-animal proceeding, or for indefinite confinement.

96. Tucson City Code § 4-10(a) authorizes impoundment only of an animal found in plain view or taken under a valid search warrant on probable cause of specific, defined conditions. Defendants invoked § 4-10 on the October 11 notice and checked none of the four boxes identifying the ground for impoundment. A.R.S. § 11-1014(A) requires pound confinement of an unvaccinated biting dog. Defendants recorded on October 7 that he was current on vaccines.

97. Plaintiff called to redeem the animal on October 10, 11, and 13, 2025. Defendants did not release him. From October 18, 2025 forward, the quarantine justification Defendants themselves wrote had expired. A seizure is justified only while the government's justification holds force. Thereafter the government must cease the seizure or secure a new justification.

98. No City Court order existed during this period. The reasonableness of the October 7 taking and of the detention after October 17 does not depend on whether any later state-court order is valid.

99. Officer Jacobus executed and served the October 11 Impoundment and Bond

Notice that recited a § 4-10 impoundment, left every statutory ground unchecked, and demanded a City of Tucson bond. That instrument did not supply the warrant or the plain-view predicate the Code requires.

100. The City of Tucson and Pima County are liable under *Monell* because the taking and continued detention were carried out pursuant to the official codes those entities enacted and the forms their officers are trained and directed to use, and because no evaluation or new justification was obtained after October 17.

***2. The continuing detention after November 24, 2025 (Against Pima County and, for injunctive relief only, Lesher and Kozachik) ("Count I.B")***

101. Independently of Count I(A), Pima County has held the animal in continuous physical custody from October 7, 2025 to the present. After November 24, 2025, the County has identified a City Court order as the asserted basis for that custody.

102. A County custodian may not indefinitely detain living property without a present, reasonable justification of its own. The County has independent release authority under A.R.S. § 11-1014. Plaintiff demanded exercise of that authority in writing on July 6, 2026. The County refused and continued to assess boarding fees.

103. The County's own chart documents continuous "SHELTER STRESS," escalation of Gabapentin and Trazodone, a January 5, 2026 gastric-distension episode withheld from Plaintiff for nearly a year, and no behavioral evaluation in more than 320 days. That course of custody is itself an ongoing seizure.

104. Count I(B) seeks injunctive relief ending the County's detention and damages against the County. It does not ask this Court to declare the City Court orders void. If those orders are later set aside in the Arizona courts, Plaintiff will seek leave to amend.

105. The continuing deprivation is jointly caused. The City is a moving force as the procurer of the order who refuses to withdraw it or consent to release, and the County is a moving force as the custodian who refuses to release Snuggles. Each Defendant retains the independent ability to end the deprivation and has declined to exercise it. No Defendant may avoid liability under § 1983 by attributing the deprivation to the other.

106. Plaintiff does not seek review or reversal of any state-court judgment. She challenges Defendants' independent, ongoing conduct in seizing and detaining her property, and their threatened conduct with respect to it. Plaintiff's out-of-pocket losses—including the supersedeas bond and the boarding and kennel fees paid to keep Snuggles alive during his unlawful detention—are recoverable as compensatory damages under § 1983

107. As a direct and proximate result of Defendants' unreasonable seizures, Plaintiff has suffered and continues to suffer damages, including but not limited to the loss of use and companionship of Snuggles, emotional distress, the costs of the supersedeas bond and ongoing kennel fees, and other out-of-pocket and non-economic losses.

**B. COUNT II: 42 U.S.C. § 1983—Violation of the Fourteenth Amendment (Procedural Due Process) (Against Officers Mills, Estrella, and Jacobus in their individual capacities; the City of Tucson; and Pima County)**

108. Plaintiff realleges and incorporates by reference paragraphs of Sections I through IV as if fully set forth herein.

109. Count II challenges the process Defendants themselves provided and withheld: a notice that stated no statutory ground; a 10-day quarantine form that expired; the refusal of redemption on October 10, 11, and 13, 2025; the November 2, 2025 directive that PACC staff "are NOT to reach out" and "are unable to speak with" the owner; the eight-month concealment of the January 5, 2026 medical episode; and the absence of any evaluation of the animal from October 7, 2025 to the present. Count II does not challenge the sufficiency of the November 24, 2025 hearing as a judicial proceeding.

110. A companion animal is property protected by the Due Process Clause. Defendants deprived Plaintiff of that interest by taking the animal on October 7, 2025, by refusing redemption before the October 17, 2025 release date they printed on their own form, and by holding him thereafter without any evaluation and without telling her what they knew of his condition.

111. The process constitutionally due is measured by the private interest, the risk of error under the procedures used, and the government's burden. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The private interest is a living companion animal. The procedures

Defendants themselves used supplied no checked statutory ground on the October 11 Impoundment and Bond Notice, no evaluation of the kind Tucson City Code § 4-13(c)(2) makes mandatory before a lesser restriction, and no information to the owner after November 2, 2025. Those are Defendants' instruments and Defendants' choices. They are not a request that this Court review the November 24, 2025 hearing.

112. Independently, Defendants conditioned the animal's survival and any prospect of return on payment. Plaintiff posted a $3,600 supersedeas bond and has paid approximately $16,000 in kennel and boarding fees, which continue to accrue, to keep property the County is holding. The government may not exact those sums as the price of a detention that outlasted the quarantine period Defendants themselves set, nor retain them if the detention was without due process.

113. The City's established procedures—Tucson City Code Chapter 4, the October 7 Quarantine Transport Agreement, and the October 11 Impoundment and Bond Notice — created a deprivation that was feasible to process in advance. *Zinermon v. Burch*, 494 U.S. 113 (1990). Count II relies on those instruments. The facial defects in Chapter 4 are stated in Counts IV through VI and are not restated here.

114. Officers Mills and Estrella presented the quarantine form and took the animal. Officer Jacobus executed and served the October 11 notice that stated no statutory ground. Pima County, through PACC, held the animal, billed the fees, followed the November 2 no-contact directive, and withheld the January 5, 2026 medical episode until August 24, 2026. Those are the individual and entity acts Count II charges. Count II does not charge the magistrate, the prosecutor, or the City Attorney.

115. The City is liable for Chapter 4 and for the official forms issued in its name. The County is liable for the custodial, billing, and information practices alleged in the medical-file and no-contact paragraphs of Section IV and in Part VI. Municipal liability is not separately restated.

116. Plaintiff does not ask this Court to review, vacate, or declare invalid any order of any Arizona court. Count II addresses Defendants' own notice, forms, custody, billing,

and concealment.

117. As a direct and proximate result, Plaintiff has suffered the loss of use of her property, the bond and boarding charges, and the emotional harm of an information blackout while the animal remained in Defendants' kennel.

### C. COUNT III: 42 U.S.C. § 1983—Violation of the Fourteenth Amendment (Substantive Due Process, pleaded in the alternative) (Against the City of Tucson and Pima County only)

118. Plaintiff realleges the factual allegations of Sections I through IV. Count III is pleaded in the alternative. Where the Fourth Amendment supplies the rule of decision for a seizure, Plaintiff relies on Count I and does not ask the Court to duplicate that claim under the Due Process Clause. *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998).

119. Count III is directed at conduct the Fourth Amendment does not, by itself, price: Defendants' extraction of a $3,600 bond and approximately $16,000 in boarding fees as the condition of keeping the animal alive during a detention that outlasted the October 17, 2025 release date printed on Defendants' own form.

120. After setting a quarantine release date of October 17, 2025, Defendants refused redemption on October 10, 11, and 13, continued the detention, and billed the owner for the kennel. No evaluation of the animal has been conducted at any time. The County's chart records continuous "SHELTER STRESS," escalation of trazodone, addition of gabapentin, and a January 5, 2026 gastric-distension episode that was not disclosed to the owner for eight months. Conditioning the animal's life on payment for that course of custody, after the justification Defendants wrote down had expired, is arbitrary.

121. The same course of billing continues. Fees accrue daily. Plaintiff has no means of stopping the meter except by abandoning the animal or paying. That is an unconstitutional condition on a protected property interest.

122. Count III is alleged against the City and the County. It is not alleged against Officers Mills, Estrella, or Jacobus. The Kozachik June 6, 2026 memorandum to the Board of Supervisors remains in the facts. It is not the act Count III charges.

123. Plaintiff does not ask this Court to review any state-court order. As a direct

and proximate result of the fee extraction and the continued detention after October 17, 2025, Plaintiff has incurred the bond, the boarding charges, and the associated distress.

**D. COUNT IV: 42 U.S.C. § 1983—Violation of the Fourteenth Amendment (Procedural Due Process—Facial Challenge to Tucson City Code § 4-11(f)(3)) (Against the City of Tucson)**

124. Plaintiff realleges and incorporates by reference the paragraphs of Sections I through IV.

125. Tucson City Code § 4-13 governs animals the City deems dangerous. Section 4-13(a) defines a "dangerous animal" as one that "[h]as been declared to be vicious or destructive pursuant to section 4-7 or 4-11," or that "[d]isplays or has a tendency" toward the conduct described, as determined by the city enforcement agent.

126. Section 4-13(c)(2) provides: "Whenever the city enforcement agent has reason to believe an animal is dangerous, an evaluation of the animal shall be conducted." The requirement is mandatory.

127. Section 4-13(c)(1) directs the city enforcement agent to "develop guidelines" governing that evaluation, confirming that the ordinance contemplates an individualized, standards-based assessment of the particular animal rather than an inference drawn from a single past act.

128. Section 4-13(c)(3) prescribes the contents of the notice that must accompany a dangerousness determination, and section 4-13(e) prescribes what the City may then require: an order of compliance imposing secure confinement, muzzling and leashing, posted signage, microchipping, sterilization, and liability insurance.

129. Every consequence section 4-13(e) authorizes is reversible. For example, an order of compliance restricts how an animal is kept; it does not extinguish the owner's property interest, and an animal subject to one remains alive.

130. Section 4-13 authorizes destruction only in circumstances presupposing the owner's default or disobedience: where the owner fails to appear at or request a hearing, § 4-13(d)(4); where the animal is seized for failure to obey an order of compliance and five days pass, § 4-13(f)(2); or following a conviction, § 4-13(h)(1)-(2). In each instance the

evaluation required by § 4-13(c)(2) has already occurred.

131. Tucson City Code § 4-11 provides a separate route. Section 4-11(f) provides that if the magistrate "finds by clear and convincing evidence that an animal is dangerous or vicious or destructive, or is a danger to the safety of any person or other animal," the magistrate "shall order the owner to do one (1) or more of the following," including, at § 4-11(f)(3), "[t]hat the animal be humanely destroyed."

132. Section 4-11 contains no evaluation requirement. Nothing in § 4-11(f), or elsewhere in § 4-11, conditions a destruction order on the individualized assessment that § 4-13(c)(2) makes mandatory before the City may require an owner to muzzle an animal.

133. The two provisions therefore stand in this relation: the City must obtain an individualized evaluation before requiring an owner to muzzle an animal, and need obtain none before obtaining an order that the animal be killed.

134. An owner's interest in a companion animal is a protected property interest. Destruction extinguishes that interest permanently and cannot be remedied by any subsequent proceeding.

135. The process constitutionally due is measured by the private interest affected, the risk of erroneous deprivation under the procedures used and the probable value of additional safeguards, and the government's interest, including the burden an additional safeguard would impose. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Each factor points the same direction. The private interest is maximal and irreversible. The safeguard at issue is not speculative—it is the safeguard the City's own ordinance requires before a lesser deprivation, which forecloses any contention that it is unavailable, unworkable, or without probative value. And the burden is a single behavioral evaluation.

136. A scheme that conditions the reversible deprivation on an individualized assessment while imposing no such condition on the irreversible one inverts the relationship between the severity of a deprivation and the process that must precede it.

137. The defect is structural. It inheres in the text of § 4-11(f)(3) and operates identically in every case in which that provision is invoked. There is no set of circumstances

under which § 4-11(f)(3) supplies the assessment that § 4-13(c)(2) requires, because § 4-11 does not require one at all.

138. Plaintiff does not contend that the City may never obtain an order that a dangerous animal be destroyed. She contends that the City may not do so under a provision requiring less individualized proof of dangerousness than the same Chapter requires before an animal may be muzzled.

139. Tucson City Code § 4-11 is an ordinance enacted by the Mayor and Council of the City of Tucson. It is "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," and is therefore municipal policy under 42 U.S.C. § 1983. *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). No pattern of prior incidents is required where the policy is the enactment itself.

140. The City initiated proceedings against Plaintiff under § 4-11 and sought an order that her animal be destroyed pursuant to § 4-11(f)(3). Ex. C at 7/10. No evaluation of the animal has ever been conducted.

141. As a direct and proximate result, Plaintiff has been subjected to proceedings seeking the permanent destruction of her property without the individualized assessment the City's own Chapter 4 requires before imposing far lesser restrictions, and has incurred bond and impoundment costs in those proceedings.

**E. COUNT V: 42 U.S.C. § 1983—Violation of the Fourteenth Amendment (Substantive Due Process—Facial Challenge to Tucson City Code § 4-7(1)) (Against the City of Tucson)**

142. Plaintiff realleges and incorporates by reference the paragraphs of Sections I through IV.

143. Section 4-7(1) supplies the definitions on which the destruction authority of Chapter 4 depends. Section 4-7(1)(b) defines a "destructive animal" as one with "a propensity to destroy, damage or cause damage to the property of a person other than the animal's owner." Section 4-7(1)(d) defines a "vicious animal" as one "that bites, attempts to bite, endangers or otherwise injures or causes to be injured human beings or other animals."

144. Section 4-11(f) authorizes destruction on a finding that an animal "is dangerous or vicious or destructive," using those definitions. Section 4-13(a)(1) defines a "dangerous animal" as one "declared to be vicious or destructive pursuant to section 4-7 or 4-11." Neither section supplies an independent definition.

145. The "destructive animal" predicate is defined entirely by damage to property. It contains no element of danger to any person or to public health. It is satisfied by an animal that damages a neighbor's fence or garden.

146. Because §§ 4-7(3) and 4-11(f) are framed in the disjunctive, a "destructive" finding standing alone is a sufficient basis for an order of destruction. Nothing in the text requires that a "destructive" animal also be found dangerous to any person.

147. A dog is the personal property of its owner, held subject to the police power, which is concerned with the safety or health of the community. Danger to the safety or health of the community is the constitutional predicate for destroying property under the police power.

148. Because the "destructive animal" predicate never requires that predicate, § 4-7(1)(b) authorizes destruction in circumstances the police power does not reach, and does so in every application. There is no set of circumstances under which a property-damage-only finding supplies danger to the safety or health of the community. Salerno, 481 U.S. at 745.

149. The same ordinance treats property damage as a misdemeanor, § 4-7(2)(c); requires the owner to make the victim whole through restitution, § 4-7(3); and prescribes a ladder of non-lethal measures including sterilization, secure confinement, muzzling, signage, microchipping, liability insurance, and banishment, §§ 4-7(3)(a)-(b), 4-11(f)(1)-(2), 4-13(e). An enactment that authorizes the single irreversible remedy for conduct it treats as minor, and for which it supplies a complete remedy, is not rationally related to any legitimate governmental end.

150. The Arizona Legislature, regulating the same subject statewide, authorized court-ordered euthanasia only for a "vicious animal," defined as one with "a propensity to

attack, to cause injury to or to otherwise endanger the safety of human beings without provocation." A.R.S. §§ 11-1001(16), 11-1014(H). That the State drew the line at an unprovoked propensity to endanger human beings, while the City draws it at damage to property, is evidence that the City's line bears no rational relationship to public safety.

151. Independently, the "vicious animal" definition is impermissibly standardless. An animal is "vicious" not only if it "bites" but if it "attempts to bite, endangers or otherwise injures" a person or other animal. "Endangers" is undefined and reaches conduct as ambiguous as lunging, barking, or baring teeth. The provision supplies no ascertainable standard distinguishing an animal that may be killed from one that may not, and confers standardless discretion in a determination of life and death.

152. Sections 4-7, 4-11, and 4-13 are ordinances enacted by the Mayor and City Council and are municipal policy under *Monell*, 436 U.S. at 690. No pattern is required.

153. Plaintiff has standing to challenge these provisions. Her animal was adjudicated under them, and she continues to own a second animal on the same property subject to the same provisions.

### F. COUNT VI: 42 U.S.C. § 1983—Violation of the Fourteenth Amendment (Procedural Due Process—Facial Challenge to the Disposition Scheme, Tucson City Code §§ 4-12(a), 4-12(d), and 4-11(k))

154. Plaintiff realleges and incorporates by reference the paragraphs of Sections I to IV.

155. Tucson City Code § 4-12(a) provides that a forfeited animal "shall be disposed of by one of the following methods: (1) Placed by adoption in a suitable home; or (2) Humanely destroyed; or (3) Transferred to a duly incorporated humane society or other nonprofit corporate animal-welfare organization devoted to the welfare, protection and humane treatment of animals."

156. The Code supplies no criteria for choosing among those three outcomes. It does not direct the enforcement agent to consider adoptability, temperament, health, the animal's behavior in custody, or any other factor. The choice between placement and death

rests in an executive officer's unguided discretion.

157. The Code imposes no holding period, no waiting period, and no notice to the owner before a forfeited animal is destroyed.

158. The second sentence of Tucson City Code § 4-12(a)(3) provides: "Transferred animals shall be placed by adoption in a suitable home after first being sterilized; humanely destroyed; or released as part of a community cat program."

159. Read as written, the sentence makes humane destruction a step that precedes, or is a condition of, placement by adoption. An animal cannot be placed by adoption after it has been destroyed. That command is unascertainable and is not capable of coherent application in any case.

160. The only construction that avoids that result is to treat the semicolons as listing three alternative fates for a transferred animal: adoption after sterilization; destruction; or release into a community-cat program. Even on that construction, the provision that the Code offers as the alternative to killing the animal in City custody itself authorizes a private organization to kill the animal. The Code supplies no criteria for choosing among those three fates, no notice to the owner that a transferred animal will be destroyed, and no stay of that destruction pending review. Section 4-11(k) affords review of a forfeiture order but no stay of disposition under § 4-12.

161. Section 4-12(b) cannot supply the missing standard. It requires the City to verify that a receiving organization "releases animals only through community cat programs or through adoption into suitable homes after first being sterilized." Subsection (b) does not authorize destruction as a method of release. The Code therefore simultaneously commands the transferee to be prepared to destroy the animal, § 4-12(a)(3), and forbids destruction as a release method, § 4-12(b). A scheme that cannot describe what must happen to a transferred animal does not give an owner fair notice of the process that will extinguish her property, and it confers standardless discretion on the enforcement agent and on any private organization that receives the animal.

162. Plaintiff does not contend that the City may never transfer an animal to a

humane society. She contends that the City may not do so under a provision that either requires adoption of a destroyed animal or, in the alternative, permits a private organization to destroy the animal with no criteria, no notice, and no stay.

163. Moreover, Section 4-12(d) conditions a transfer on the City having "previously approved the appropriation of funds for that specific purpose," failing which the enforcement agent bears the cost "at its own cost." Destruction carries no funding condition, no verification requirement, and no documentation requirement. The Code makes the life-preserving disposition contingent on money and the lethal disposition free of condition.

164. Section 4-11(k) affords a right of review but no stay of disposition, and no provision of Chapter 4 stays disposition pending review.

165. The combined effect is that the animal may be destroyed while review of the order authorizing his destruction is pending, extinguishing the remedy through the operation of the City's own procedures. A State may not destroy a protected interest through the operation of its own procedural machinery.

166. Each defect inheres in the text of the ordinance and operates in every application.

167. These provisions are municipal policy under *Monell*, 436 U.S. at 690, and require no showing of a pattern.

168. Plaintiff's animal stands subject to these provisions. Plaintiff continues to own Coyoki, who remains on the property and is theoretically subject to the same provisions of Chapter 4 of the Tucson City Code challenged herein.

169. As a direct and proximate result, Plaintiff has suffered and continues to suffer the damages alleged herein, including ongoing emotional distress and financial burdens caused by the arbitrary and conscience-shocking nature of Defendants' conduct.

## VI. MONELL MUNICIPAL LIABILITY

### A. The City of Tucson

170. Plaintiff realleges the factual allegations of Sections I through IV. Municipal

liability is pled in Counts I through VI. This section states only the official-policy basis for the City and the County and does not restate those counts.

171. The City of Tucson is a "person" under § 1983. It is liable for its own official policy, which includes an ordinance "officially adopted and promulgated" by the Mayor and City Council. *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). No pattern of prior incidents is required where the policy is the enactment itself.

172. Tucson City Code Chapter 4 is such a policy. Counts IV, V, and VI challenge that Chapter on its face. Those counts are the City's primary *Monell* liability. They do not depend on a custom, on ratification of a subordinate, or on the City's litigation position after July 6, 2026.

173. Independently, the October 7, 2025 taking and the October 11, 2025 Impoundment and Bond Notice were carried out on City forms, under Tucson City Code § 4-10, with a City bond amount, and with venue in Tucson City Court. Those instruments are official policy for the officers who used them. They supplied no warrant, no checked statutory ground, and a quarantine release date of October 17, 2025 that Defendants then disregarded.

174. Plaintiff does not plead, as a standalone *Monell* theory, that the City's July 14, 2026 letter declining her pre-suit demand was itself a constitutional violation. That letter is alleged only as written notice that the City would not consent to release after being told of the October 7 defects.

**B. Pima County**

175. Pima County is a "person" under § 1983. It operates PACC. It has held Sergeant Snuggles in continuous physical custody since October 7, 2025, and it has assessed boarding and kennel charges against Plaintiff on a County schedule throughout that custody. Those custodial and billing practices are the County's own official policy.

176. On November 2, 2025, PACC recorded a directive that "[p]er prosecutor Roni Byrne … we are NOT to reach out to them," and that "if the owner comes to PACC for any reason, we are unable to speak with her." The County followed that instruction for more

than nine months, including after Plaintiff was proceeding without counsel. That operating instruction is alleged as County policy for purposes of the information-withholding and continuing-seizure claims, not as a claim against the prosecutor.

177. The County has independent release authority under A.R.S. § 11-1014. On July 6, 2026, Plaintiff demanded in writing that the County exercise that authority. The County refused and continued the detention and the charges. That refusal, after written notice of the October 7 defects, is alleged as the County's own decision respecting property in its custody. Count I.B. states that claim. This paragraph does not ask the Court to hold that the County was required to sit as an appellate court over the later City Court orders.

**C. Notice**

178. On July 6, 2026, Plaintiff served written demands on the Tucson City Attorney's Office and on the Pima County Attorney, stating the October 7 defects and demanding release under A.R.S. § 11-1014 and preservation of records. The City responded on July 14, 2026 that it would "not comply" because "the matter is before the Court of Appeals and the animal is not in [its] custody." The County refused release and continued to hold and bill. Those communications are alleged as notice and as the entities' own decisions respecting property then in County custody. They are not alleged as a separate ratification count.

## VII. GROUNDS FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

179. Plaintiff has applied for preliminary injunctive relief. That application remains pending and is maintained on this Amended Complaint. Plaintiff seeks the same categories of prospective relief identified in the Prayer: an order ending the ongoing seizure by requiring return or a placement of Plaintiff's choosing on reasonable conditions; an order barring destruction during this action; welfare-inspection and records relief; a halt to further boarding charges; and an order barring enforcement of the challenged Code provisions against Plaintiff and any animal she owns.

180. None of that relief asks this Court to enjoin a state-court judge or to vacate a

state-court order. It runs against Defendants' own custody, billing, and enforcement of municipal ordinances.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jennifer Evancho respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

**A. Preliminary and Permanent Injunctive Relief:**

(1) An order prohibiting all Defendants, their officers, agents, employees, and all persons in active concert with them from euthanizing, destroying, or transferring Sergeant Snuggles for purposes of destruction during the pendency of this action or otherwise harming Sergeant Snuggles;

(2) An order requiring Pima County and the official-capacity Defendants who control Pima Animal Care Center, to end the ongoing seizure by returning Sergeant Snuggles to Plaintiff or, in the alternative, by transferring him to a facility or placement of Plaintiff's choosing on reasonable conditions as the Court may impose to protect public safety (conditions Plaintiff is prepared to meet and has always been willing to meet);

(3) An order requiring the custodial Defendants to (a) confirm in writing that Snuggles is alive and disclose his current location and current condition; (b) provide reasonable, periodic written updates (including proof of life) on his condition and care during the pendency of this action for so long as he remains in Defendants' custody; (c) permit a welfare inspection of Snuggles by Plaintiff or Plaintiff's designated veterinarian on reasonable notice; and (d) preserve all records concerning Snuggles' custody, care, and condition.

(4) An order prohibiting further boarding, kennel, or related charges against Plaintiff for a detention that has outlasted the justification Defendants themselves recorded; and

(5) An order prohibiting all Defendants from spoliating and destroying evidence germane to this matter, the care and confinement and condition of Snuggles since October 7, 2025 to the present;

(6) A preliminary and permanent injunction prohibiting the City of Tucson, its officers, agents, and employees and those acting in privity with it from enforcing Tucson City Code §§ 4-7(1), 4-11(f)(3), 4-11(k), 4-12(a), and 4-12(d) against Plaintiff or against any animal owned by her; and

(7) Such other injunctive or equitable relief as the Court deems just and proper to remedy the ongoing constitutional violations and prevent irreparable harm.

**B. Declaratory Judgment:** A declaration that the October 7, 2025 taking, and the detention after the October 17, 2025 release date, violated the Fourth Amendment; that Pima County's continued detention of the animal is an ongoing seizure; and that Tucson City Code §§ 4-7(1), 4-11(f)(3), 4-11(k), 4-12(a), and 4-12(d) are unconstitutional to the extent alleged in Counts IV, V, and VI.

**C. Compensatory Damages:** An award of compensatory damages against the City of Tucson and Pima County, jointly and severally, in an amount to be determined at trial, including but not limited to:

(1) The $3,600 supersedeas bond and all kennel, boarding, and related fees paid to date (approximately $16,000 and continuing to accrue);

(2) Professional rehabilitation and training costs necessary to restore Snuggles to as close to his pre-violation condition as possible;

(3) Emotional distress damages, including the profound anguish caused by the seizure of a beloved family companion, forced separation, the constant threat of irreversible death, and the ordeal of fighting to keep Snuggles alive; and

(4) All other out-of-pocket losses and consequential damages caused by Defendants' unconstitutional conduct.

**D. Punitive Damages:** An award of punitive damages against the individual Defendants (Officers Mills, Estrella, and Jacobus, and Does 1–10) in an amount

sufficient to punish and deter, because their conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff's clearly established constitutional rights.

**E. Attorney's Fees and Costs:** An award of reasonable attorney's fees and costs under 42 U.S.C. § 1988 and any other applicable authority.

**F.** Such other and further relief as the Court deems just and equitable.

DATED this September 1, 2026.

*/s/ Christina E. Ponig*
*Christina Ponig*
Christina E. Ponig *(Admitted Pro Hac Vice)*
*-and-*
*William B. Thomas* [AZ Bar. No. 039456]
MCDOWELL HETHERINGTON, LLP
*Attorneys for Jennifer Evancho*

**CERTIFICATE OF SERVICE**

I certify that, on September 1, 2026, this First Amended Complaint was served on counsel for the City of Tucson and Pima County through the Court's electronic filing service.

*/s/ Christina E. Ponig*
Christina Ponig