IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PIMA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>vs.<br><br>JENNIFER EVANCHO,<br><br>Defendant. | No. C20258606 |

Tucson, Arizona
November 24, 2025
9:00 a.m.

BEFORE THE HONORABLE SARAH L. MAYHEW

TRANSCRIPT OF PROCEEDINGS

Hearing

Proceedings recorded by electronic sound recording; transcript produced by eScribers, LLC.

DANA BUETTNER
Transcriptionist

eScribers

EXHIBIT B

# I N D E X


November 24, 2025

| STATE'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VD |
|---|---|---|---|---|---|
| Ofc. Leslie Mills | 12 | -- | -- | -- | -- |
| | -- | 23 | -- | -- | -- |
| | -- | -- | 29 | -- | -- |
| Sgt. Paige Gagnon | 32 | -- | -- | -- | -- |
| | -- | 46 | -- | -- | -- |
| | -- | -- | 51 | -- | -- |
| Dr. Mariam Bourque | 55 | -- | -- | -- | -- |
| | -- | 61 | -- | -- | -- |
| | -- | -- | 65 | -- | -- |
| | -- | -- | -- | -- | 53 |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VD |
|---|---|---|---|---|---|
| Clara Gastelum | 68 | -- | -- | -- | -- |
| | -- | 76 | -- | -- | -- |
| Vanya Moreno | 79 | -- | -- | -- | -- |
| | -- | 88 | -- | -- | -- |
| Blase Evancho | 100 | -- | -- | -- | -- |
| | -- | 105 | -- | -- | -- |
| Jennifer Evancho | 106 | -- | -- | -- | -- |

## M I S C E L L A N E O U S


| | PAGE |
|---|---|
| State's Closing Argument | 108 |
| Defendant's Closing Argument | 110 |
| Court's Ruling | 113 |

EXHIBITS

STATE'S EXHIBITS:

| NO. | DESCRIPTION | ID | EVD |
|---|---|---|---|
| 1 | Picture of Diaper and Scalp Tissue | 15 | 15 |
| 4 | Photo of Victim's Face After Treatment | 38 | 38 |
| 5 | Photo of Victim's Right Side | 38 | 38 |
| 6 | Photo of Victim's Arm | 38 | 38 |
| 7 | Photo of Victim's Hand | 38 | 38 |

APPEARANCES

November 24, 2025

Judge: Sarah L. Mayhew

For the State:

Roni Byrne

Witnesses:

Ofc. Leslie Mills

Sgt. Paige Gagnon

Dr. Miriam Bourque

For the Defendant:

Janet Altshulerltschuler

Witnesses:

Clara Gastelum

Vanya Moreno

Blase Evancho

Jennifer Evancho

Tucson, Arizona

November 24, 2025

(The Honorable Sarah L. Mayhew Presiding)

HEARING:

THE COURT: This is the matter of State v. Jennifer Evancho. Shows she is present and being represented by Janet Altschuler. Ms. Byrne for the State. We have a lot of witnesses.

MS. BYRNE: Mostly trainees, Your Honor.

THE COURT: Got it.

MS. BYRNE: Yeah.

THE COURT: Okay. Is anybody invoking the rule?

MS. ALTSCHULER: We were just talking about that. Yes. I would like to invoke the rule. Obviously, I don't mind the trainees hanging out. I believe the State has a case officer, and I have, essentially, a case officer, too. It's a animal behaviorist expert.

THE COURT: Okay.

MS. ALTSCHULER: Vanya Moreno. She's right behind me.

THE COURT: All right.

MS. ALTSCHULER: I would ask that she stay.

THE COURT: Okay. Are there any witnesses who are not --

MS. BYRNE: Your Honor, may I respond?

THE COURT: Yeah.

MS. BYRNE: According to the Local Rules of Practice and Procedure in the City Court Civil Proceedings, City of Tucson, Rule Number 16, "The rules of evidence do not apply in civil traffic, civil infraction, or civil parking infraction proceedings. Any evidence offered shall be admitted subject to determination by the magistrate, special magistrate, or limited special magistrate, as that the evidence offered is relevant and material."

So in essence, the State would argue that there is no rule to invoke because the rules of evidence do not apply in this case.

MS. ALTSCHULER: Well, Judge, rules of evidence apply in the sense that relevance applies and rules -- even though it doesn't say it specifically -- we don't traditionally and, as a norm, have witnesses listen to each other's testimony.

We know that it can prejudice and influence other witnesses. We do have this exception for case officers, victims, and experts. So I think it's just one case officer. And then I intend to call my client's husband, and he's got the two kids with him that he's watching. So he would leave the room.

THE COURT: Okay.

MS. BYRNE: The rules of evidence do not apply in this case.

THE COURT: All right. Are there other witnesses that the State is intending to call?

MS. BYRNE: I have Inv. Gagnon, who's my case officer; Officer Mills, who visited the victim in the hospital; and Dr. Bourque, who is the evaluator in, you know, from back to the (indiscernible).

THE COURT: All right.

MS. BYRNE: So in essence, they all testify to different things.

THE COURT: Okay. Hold on one second.

(Pause)

THE COURT: I'm still looking at this issue. I'm sorry. I'm not normally an animal forfeiture judge. So I'm trying to look this up. Ms. Byrne, can you give me the local rule again?

MS. BYRNE: Yes. It's Local Rules of Practice and Procedure in the City Court Civil Proceedings City of Tucson.

THE COURT: Um-hum.

MS. BYRNE: Rule Number 16, Rules of evidence.

THE COURT: Rule 16?

MS. BYRNE: Yes.

THE COURT: Thank you.

(Pause)

MS. ALTSCHULER: And, Judge, I can -- I'm not adamant about this. In this case, I really don't think it would make

that much of a difference substantively for me. I can concede.

THE COURT: You don't have to. Let me finish looking it up. It's just --

MS. ALTSCHULER: Okay.

THE COURT: Sorry. It's just I want to make sure I know what rules we're applying here, too. So let me make sure I've got it.

Sorry. Just please hang on. Okay. That was strange. I am not finding those local rules.

THE CLERK: I do have them printed out, Your Honor, (indiscernible).

MS. ALTSCHULER: Oh yeah. I was just going to say --

THE COURT: Yeah, I'm just trying to find where they're located.

MS. ALTSCHULER: I'm not going to judge. That's okay.

THE COURT: I don't know why they're not showing up. Our website is so fabulous that I cannot find (indiscernible).

All right. Thank you. I very much appreciate that.

MS. BYRNE: Of course.

THE COURT: All right. So it refers to civil violations or civil infractions, including civil parking and civil traffic. Okay. And then under definitions, "Civil infraction means any civil violation or civil infraction of the city charter, city code, or city ordinance." Okay.

MS. BYRNE: And if the Court would refer to Tucson City Code for 11(e), it does state that the hearing is conducted according to the --

THE COURT: The civil rules?

MS. BYRNE: -- civil rules.

THE COURT: All right. Okay. All right. So in that case, the rule of exclusion does not apply in this case.

Thank you, Ms. Jergenson.

THE CLERK: Of course.

THE COURT: You can have that back and I will make sure I bookmark that for future reference.

THE CLERK: Okay.

THE COURT: So we are going to proceed without the rule of exclusion. I would note that, for the witnesses who are remaining in the courtroom, it is very important that your testimony is not influenced by the testimony of others because this is a fact-finding mission.

All right. Okay.

MS. ALTSCHULER: (Indiscernible) any other matters -- a housekeeping matter? I have to set a trial in Milian's courtroom.

THE COURT: Okay.

MS. ALTSCHULER: If we could take a quick break at, like, 10:00?

THE COURT: Yeah. That's not a problem.

Okay. Why don't we proceed?
Ms. Byrne?
MS. BYRNE: State waives an opening statement, Your Honor.
THE COURT: Okay.
What about you, Ms. Altschuler?
MS. ALTSCHULER: I quickly, like --
THE COURT: Go ahead.
MS. ALTSCHULER: You know what? I will waive.
THE COURT: Okay.
MS. ALTSCHULER: Yeah.
THE COURT: All right.
Ms. Byrne, do you want to call your first witness?
MS. BYRNE: State calls Officer Mills.
THE COURT: Raise your right hand.

OFFICER LESLIE MILLS

called as a witness for the State, having been duly sworn, testified as follows:
THE COURT: Go ahead and be seated.
MS. BYRNE: Hi. Can you hear me okay?
THE COURT: Yes, I can.
MS. BYRNE: Okay.

DIRECT EXAMINATION

BY MS. BYRNE:
Q Can you please state your name and spell your last

name for the record?

A Leslie Mills. M-I-L-L-S.

Q And where do you currently work?

A I work for Pima Animal Care Center.

THE COURT: Sorry. They're very responsive.

THE WITNESS: As a protection officer.

BY MS. BYRNE:

Q How long have you been working there?

A I've worked since June 30th.

Q What do animal protection officers -- can you briefly explain your responsibilities and duties?

A Yes. I am a field officer, and I enforce the animal laws through Pima and Tucson, as well as follow up with bite complaints, rabies protocol, as well as investigate animal cruelty and neglect.

Q And you stated you recently started your work at PACC. Do you have previous experience with animals?

A Yes, I do.

Q Roughly how many years?

A I would say all my adult life.

Q Can you briefly describe your experience with animals?

A Yes. I have worked in the horse industry since I was 15. I've also been a veterinary technician for five to six years. I am currently in veterinary technician school.

Q Were you working on October 7th of 2025?
A Yes.
Q And do you remember you were dispatched to an address?
A Yes.
Q Do you remember the address?
A Not off the top of my head.
Q Will it help you if you saw the report?
A Yes.
Q (Indiscernible).
A The incident was at 8230 East Woodland Road.
Q And when you were dispatched, what did you know about what you're coming to?
A We were dispatched by Tucson Fire Department that a woman 68 years of age was attacked by a dog currently.
Q Is that normally dispatched by Tucson Fire Department?
A We assist police and other off -- agencies. Yes.
Q Okay. So when you arrived at the address, is this address now and was it then within the city limits of Tucson?
A Yes.
Q And when you arrived, was the victim still there?
A No.
Q Did TFD describe where she was?
A Yes.

Q Do you remember what they said?
A Tucson Fire Department said that she had been taken by EMS to St. Joseph's Hospital.
Q Did they describe to you anything about the severity or the injuries that the victim sustained?
A Yes. So Tucson Fire Department chief showed a picture of what appeared to be a piece of scalp with hair attached from the victim.
Q Okay. I'm showing you a picture. State Exhibit 1. Can you describe what you're seeing?
A It appears to be some type of diaper used on the ground. There is tissue and scalp pieces, appear to be from a human, with a large amount of hair.
Q Did you see that when you were in the property?
A Yes, I did.
Q Did you take that picture?
A I can't recall if this is the exact picture I took.
Q To the best of your recollection, does it look like you did on October 7th?
A Yes, to the best of my recollection.
MS. BYRNE: State would move to admit Exhibit 1.
MS. ALTSCHULER: There's no objection.
THE COURT: Admitted.
(State's Exhibit 1 Received)
BY MS. BYRNE:

Q Once he told you that and he explained that the victim was no longer there, how did you proceed?

A So we did observe the dog was confined. The Tucson fire chief did point out the dog that initiated the attack. It appeared to be a large Anatolian Shepherd that was brown brindle with white.

The dog was running the fence line. It appeared to be a fenced-in horse enclosure. So we no longer needed the Tucson Fire Department on scene, as we were going to meet with the homeowner and evaluate the dog.

Q So the dog was confined?

A At the time of our arrival. Yes.

Q When you first saw the dog, did you see any indication of an attack or anything was out of order?

A The dog did have some blood spots on its white chest and front limbs that appeared to be fresh.

Q Did you see any injuries on the dog?

A I did not see any injuries.

MS. BYRNE: Your Honor, the State would like to publish.

THE COURT: Okay.

MS. BYRNE: (Indiscernible).

THE COURT: Yeah. That's fine.

MS. BYRNE: Thank you.

BY MS. BYRNE:

Q If you look behind you, would that be the dog that you saw?
A Yes.
Q And you saw blood. Can you describe exactly -- can you point where the blood was?
A The apparent blood was in this region on the forelimbs, and there's a few spots on the left chest.
Q And no injuries to the dog himself?
A Not that I could observe.
Q Did you mention the breed of the dog?
A It appeared to be an Anatolian Shepherd.
Q From your training and experience, do you know anything about Anatolian Shepherds?
A Yes.
Q Can you share?
A I have worked with Anatolian Shepherd types in the veterinary clinic standpoint, as a veterinary technician. They are usually used as herding guard dogs for livestock. They're -- from my knowledge, they're very intelligent, protective, as well as they need a lot of training at young age and socialization.
Q Okay. Did you meet the owner of the dog?
A Yes.
Q Do you remember her name?
A Jennifer.

Q Do you see her in the courtroom today?
A Yes, I do.
Q Can you describe where she's sitting and the color of her shirt?
A She is wearing a green jacket and she's sitting right here.
MS. BYRNE: Your Honor, may the record reflect that the witness identified the respondent?
THE COURT: Yes.
MS. BYRNE: Thank you.
BY MS. BYRNE:
Q Did she tell you that she was the owner of the dog?
A Yes.
Q Did she say what happened?
A Yes.
Q Do you remember briefly what she said?
A Yes.
Q Can you describe?
A She had told us that her mom was out front and was attacked by her male Anatolian Shepherd named Sergeant Snuggles earlier that morning. The dog was on a tie-out. The mother was taking care of an older dog that resided on the property, that also Tucson Fire Chief were concerned of as far as his welfare.
That the mom was walking back in the house and was

attacked by the dog that was on the tie-out -- Sergeant Snuggles. She didn't witness the attack but had seen some on the Ring camera.

She was alerted by the screaming of her mother, and that's what alerted her to come outside to assist, either to stop the attack and assist her mom.

Q Did she tell you how old her mom is?

A Sixty-eight years old.

Q And how old is Mr. -- sorry -- Sergeant Snuggles?

A She told me a year old.

Q Is he intact?

A Yes.

Q What's your experience, in terms of being a field officer, about tie-outs in Tucson?

A Tie-outs are --

MS. ALTSCHULER: Objection to relevance.

THE COURT: So she's not charged with a crime here. Tie-outs are not allowed. Why is that relevant?

MS. BYRNE: It's relevant for the possible reason of why the dog reacted so violently, Your Honor.

MS. ALTSCHULER: Well, that's speculation. And if you're going to start -- she's not charged with any crime.

THE COURT: Yes, but it is relevant to the animal's behavior. So I will allow it.

BY MS. BYRNE:

Q Was Sergeant Snuggles the only dog on a tie-out, as far as you could see?
A As she had stated, yes.
Q Okay. But there were other dogs in the house. Is that correct?
A There was other dogs in the property.
Q Okay. Did you see them?
A I did see Raleigh, which was told to me as a 15 or elderly Australian Shepherd that had some type of spine and arthritic behavior that they were caring for that couldn't use the bathroom outside. So they would take him out. I did observe him as I was performing a welfare check on the animal, as stated by Tucson Fire Chief, that looked very ill.
Q And were there any other dogs on the property?
A Yes. A female Anatolian Shepherd that I did not visibly see, but through a window.
Q Did Ms. Evancho explain to you why they had to be apart?
A Yes. Because the female Anatolian Shepherd was intact as well and currently in a heat cycle.
Q Okay.
A And she wanted to keep the dogs apart.
Q Did she tell you whether she -- how she reacted when she heard the screaming?
A That she came out immediately and told the dog, no.

And confined the dog.

Q Okay. What did she do then?

A Can you repeat the question?

Q I'm sorry. After she confined the dog, what did she do?

A She stated that she assisted her mom by calling 911.

Q Okay. Did she mention whether the dog had any history of prior violence?

A She stated this dog has not had previous violence.

Q Okay. Did she show you Ring video footage?

A Yes, she did.

Q Can you describe what you saw?

A So the first clip of the Ring foot -- footage was approximately 30 seconds. It basically showed the mom walking out towards the lawn in the front yard, and then walking back and screaming. I did not see or witness on the video the attack, but did hear a woman scream. And then a woman running back to the lawn holding her head.

Q Okay. Did you ask to see the place where the attack occurred?

A Yes.

Q Can you describe it?

A Yes. So the tie-out was in the front entryway. There was a cement walkway that appeared to be freshly wet from either being hosed. There was some spots of blood right in the

water.

It looked like the diaper with a piece of scalp and hair was right on the entryway around some grass and weeds. And there was a couple steps. And that is what I observed where the attack happened.

Q So you mentioned that the area was wet. Did it rain that day?

A No.

Q Was any area around the patio wet?

A It didn't appear to be.

Q Okay. So what's the protocol with biting dogs? What did you do next?

A So biting animal is a ten-day rabies quarantine after a bite has occurred due to the severity as well as the tie-out as well as the importance. We did have Jennifer load and help us get the dog to transport to PACC for a ten-day quarantine hold to observe for rabies symptoms.

Q And could she produce proof that he was vaccinated properly?

A At that time, it was very difficult of a scenario. So she did provide me with her veterinary that she uses for her animals, and I was able to contact them later that day and get proof of rabies vaccine, as well as medical records on a dog named Raleigh that I did the health check. That was the elder dog.

Q Okay. Were there any health concerns in terms of -- with relation to Sergeant Snuggles himself?

A Not that I appeared in the notes.

Q All right. Later on that day, did you go to St. Joseph's?

A Yes.

Q Did you meet someone there?

A Yes.

Q Do you remember who?

A It was the victim's brother. I do believe his name was Mike Garcia.

Q Okay. What did he tell you?

A He had told us that he was in the room taking care of Clara. She was in the bed. She was sleeping at the time of our arrival.

He stated that she was attacked. She was awake earlier and remembered the incident. That she was probably going to have some type of surgery later that day. And they were having difficulty stopping the bleeding.

Q Did you see the victim?

A I did.

Q Can you describe what you saw?

A I saw an elderly woman laying in the bed with her arm wrapped up as well.

Q I'm sorry, which arm?

A I -- I do believe it was the left, but I -- I would have to read those notes.

Q Okay.

A And her face was bandaged completely around. All I could see was her eyes, nose, and mouth at that time. It looked like it was bandaged pretty thick.

Q And you couldn't talk to her?

A No.

Q Okay. Did you have any more contact with either Ms. Evancho or the victim, Clara?

A I did have contact with Jennifer to let her know that Sergeant Snuggles did arrive at PACC and was impounded.

MS. BYRNE: Thank you.

No more questions, Your Honor.

THE COURT: All right.

MS. ALTSCHULER: Okay.

CROSS-EXAMINATION

BY MS. ALTSCHULER:

Q Officer Mills, you indicated you worked as a vet tech, but you're in vet tech school right now?

A Um-hum.

Q Okay. How does that work if you're not yet a vet tech? Were you assisting that (indiscernible)?

A So you do not have to be a licensed veterinary technician to do the role of veterinary technician, as far as

veterinary. But to in -- harbor the skills and for higher pay and specialty, veterinary technician licensing through the national exam is recommended.

Q And is that with -- it seems you're called to horses.

A Um-hum.

Q That you did some work with horses since you were a teenager. Did you work with a large animal vet or was it a vet that did large and small animals?

A No, I was a farrier.

Q A farrier?

A Yes.

Q Okay. Horse hooves, correct?

A Yes.

Q Okay. (Indiscernible). So when you went to Ms. Evancho's home and spoke to her, she explained to you that the reason the dog was on a tie-out was because her female Anatolian Shepherd Keoki was in heat and in another fenced area of the yard, correct?

A Um-hum.

Q Okay. And so her property had adequate fencing? You looked at the fencing?

A It appeared to be horse-style fencing and it was adequate in certain areas. Yes.

Q Adequate to hold dogs -- to contain dogs? No holes on the bottom or holes in the fencing that dogs could get out

of?

A I didn't walk the fence line to appear to see any holes or anything like that. The dog was confined at that time walking the fence line. So.

Q Okay. And in your research with with veterinary records and PACC records, there is absolutely no history of any of Ms. Evancho's dogs being at large, correct?

A Not that I've seen.

Q Okay. So neither Sergeant Snuggles, Raleigh, or Keoki have ever escaped. Fair to say?

A In the reports.

Q Okay. That you're aware of?

A Correct.

Q Okay. And when you arrive, all the dogs were contained?

A Correct.

Q No dog came and ran up to you or was running on the property, correct?

A Correct.

Q Okay. So Ms. Evancho explained that Keoki was in heat and she was trying to keep Sergeant Snuggles away. They didn't want puppies, correct?

A Correct.

Q Okay. And that was why Sergeant Snuggles was on the tie-out, correct?

A That -- from what she said, yes.

Q Okay. She told you that her mom went outside on the patio and was walking towards the grass to help Raleigh, the older dog, correct?

A Correct.

Q And she didn't see what happened, but she believed as her mom was walking past the male dog on the tie-out, the dog -- Sergeant Snuggles -- attacked her mom, correct?

A Correct.

Q She was inside when this happened, and she heard her mom, and she ran out to help her mom. And that was approximately at 7:20 in the morning, correct?

A I don't remember the exact time, but I can review the incident --

Q Would you look at the report in front of you? It's the part where you're talking to Ms. Evancho.

A Correct.

Q 7:20, correct?

A Correct.

Q And about what time did you arrive? Do you know?

A We arrived to (indiscernible) -- would have to review the notes as well. So appeared 7:45 approximately, we arrived.

Q And Ms. Evancho believed she told you she stopped the attack when she came out of the house and screamed at the dog,

correct?
A Correct.
Q Okay. When she came out, the dog was separated, no longer attacking her mom, correct?
A Correct.
Q And then she called 911. And mom -- the victim -- was taken to St. Joseph's Hospital, correct?
A Correct.
Q And you then began some research about the older dog, as well as Sergeant Snuggles, to make sure everybody was vaccinated and cared for, correct?
A Correct.
Q And you learned that Raleigh, the older dog, was having routine health checks for his end-of-life care, correct?
A Correct.
Q And that diaper you keep mentioning, that was Raleigh's diaper? Were you able to determine that?
A It appeared to be, but I didn't inspect, like -- I can't tell the difference between --
Q A human and a dog diaper?
A Some people use interchangeably, but it appeared to be.
Q Okay. And you didn't go back to Jennifer's mom in the hospital to interview her later?
A So she was going to get a surgery performed. We

hadn't reset the call for another officer to respond.

Q Okay. And along with new at-large reports, Sergeant Snuggles has -- there aren't any bite reports in the past, correct?

A Not that I see.

Q Okay. If I could just have one second.

A Not a problem.

Q Okay. Jennifer, you asked Ms. Evancho to help you put Sergeant Snuggles in the truck, correct?

A Correct.

Q And you watched her do this?

A She -- to -- she asked if she could help as well as we also know that stress of the animal -- if any more help. The dog was approximately -- appeared to be 120 pounds.

Q So you watched her do this?

A I watched her leash up the dog and walk towards the truck. Correct.

Q Okay. No problem with that? You didn't see any aggression with the dog?

A The dog was -- appeared to be in an active high intensity state, but no reaction.

Q Okay. And the dog got on the truck, correct?

A Correct.

Q Okay. And Ms. Evancho showed you her video. She was cooperative with you. She spoke with you, correct?

A Yeah.

Q Allowed you to come into her home and look around, do everything you needed to do, with no resistance. Fair to say?

A Fair to say. We never stepped in the home, though.

MS. ALTSCHULER: Okay. I don't have any other questions.

THE COURT: Redirect?

MS. BYRNE: Thank you.

REDIRECT EXAMINATION

BY MS. BYRNE:

Q Jennifer said she did not see the attack, but did she tell you that the dog attacked her mom?

A She appeared that the dog attacked her mom. She did not witness the attack, she stated.

Q And what did Clara's brother tell you about the attack?

A He had some questions. Wondering why the attack happened. That the -- the dog has never attacked her before, that he was very concerned about the dog in that scenario. But I had no other info for him at that time.

Q So he did talk to Clara?

A Yes. He said that she was able to talk a little bit ago before our arrival, and was able to relay the incident, and he was concerned.

Q And did he say anything about Clara describing the

attack?

A He said it was very horrific that a dog could do this.

Q But is that something that came from Clara or from him?

A So I'm not sure if --

Q Okay.

A -- it came from Clara or him. He just stated.

Q All right. You said that -- you describe a high intensity state when Sergeant --

A Yes.

Q Can you explain that?

A So from my training as a veterinary technician, as well as working with animals, I've been able to recognize fight and flight response.

And so after a fight, they come into that hyper state and basically -- is what I appear -- is their body starts to slow down, process everything. But he was still running the fence line. He was still in that fight or flight response.

Q Did you happen to see him in PACC when he was bonded in his crate?

A I -- I put him in the kennel.

Q Did you visit him between?

A A few times. Yes.

Q Can you explain or describe his behavior?

A His behavior was even a higher intensity state. Very -- lunging at the kennel, as far as that goes. Pretty intense. And his eye contact was definitely concerning as far as -- definitely whenever they look towards you and have that whale eye, it was a -- I was concerned.

Q Can you explain about the eye (indiscernible).

MS. ALTSCHULER: I'm going to object to this. This was never disclosed. Anything that happened after the dog went back was never disclosed. My client asked to see the dog at PACC and was refused, so there's no way for me to refute that evidence. There has to be some level of fairness here in terms of disclosure.

THE COURT: Sustained.

MS. BYRNE: I would just like to remind Counsel that I did send you the dangerous dog evaluation, and that was after he was bonded to PACC. So there is some report about the dog after. Just to put on the table.

THE COURT: There's no description --

MS. BYRNE: No, I agree. I -- but --

THE COURT: Okay. Okay.

MS. BYRNE: Yeah.

THE COURT: All right. I am going to sustain on this line of questioning though.

MS. BYRNE: No more questions. Thank you.

THE COURT: All right.

You may be excused.

THE COURT: Next witness?

MS. BYRNE: State calls Sgt. Gagnon.

THE COURT: Okay. Can you raise your right hand?

SERGEANT PAIGE GAGNON

called as a witness for the State, having been duly sworn, testified as follows:

THE COURT: Go ahead and be seated.

DIRECT EXAMINATION

BY MS. BYRNE:

Q Can you please state your name and spell your last name for the record?

A My name is Paige Gagnon. G-A-G-N-O-N.

Q And what is your current employment?

A I am a animal care field sergeant for Pima Animal Care Center's Animal Protection Division.

Q How long have you been a sergeant for PACC?

A Going on about two months now. I've just been (indiscernible).

Q And when did you start working in PACC?

A November of 2023.

Q Can you describe your position's impact?

A I was originally hired as a animal care protection officer. After around two years in that position, I was promoted to a animal care field investigator. I was in that

position for a little over a year, and then I was promoted to sergeant.

Q What's the difference between an officer and an investigator?

A So officers will respond to bite calls, conduct rabies quarantines, as well as negligence and cruelty investigations. Investigators work more hands-on with dogs that are deemed dangerous, higher-level bite cases, and then the higher-level negligence concerns.

Q Do you have any experience with animals before you started working for PACC?

A Yes. So before I started working with PACC, I worked at a dog daycare and then eventually moved to dog training. I did attend a dog training academy. CATCH Canine Dog Trainers Academy.

Q You are sergeant, so are you, in a sense, higher than the officer you sent to interview?

A Yes. So I -- I -- my position is to supervise them.

Q Okay. Have you read the report that he submitted?

A I have.

Q Did you look at the pictures he submitted?

A I did.

Q Do you remember what statements Clara made on the report?

A So when Officer Cadena went out to her property to

take her victim statement, she stated that she was helping care for the elderly dog that was there. I believe his name is Riley (phonetic). Raleigh. The dog can't walk out to use the restroom, so she carried the dog out.

She walked past the dog. Dog was completely normal. She walked back in, past the dog. She stopped to say hello to him. She patted him on the head.

She called him a good boy, and then the dog latched onto her arm, bit her multiple times on her left arm, dragged her to the ground, bit her on her head multiple times.

She was able to pull on the tie-out that was holding the dog and was able to get away from the dog at that time.

Q Did you view the pictures that he took?

A I did.

MS. BYRNE: Okay. I'm showing Defense 5, 6, and 7.

Anyways. Okay. Let's go one by one. Start with Exhibit 4.

BY MS. BYRNE:

Q What do you see?

A So this is a photo of the victim. It is on -- I believe it is -- the left side of her face after she received medical treatment. She has extensive suturing on a wound there. It's a large portion of her cheek that appeared to have been lacerated.

Q If you look behind you, is that the picture you're

holding in your hand?

A That is correct.

Q Do you know of any surgeries that she had to go through or any description that you gave Officer Cadena?

A From the conversation Cadena had with her, she had to have reconstructive surgery for her face and her scalp.

Q Okay. Can you look at the next picture? Is that another picture that was in the report?

A This is. Yes.

Q Okay. And what are you looking at?

A So this is a photo of the victim's right side. It is a --

THE COURT: I'm going to pause for a second. I apologize for the intrusion. Number one, we have little kids in the room, and I'm not sure about the photos. If that's --

MS. ALTSCHULER: Are you okay with that?

THE COURT: It looks like it's pretty upsetting to them.

Number two, Judge Milian is looking for Ms. Altschuler.

MS. ALTSCHULER: Okay.

THE COURT: Why don't we take a five-minute break? Let's adjust our scenario and we'll deal with that when we come back.

MS. ALTSCHULER: Okay.

THE COURT: Okay.

(Pause in proceedings)

MS. ALTSCHULER: They're out. The kiddos are out.

THE COURT: Yeah? Okay.

MS. ALTSCHULER: (Indiscernible).

MS. BYRNE: Would you (indiscernible)? Are you done with your meeting?

MS. ALTSCHULER: Yeah. I'm done.

THE COURT: All right. We are back on the record in the matter of State v. Jennifer Evancho. LC25040922.

And, Sergeant Gagnon, remember that you are still under oath.

I will note the presence of the defendant and Counsel and Ms. Byrne for the State.

Go ahead.

MS. BYRNE: The next photo, I believe, is Exhibit 5?

THE CLERK: Yes.

BY MS. BYRNE:

Q Okay. Can you describe what you are seeing?

A So this is a photo of the victim's right upper thigh. It's on the inner groin area of the leg. It is a very large laceration that has received stitches. There is dark yellow and blue -- blue bruising surrounding the area.

Q And that is, again, a picture that Officer Cadena took of the victim?

A It is.

Q And the next one is number --

THE CLERK: 6.

BY MS. BYRNE:

Q Okay. Can you describe what you're looking at?

A This is a photo of the victim's arm. This was a photo taken by Officer Cadena. There are two -- two punctures that are exposing underlying fatty tissue. And there is blood present in the wounds as well.

MS. BYRNE: Okay. And the next picture is?

THE CLERK: 7.

MS. BYRNE: Okay.

THE WITNESS: This is a photo of the victim's hand. This is taken by Officer Cadena. It is -- on -- on the victim's hand, there is a laceration on the wrist, as well as dark blue bruising on the hand.

BY MS. BYRNE:

Q And this is the left-hand that Officer Mills said was bandaged when she came to, right?

A Yes.

Q Thank you.

MS. BYRNE: State moves to approve Exhibits 4 through 7.

MS. ALTSCHULER: No objection.

THE COURT: Admitted.

(State's Exhibit 4 Received)

(State's Exhibit 5 Received)

(State's Exhibit 6 Received)

(State's Exhibit 7 Received)

BY MS. BYRNE:

Q Did Officer Cadena, in his report, refer to any statements made by the victim?

A He did. He had a -- a conversation with the victim.

Q And do you remember what she told him?

A After she gave her statement as to what occurred during the attack, she did state that she was fearful of the dog.

Q Uh-hum.

A She would not return to the home if the dog stayed at the property, and that she was in fear for the safety of the children at the property.

Q Do you happen to know how many children live in the house?

A I'm not sure.

Q Okay. All right. So you went -- you're in PACC, and then on October 13th, you met Ms. Evancho. Is that correct?

A Correct.

Q Can you describe briefly what happened?

A So she came to PACC to have a conversation about the bond process.

Q Uh-hum.

A I did have to reissue the bond forms that had been issued incorrectly, so I went over the bond process again with her, reissued the forms.

She had brought in her behaviorist. I believe her name is Dr. Vanya. And we had a conversation for a treatment plan or a behavior plan for the dog if we were to release the dog back into their custody. This plan included behavior management modification as well as a partial pulpectomy.

Q Okay. Can you first explain very shortly what it is? Because I have a follow-up question. Sorry.

A Partial pulpectomy?

Q Yes.

A Okay. A partial pulpectomy is where they remove part -- part of the dentition in a dog. They can either remove them by pulling them out or grind them down to the gum line. And this is done to try and prevent damage done through a dog bite.

Q All right. And you mentioned CATCH earlier, the Canine Trainer Academy?

A Correct.

Q Where did you learn about this procedure?

A So I -- I did not learn this procedure through Canine Trainers Academy because it's typically not something that they would recommend. I have learned about this through working as

an investigator and looking into different ways people try and address behavior issues.

Q Okay. Do you know if it's -- okay. Never mind.

So when you talked to Ms. Evancho, what was your impression in terms of her -- She loved the dog, right? Like, she loved Sergeant. There's no doubt she loves him.

A A hundred percent.

Q She wants him back.

A A hundred percent. Yes.

Q All right. He's well-cared for?

A Yes.

Q Okay. In your experience as a PACC investigator, are you familiar with similar cases where dogs attack their owners or the people they live with?

MS. ALTSCHULER: Objection, relevance.

THE COURT: Overruled.

MS. BYRNE: Thank you, Judge.

MS. ALTSCHULER: Every dog is different. Every situation is different. How can you draw conclusions from this? You can have sick dogs that owners don't know they're sick, that attack and bite people. You're drawing gross generalizations.

MS. BYRNE: Your Honor, it goes to weight, not admissibility.

MS. ALTSCHULER: Well, everything's admitted in this.

And all we have is relevance.

THE COURT: Right.

MS. ALTSCHULER: What if somebody said, in your experience as a judge, are most people convicted at trial?

MS. BYRNE: That is not what I asked, Your Honor. I asked about one specific case that the State has concerned about.

MS. ALTSCHULER: No, she's asking about her general experience where jobs like people that --

MS. BYRNE: That is not what I asked.

THE COURT: Okay. All right. Rephrase the question and then let me -- because -- go ahead.

BY MS. BYRNE:

Q In your experience as an investigator -- you were an investigator for the last year and something?

A Correct.

Q Did you have a case where a dog attacked -- one specific case where a dog attacked its owner?

A Yes.

Q Was the dog surrendered to PACC for the bond?

A Can I describe the case?

Q It's up to the judge.

MS. ALTSCHULER: Judge, this isn't disclosed. This is a case where there are reports.

MS. BYRNE: It's based on her training and

experience, Your Honor. The State here is concerned with the safety of the family. And we, in good faith, believe that this case is relevant.

THE COURT: Right. But I -- okay. If I can. All right. The problem is that you're asking me to compare it to another case that's not in front of me, and we're not going to do a mini trial on the other case.

MS. BYRNE: Nope.

THE COURT: So I'm not -- I don't -- was this case something that was disclosed as evidence in this?

MS. BYRNE: No, Your Honor.

THE COURT: Okay.

MS. BYRNE: I didn't know about it until I interviewed Sergeant Gagnon.

THE COURT: Okay. Then I'm going to sustain the objection.

MS. BYRNE: Okay.

BY MS. BYRNE:

Q So based on your training and experience, did you -- okay. You heard the description of the event. From what we heard, the dog was calm. Based on your experience as an investigator in PACC, do you have any specific concerns about Sergeant Snuggles?

THE COURT: I'm going to allow that.

MS. ALTSCHULER: Yeah. Okay.

THE COURT: Do you want to make your record?

MS. ALTSCHULER: No, I just was processing.

THE COURT: Okay.

MS. ALTSCHULER: Okay.

THE COURT: Yeah. No. That's relevant.

Go ahead.

THE WITNESS: So from my experience and -- and training through being an investigator, part of my job was to evaluate dog behavior, and, from what was described on scene, as well as what I saw from the dog in person, I did have some very -- I had very large concerns for the dog's behavior.

BY MS. BYRNE:

Q Why?

A So from the events that were described in the case notes, this dog did not show any sort of small incremental escalation of his -- his attack. He went from zero to a hundred and mauled this woman to a Level 4 bite, which is one step before death.

And -- and for a dog to jump to causing injuries that severe, it's -- it's very concerning. It, for me, shows that the dog poses a risk to public safety because we can't always control what happens in our environment.

If a kid were to get into that yard to go pick up a ball, we can't control what that kid does. He sees a dog that isn't barking and growling, walks up to him to pat him on the

head, and then small child gets mauled. So I did have some very pressing concerns for his behavior.

Q Just briefly, you mentioned a Level 4 bite.

A Uh-hum.

Q Does PACC have -- are the bites staggered or are they --

A We have a -- a bite scale that we classify bites for, ranging from 1 to 5. 1 is a tooth mark.

Q Uh-hum.

A 5 being death. And this was a Level 4, so it was one step below death.

Q Okay. You talked about the shaving the teeth?

A Correct. The pulpectomy.

Q Pulpectomy. Are you familiar with the concept that is called the Five Freedoms?

A Yes.

Q Can you describe generally what that is?

A So the Five Freedoms is a societal standard of what is expected for animals when they're in human care. 4 and 5 are my major concerns for pulpectomy. Number 4 is the freedom to express natural behaviors, and number 5 is the freedom from stress and anxiety, I believe, or something in that.

Q And you believe, based on your training and experience, that if Sergeant Snuggles went through with that procedure, he will not have those five freedoms?

A Correct. So normal behavior for dogs is chewing, gnawing. They -- they use those behaviors to express anxiety, to cure boredom. When they get excited, it's a way to entertain themselves.

And then if they're unable to do that, that can cause stress in dogs. It can -- dogs protect themselves with their mouths. And if you remove that method of protection, it can cause anxiety in dogs, which can actually elevate unwanted behaviors like biting.

When a dog feels like he has no other option to bite, he will jump to that behavior more frequently.

Q I have a question for you relating to something you said earlier. You said that you have concern for the public. Does that include the immediate family --

A Yes.

Q -- of Sergeant Snuggles?

A Yes. They are -- they are also members of the public.

MS. BYRNE: Okay. All right.

No more questions, Your Honor. Thank you.

THE COURT: All right. Cross-examination?

CROSS-EXAMINATION

BY MS. ALTSCHULER:

Q So you are repeating what Officer Cadena reported. Is that accurate?

A Yes.

Q Okay. So you never spoke to Clara Gastelon yourself, correct?

A No.

Q And as far as PACC officers and investigators go, you guys don't wear body cameras like TPD?

A No.

Q Okay. So it's sort of hearsay on hearsay, right?

MS. BYRNE: Objection.

THE COURT: Overruled.

MS. ALTSCHULER: Well, I'm just clarifying that --

THE COURT: Yeah. It's not -- you're not --

MS. ALTSCHULER: I'm not objecting to it.

MS. BYRNE: Right. Right. Okay.

MS. ALTSCHULER: I'm just trying to clarify how this information is coming through here.

THE COURT: Understood.

BY MS. ALTSCHULER:

Q So no body cameras?

A No.

Q Right. Okay. So with regard to what Officer Cadena said that Clara said -- Clara, the victim.

A Uh-hum.

Q Clara indicated to Officer Cadena that she had walked past Sergeant Snuggles several times while he was on the

tie-out, correct?

A Uh-hum.

Q But the last time before the bite, she stopped and interacted with him, and touched him or petted him or -- and I've heard it described also as a bop on the head.

MS. BYRNE: Objection. That's not in the reports, Your Honor.

MS. ALTSCHULER: Well --

MS. BYRNE: Nowhere in the reports.

MS. ALTSCHULER: She's going to answer and she's also going to testify.

BY MS. ALTSCHULER:

Q But with regard to the report of Officer Cadena, Clara said this last time before the bike, she pet Sergeant snuggles on the head and was talking to him. And that's when the bite occurred?

A Correct.

Q That's -- okay. So there was something different that occurred to this physical interaction with him, correct?

A Correct.

Q Okay. And as far as you know, Sergeant Snuggles has never been at large, correct?

A Correct.

Q And in fact, Ms. -- none of Ms. Evancho's dogs have been at large, correct?

A Correct.

Q And Sergeant Snuggles does not have any bite history, correct?

A Correct.

Q Okay. And are you aware -- did you talk to Ms. Evancho?

A When she came in and I issued the bond, I did.

Q Okay. Did she explain to you why Snuggles and Keoki were intact?

A No. I don't believe so.

Q Okay. Did you call her in to PACC to do the bond paperwork?

A Can I make a correction to my last statement?

Q Sure.

A She -- she did explain why. She stated that she had been told by a vet, due to development, not to have the dogs fixed early before a year into their life.

Q Is that standard?

A I've heard that from vets before. Yes.

Q Okay. Do other people spay and neuter, like, when a dog is a couple months old?

A They do.

Q Yes. Okay. Is there an accepted medical age for spay and neuter?

A I'm not a hundred percent certain. I just know that

it can be done before a year as well.

Q Okay. And this situation where one dog is in heat and another dog is not at a separate location, that's a pretty intense situation for a dog, correct?

A Yes.

Q And as far as you knew, was that the first experience Sergeant Snuggles had around a dog in here?

A I'm not sure. I didn't ask those questions.

Q But he was about a year old.

A Uh-hum.

Q Do you know how old Keoki was?

A I don't.

Q Okay. Did you go to the home at all?

A No.

Q Okay. With regard to the pulpectomy, have you encountered a dog with a pulpectomy in your professional --

A No.

Q No. Okay. And you base your opinions about the pulpectomy on the article that you mentioned in the reports. Is that correct?

A No. So I went searching for veterinary opinion on pulpectomies because, in my training and experience, I had heard that pulpectomies can be adversive and they don't necessarily address the root cause of behavior issues.

But since I'm not a licensed medical professional, I

wanted to see what was the opinion of those -- those individuals.

Q So Ms. Evancho, did you call her to come in so you could reissue the bond?

A I had received a phone call from Ms. Evancho. But when she came in, she came in with questions. And -- and at -- at that time, I reissued since she was already present.

Q Okay. And there was no resistance to any of the administrative tasks you had to do?

A No.

Q And she had questions. She wanted to present a behavior plan and get feedback, correct?

A I -- I believe. Yeah. She wanted to speak with me about her behavior plan, to see if we would release the dog into her custody if she could show proof of that.

Q Okay. And the answer was no, but you did discuss behavior management plans with her?

A Correct.

Q Okay. And her demeanor with you at that time was polite and pleasant?

A Correct.

Q Okay. Okay. If I could have one second.

A Sure.

MS. BYRNE: All right. I don't have any other questions.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. BYRNE:

Q have a question. When you met with Ms. Evancho, did she explain what the injuries stemmed from? What caused the injuries? Do you remember?

A She stated that the injuries to the face were caused by the dog's nail and not the dog's mouth.

Q And then, you read Officer Cadena's reports. Is that correct?

A Correct.

Q Are you familiar with him as an officer?

A Yes.

Q You're his supervisor?

A Yes.

Q Are you familiar with any disciplinary or problems with his accuracy of describing reports?

A No.

Q Thank you. What exactly did you speak, in terms of behavior management with Ms. Evancho. Do you know?

A We didn't go into a behavior plan, like, any particular. She just stated that she did have one, and she was working with a behaviorist.

Q Okay. So no details?

A No details.

MS. BYRNE: Okay.

No more questions, Your Honor.

Thank you.

THE COURT: You may step down.

State have any more witnesses?

MS. BYRNE: State calls Dr. Bourque.

THE COURT: Raise your right hand for me.

DR. MARIAM BOURQUE

called as a witness for the State, having been duly sworn, testified as follows:

Do you solemnly swear or affirm under penalty of perjury, to tell the truth, the whole truth, and nothing but the truth?

DR. BOURQUE: I do.

THE COURT: Okay. Go ahead and have a seat.

VOIR DIRE

BY MS. BYRNE:

Q Hi. Good morning.

A Good morning.

Q Can you please state your name and spell your last name for the record?

A Mariam Bourque. B-O-U-R-Q-U-E.

Q And where do you work?

A I work at Pima Animal Care Center as a veterinarian.

Q How long have you been working there?

A A little over a year and a half.
Q What are your current duties as a vet in PACC?
A Currently, we split surgery and triage duties, so that includes spay/neuter of incoming animals, dental procedures, mass removals, and in triage, dealing more with emergent cases that come in, such as from APS or the public, as well as patients that are already in our care.
Q How long is a shift for you?
A About ten hours, usually.
Q And on average, how many animals do you see per ten hours?
A Usually between forty and sixty.
Q Okay. What degrees do you have?
A I have a degree in veterinary medicine, as well as a bachelor's degree in cognitive neuroscience.
Q And where did you go to school?
A Midwestern University.
Q What licenses do you have?
A Beyond that, I don't have any additional licenses.
Q Your licensed in the State of Arizona?
A I do have the State of Arizona.
Q Are you licensed in any other state?
A No.
Q Okay. Where did you work prior to PACC?
A Prior to PACC, I worked as a medical director up in

East Mesa, and I did relief work, usually one to two days a week at the shelters up in Phoenix -- (indiscernible) shelters.

Before that, I worked at Maricopa County Animal Shelter for about three, three and a half years.

Q And do you believe that your testimony today with regard to Sergeant Snuggles will assist the finder of fact in this case?

A I hope that it does.

MS. BYRNE: Your Honor, the State tenders Doctor Bourque as an expert.

MS. ALTSCHULER: I have no objection.

THE COURT: No objection?

MS. ALTSCHULER: No.

THE COURT: That's fine.

MS. BYRNE: Thank you.

DIRECT EXAMINATION

BY MS. BYRNE:

Q So you mentioned that, at PACC, there are several procedures that the vets do. Do you do anything in particular?

A I do the majority of the dental procedures.

Q Okay. And can you describe what dental procedures in dogs entail?

A The majority goes from the basics of cleaning, scaling, and polishing to extracting dentition. A lot of vets don't spend as much time, I guess, extracting. So usually the

more complicated ones get sent to me in the clinic, as well as things that involve, like, jaw removals due to fractures, things like that.

Q Okay. When you do dental work on dogs, is that usually under anesthesia?

A Yes.

Q In your training and experience, are you familiar with dog behaviors?

A Yes. I haven't had specialized training in it, but I've worked with animals outside of even being a vet since I was 15.

Q And is behavior something you cover in vet school?

A Uh-hum.

Q You reviewed Sergeant Snuggles' case. Is that correct?

A Yes.

Q When you noticed that he's of Anatolian Shepherd breed, did you have any concerns?

A My major concern was that Anatolian Shepherds have one of the strongest bite forces out of breeds that exist in the U.S.

Q Can you explain that?

A The jaw force, when measurements were done, averages around 720 to 750 psi, whereas a German Shepherd, which most people think of as a fairly strong dog, measures around 250.

Q And psi stands for?
A Pressure force.
Q Okay. So Anatolian Shepherds are at 750 and German Shepherds are at 250?
A Correct.
Q Okay.
A Average.
Q Does a dog control the force of the bite when it bites something?
A I think to a small degree, just like when you are playing with your dog and they're tugging on a toy.
Q Um-hum.
A It's biting gently. Some dogs are more careful than other dogs, but I think in general, a dog that is anxious or upset or for any reason doing something it shouldn't be, such as going after a human, I don't think that controlling that bite is as easily obtained.
Q Is there a way for bite inhibition? If I tell you that term, what can you explain to me?
A It would involve extensive training. It could involve types of muzzles to try to keep them from being able to contact you with their teeth itself.
Q Um-hum.
A It could involve medications. But it's one of those things that, again, depends on the dog, depends on the case.

That is very difficult in general to obtain to any degree of certain safety.

Q Okay. Based on your experience with dogs, are you concerned because there were no previous attacks or any -- from what we hear today -- any warning signs before the attack?

A I am more concerned because of that.

Q Can you explain why?

A He wasn't growling. He wasn't doing anything that caused her to feel unsafe going to pet him on the head or approaching him. He doesn't have any previous bites of smaller degrees of warning bites, or there was no warning behavior with that bite.

So jumping from zero to a hundred is, like Sergeant Gagnon said, is the more concerning factor that -- it's a lot harder to prevent something from occurring again if you can't accurately state why it occurred in the first place.

Q Okay. Do you have experience from reading or in practice with pulpectomy?

A Yes.

Q Can you describe what it is?

A The procedure of a pulpectomy is usually when a dog fractures a tooth acutely within the past couple days or a week, and the owner wants to save the dentition.

You perform a root canal on the tooth, just as many humans get a deep cavity, and you cap the tooth to try to save

them from losing it.

Q Okay. So how does that relate to Sergeant Snuggles? Because that was -- he was explained if the tooth is just --

A From my understanding of the case, it sounds as though they would like to do a partial pulpectomy of four of the canines. So the big long teeth in front. Cut them down basically to the gum line, perform a root canal, and then cap them.

Q Do you have any concerns about the procedure?

A With the procedure itself, the main concern is that I don't know of many vets that are willing to perform that procedure.

Q Why not?

A It's one of the things that are seen as somewhat unethical. That if the dog didn't injure the tooth and there isn't a medical necessity for that because there's no proven cause that removing those teeth will cure the behavior, that not many vets will ethically perform the procedure.

The other is that, just as with a root canal with a human, performing it doesn't guarantee that the tooth isn't still going to fall out, that you aren't going to have pain or infection or any sort of complications from that procedure itself, as well as the fact that if it is only all four canines, as I've -- my understanding is the dog still has other teeth. The dog still has nails. The dog still has a jaw force

of a much stronger capacity than the majority of dogs. So there is still a very high capacity for that dog to cause damage.

Q You mentioned the risks of infection. Does a dog behavior change if they are in pain?

A Yes. It's -- even though they can't tell you they're in pain, it's just like humans where if you're not feeling good, you're going to be a bit snappier or a bit grouchier than you normally would. You may not react the way that you normally would.

Q Generally, what would you say about the quality of life with a pulpectomy for a dog?

A I think that the quality of life is majorly affected in a case like this with a pulpectomy because you still have to go through the other routes of trying to keep the dog from biting.

You still have to talk about doing a potential muzzle long-term. You still have to talk about separating it from other people that you can't be certain it won't go after. You lose the ability to chew and play and act like a normal dog.

Q Okay. So it does not stop the dog from biting?

A It does not, unfortunately, stop the dog from biting.

Q Does it change the force of the bite?

A Maybe. I'm sure that, to some degree, not having those canines would change the force. I'm not certain that

studies have been done on that.

But again, the concern is that the degree of force of this breed of dog is so high to begin with, that even if it drops that bite force down to the level of a German Shepherd, that's still a very strong bite.

Q If Sergeant Snuggles -- we heard in testimony that the house has children, but even the current victim is definitely not a child. Were Sergeant Snuggles released to the family with a behavioral plan, would you be able to support that as a doctor, based on your training and experience?

A I personally would not be able to support that as a doctor. I would still have concerns. I think it's too difficult to be able to state perfectly that we can keep this from happening again, despite your best efforts or your best intentions.

Just because of the fact that there was no warning for the bite. There's no way to say this occurred that caused the bite. We won't do that again.

MS. BYRNE: Okay. No more questions, Your Honor.

THE COURT: All right.

Cross?

CROSS-EXAMINATION

BY MS. ALTSCHULER:

Q You did not talk to the bite victim direct, correct?

A No.

Q And the information you have about no warning comes from various sources (indiscernible) the officers.

A Mostly the report itself.

Q Okay.

A I don't spend the most time interacting with the officers. They come in and out of the clinic.

Q Okay. And PACC officers wrote the report?

A Yes.

Q Okay. And you're aware there's no video of the incident, correct?

A Um-hum.

Q Okay. Now, with regard to a dog being around another dog in heat, does that affect of the dog's behavior? You're aware Sergeant Snuggles was the other dog in the house, wasn't he? Right?

A Yes. It can affect their behavior to some degree.

Q Well, do you recommend the best plan to remove one of the dogs to another location?

A I think that that would be a good step of a bite inhibition plan, but still would not completely guarantee safety.

Q Sure, but a dog being in heat is a unique situation for any dog to be around, correct?

A To some extent. I mean, if she was in the home or in a separate yard, separate from -- there's no guarantee a female

dog in heat isn't going to walk down the fence line that he's walking.

Q Um-hum. Yeah. Okay. With regard to that, were you aware that he was adequately confined, that there's no history of him being at large?

A From what I've heard, yes.

Q Okay. And you're not familiar with how the family interacted with Sergeant Snuggles, whether he was crated at certain times or not other times, correct?

A Um-hum.

Q Nobody talked to you about that?

A No.

Q Okay. The same with being around a dog in heat, a tie-out can also affect a dog's behavior with some of that testimony today, correct?

A Correct.

Q Okay. And how can that affect a dog's behavior?

A It can increase degrees of anxiety.

Q And with regard to pulpectomy, have you encountered dogs with this procedure having been --

A Yes.

Q Okay. And about how many have you encountered in the course of your professional life?

A Probably ten to fifteen, at least. But they're usually law enforcement dogs or dogs that need all four of

their canines in order to be functional and damaged one, usually.

Q You're very soft-spoken. Did you say law enforcement?

A Usually law enforcement.

Q Okay. And law enforcement dogs like the Belgian Malinois we see.

A Yes.

Q And is there a reason that you're aware of why the law enforcement dogs have that?

A It's usually not in the case of shaving down to the gums, but more they fractured a tooth performing something for their job. And they wanted to make sure that the dog was able to keep the tooth and keep performing to its full function.

Q Okay.

A So it's usually capped off in root canal at whatever level they fractured it.

Q Okay. And they weren't concerned about their ability to (indiscernible)?

A It's always a concern, but in that situation, the damage has already been done, and it's more of a salvage procedure, and try to keep their quality of life to the level they were at versus intentionally changing it.

Q And so there are veterinarians that do that work in Arizona, correct?

A Yeah.
Q Okay. But you didn't do that?
A No.
Q And it's fair to say that any dog, no matter the size, can bite a human and cause an injury, correct?
A It is. The forces is definitely different dog to dog and based on the situation. But any dog can cause damage.
Q And so you're concerned with bite forces for larger dogs with larger jaws, correct?
A Yes.
Q So pit mixes and cats and German Shepherds and Belgian Malinois, all the bigger dogs, have bite forces, correct?
A They do, but not to the same extent. And part of it is just in terms of why an Anatolian Shepherd was bred the way that it was bred. It is built for herding. It is built for jaw strength.
Q Are there studies where Anatolian Shepherds who live with families have -- that you're aware of -- studies that show that those dogs cause more injuries than as compared to pits or shepherds or labs that you're aware of?
A There is not that I am aware of.
Q Okay.
A I think the major concern is more that this Anatolian Shepherd has caused damage. So what else is this specific dog

capable of based off of its breed and its situation?

Q But there are no studies?

A Not that I know of.

MS. ALTSCHULER: Okay. So I don't have any other questions.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. BYRNE:

Q Defense asked you about separating the dogs when Keoki is in heat.

A Um-hum.

Q From the testimony you heard here today, were they already separated.

A It sounds like they were.

Q And he still attacked?

A Yes.

Q Okay. I just want to clarify. The pulpectomy in police dogs is in order to improve quality of life?

A Yes. It's to try to maintain their quality of life to the same degree before the fracture occurred. It's not intentionally grinding down the tooth or doing a root canal. It's -- the tooth has already broken. The root is already exposed. You're attempting to save the tooth as best as you can.

Q And the pulpectomy that you refer to that you will

not perform has to do with healthy teeth that require --

A Yes. Yes. Most of those dogs are one tooth, a one-off situation. They bit a bone too hard. They did something.

If this is more in -- in the argument of grinding down all four canines to try to keep a dog from biting. Besides the ethical concerns I have of putting a dog through that procedure with the anesthetic risk, the surgical risks, the complication risks long-term, it's that that does not prevent the behavior itself.

Taking four teeth out of a dog that has forty-two teeth does not keep it from using those other thirty-eight teeth to still go after you when you don't know why it occurred in the first place.

MS. BYRNE: Thank you.

Your Honor, the State would request that Dr. Bourque stays for rebuttal, please.

THE COURT: That's fine.

MS. BYRNE: Thank you.

THE COURT: All right.

You may step down.

MS. BYRNE: State rests, Your Honor.

THE COURT: All right.

MS. ALTSCHULER: We have witnesses. So we'd like to (indiscernible).

THE COURT: I'm sorry?

MS. ALTSCHULER: (indiscernible) Put them on the stand.

THE COURT: Oh, you're calling Clara Gastelum?

Okay.

Ms. Gastelum, can you raise your right hand for me?

CLARA GASTELUM

called as a witness for the Defendant, having been duly sworn, testified as follows:

Do you solemnly swear or affirm, under penalty of perjury, to tell the truth, the whole truth, and nothing but the truth?

MS. GASTELUM: I do.

THE COURT: Go ahead and be seated.

DIRECT EXAMINATION

BY MS. ALTSCHULER:

Q Tell us your name, ma'am?

A Clara Gastelum.

Q And you are Ms. Evancho's mom?

A Yes, I am.

Q Okay. And you were, at the time of this incident, at Jennifer's home, correct?

A Yes.

Q What were you guys doing?

A Well, I was asleep, and I was taking care of our

other dog that was in -- in hospice. Like, we were giving him hospice care.

Q And that was Raleigh, correct?

A Yes. And I was going to -- he woke me up because he was yappy. And so I -- he -- he had gone poop on a towel that I had in there for him. And so I took him outside to clean him up.

That's when I -- I didn't know that Snuggles was there, but I went right by him with the dog, and I put him in the orchard, and I went back inside to grab some stuff to clean him up -- to clean up.

So I grabbed a towel with the poop to go throw it away, and I passed by him again. And the trash cans were out in the road in front of the farm.

So I -- I ran over there, and I threw the towel away, and -- and our dogs started barking everywhere. And our dogs -- dogs were barking everywhere. And -- and I was scared because coyotes and javelinas around there. You know?

MS. ALTSCHULER: I'm just going to move over here. The way the microphone is makes it just hard for me to hear. Is that okay?

THE COURT: That's fine.

MS. ALTSCHULER: Okay.

THE WITNESS: I was kind of scared.

THE COURT: That did not help.

Ms. ALTSCHULER, just make sure you're near a microphone when you ask a question.

MS. ALTSCHULER: Okay.

THE WITNESS: So I ran.

THE COURT: Don't get too close.

THE WITNESS: Too close?

THE COURT: Further back. Yeah. Okay.

THE WITNESS: And so I ran.

THE COURT: Go ahead.

THE WITNESS: And -- and as I was running, you know --

THE COURT: Can you send a message about the microphone? Thank you.

I'm sorry. There's only so much I can do about the technology in the courtroom.

THE WITNESS: Okay. Well, I was running. I ran back, and there was barking everywhere. And when I was coming back, you know, I guess I -- I was all -- I was -- I had fear and anxiety.

I think maybe he -- I don't know if he noticed it, but I was coming in, and he was inside right there and looking everywhere, like scared or -- And so I went -- I said, poor baby. And I went and -- and tapped him on the head.

And that's when he just -- I don't know if I scared him or what, but he turned around and grabbed my arm and went

down.

BY MS. ALTSCHULER:

Q So just going back and making sure I heard correctly. I can tell you're upset. Can I get you some Kleenex? Do you want some water?

A Huh-uh. I'm fine.

Q Okay. So you frequently go to Jennifer's house, correct?

A Yes. I stay there and spend the night with her sometimes because her husband travels a lot.

Q Okay.

A And I stay to help her with that one dog that -- that was in hospice. I mean, that we were doing hospice for him.

Q So you're familiar with all the dogs. You were familiar with Sergeant Snuggles?

A Oh, yeah.

Q Okay.

A He -- he never acted that way towards me before. He was -- he always come to me and hit the top of his head 'cause that's where he liked to be pet. That's why I try to pet the top of his head.

Q So you were walking back and forth, taking care of the poop for Raleigh and --

A Uh-huh. Yeah.

Q -- cleaning up. And you said there were these other

dogs that were barking?

A Yeah. They were barking, like, out -- throughout the -- all the farms around there. I could hear them all.

Q Okay. And as you were walking back and forth, were the dogs barking? Or did they start to bark when you were --

A When I was running. When the trash (indiscernible)

Q And when you say running, were you running?

A Yeah.

Q Running?

A 'Cause I was scared. Yeah.

Q What were you scared of?

A Because usually there's -- there's javelinas or coyotes around there. Was just -- I don't know, it's always -- I'm always scared there.

Q Okay. And would you describe yourself as somebody who's comfortable with dogs, or do you have the same scared feeling around dogs as javelina and wildlife?

A Not with dogs that I know. (indiscernible)

Q Were there other dogs? Those barking dogs, were they on the property?

A They were next door. No, next -- the farm next -- both sides.

Q Okay. Okay.

A And far away.

Q Okay. And did you pat him or tap him on the head?

A Tapped him on the head.
Q Okay.
A And I -- maybe I startled him. I don't know. Bbecause he was kind of looking the other way. Away from me. And (indiscernible)
Q I'm sorry. You don't know what?
A I don't know if he -- if I startled him, if I -- if he got, you know, spooked or whatever, 'cause --
Q Was he standing up or sitting down?
A He was, like, sitting up.
Q Sitting up on his four legs?
A Yeah. On these -- front legs.
Q Okay.
A I'm looking looking towards the neighbor's house.
Q Okay. And were you facing him when you tapped him on the head?
A No. No. He was just looking that way -- the other way, and I just tapped him. I don't know if I scared him or what, but he just -- he's never done that to me before.
Q Right. Were you to the side of him or behind him?
A The side of him.
Q Okay. Did you see any body language from him that indicated he knew you were there?
A No. No.
Q Okay. How many barking dogs, if you're able to tell,

did you think --

MS. BYRNE: Objection, Your Honor. This is pure speculation. Especially since the witness testified she was afraid, her evaluation is even more skewed.

THE COURT: Overruled.

BY MS. ALTSCHULER:

Q If you're able to tell us, was there one barking dog or --

A It was more than one.

Q More than one. Okay. The other times --

A Different directions.

Q Okay. The other times that you've been at Jennifer's home, were these dogs -- have you experienced those dogs barking? The neighbor dogs?

A Sometimes at night from inside the house, yeah.

Q Okay.

A You can hear coyotes and stuff out there. Yeah.

Q Lots of wildlife?

A (indiscernible)

Q Okay. But that day, did you see any wildlife?

A No, I didn't see any.

Q Okay.

A Sometimes they -- they come around in the orchard And -- and my daughter's gone out there and chased them away.

Q Okay. So you talked to people about the dog bite,

correct? You talked to PACC officers and other people after this happened. You spoke to them, correct? .

A Yes.

Q Do you remember telling them that you would not go back to Jennifer's house because of this bite?

A I might have. Yeah.

Q Okay. Did you go back to Jennifer's house?

A Yeah. I've been there, but he's -- he's not there and --

Q Okay.

A Her other dog is. And I'm kind of scared of dogs right now. Eve -- I was even scared of my own dog when I went home, but.

Q Okay. Is that still the case that you won't go back there if (indiscernible) there?

A I've been there. No. No.

Q Okay. But if he's there, if he were to return home, would you go back there?

A I don't know. I don't know if I'll be comfortable with him in -- inside the house with me, but if he's in the pasture, I'm fine with that.

Q Okay. And did you tell the PACC people that you had concerns of Sergeant Snuggles being around the children?

A I think I might have. Yeah. I was scared at the time. I was just -- it just happened, and I was --

Q Do you have those same concerns now?

A Well, I started thinking about it, and I -- like, he's always been good with kids, you know? They -- they pull his tail, they jump on him. And then -- and -- and I was just thinking, why did he do that to me?

'Cause he's always -- he's always so good with the kids, you know? And they laid down with him. And that's why they named them Snuggles. 'Cause, you know, they snuggle with him they said.

Q Do you have their same concerns or is your answer I don't know, which is a perfectly acceptable answer.

A I don't know.

Q Okay.

A You know, I don't know.

Q Okay.

A All I know is that he's been really good with them.

Q Okay.

A I'm protective of him, but you know.

MS. ALTSCHULER: Okay. If I could just have one second.

THE COURT: Sure.

MS. ALTSCHULER: I don't have any other questions.

THE COURT: Cross?

CROSS-EXAMINATION

BY MS. BYRNE:

Q i, Ms. Gastelon. I'm sorry for what you've been through. How many surgeries did you go through?
A One.
Q Because of the bite?
A Yeah. On my face and -- and my head.
Q Okay. And do you remember him biting you?
A Kind of. Yeah. I -- I don't remember him when he did what he did to my face or -- or on my groin. But I remember him biting on top of my head.
Q Um-hum. Do you remember saying to the PACC officer that you thought it was his nail that scratched you?
A Yeah. It looked like a nail.
Q Um-hum.
A Not like a bite.
Q So you're Ms. Evancho's mom?
A Yes.
Q And you love her?
A Yes.
Q And you love the grandkids?
A Yes.
Q And you visit them often?
A Yes.
Q Okay. Have you seen the pictures that we showed of your face from the injury?
A No.

Q You weren't here?

A No.

Q Is it okay if I show you one picture?

A Um-hum.

MS. BYRNE: Showing State Exhibit 4.

THE WITNESS: Um-hum.

BY MS. BYRNE:

Q So I just want you to be honest and just say what's on your mind when you look at that picture and you hear those kids running outside all happy.

Do you feel that it is safe for Sergeant Snuggles, even though he never acted like that before that one time -- are you --

MS. ALTSCHULER: Objection.

THE COURT: Overruled?

BY MS. BYRNE:

Q Can you tell me -- and you are under oath -- that you are okay with the kids being with the dog like that? I'm just asking and anything you say is okay.

A I don't know. I don't know if he would do it again. I -- I don't know.

Q So you do have concerns if he comes back home?

A I kind of do, but then I -- I always -- he's so good with them. I -- I'm -- I don't know.

Q Was he good with you before the attack?

A He would -- he would come for me when he -- for pets and stuff. I -- yeah.

MS. BYRNE: All right.

No more questions, Your Honor. Thank you.

THE COURT: Redirect?

MS. ALTSCHULER: I don't have any questions.

THE COURT: Okay. All right.

Thank you, Ms. Gastelum. You can step down.

MS. ALTSCHULER: I call Vanya Moreno.

THE COURT: Raise your right hand.

DR. VANYA MORENO

called as a witness for the Defendant, having been duly sworn, testified as follows:

Do you solemnly swear or affirm, under penalty of perjury, to tell the truth, the whole truth, and nothing but the truth?

DR. MORENO: I do.

THE COURT: Go ahead and be seated.

DIRECT EXAMINATION

BY MS. ALTSCHULER:

Q Please tell us your name, ma'am.

A Dr. Vanya Moreno.

Q And what is your occupation?

A I'm an animal behaviorist that works with dogs, cats, and their owners.

Q Do you run your own business?

A Yes.

Q Have you testified before in court hearings?

A Yes. I am certified as an expert witness in dog -- for dog behavior in Pima -- Arizona State.

Q About how many times have you testified in hearings?

A Does that include depositions?

Q (indiscernible) Roughly.

A Five or six.

Q Okay. And what kind of education and training do you have that allows you to do your job?

A I -- I have a PhD in ecology and evolutionary biology from the University of Arizona. I did not study dog behavior per se at the University of Arizona. I studied birdsong learning and -- and such. But I did study animal behavior.

And while I was still in graduate school, I decided that academics wasn't going to be the path for me. And a friend of mine got a dog, and I was listening to him talk about his dog trainer, and listening to the dog trainer, and I thought, this is -- this is what I want to do. So then I started educating myself, and I have lots and lots of teachers.

Q And how long have you been doing studying and engaging in dog behavior?

A I started in 1997.

Q Okay. How did you become involved with Sergeant

Snuggles?

A I received a phone call from Jennifer the day that we went to PACC and she signed -- signed the bond paperwork. And I was able to go with her to help advocate.

Q So you've heard the testimony today about the circumstances of the bite?

A Yes. Uh-hum.

Q What stands out to you as unique circumstances with regard to this incident?

A The fact that the veterinarian recommended that the male twelve-month-old stay intact, and the female was in heat, and they were on property together. Jennifer informed me that Sergeant Snuggles hadn't eaten in five days. It is an incredibly stressful situation for a male intact dog to be around a -- a female in heat.

Q Yeah.

A Yeah.

Q When dogs are stressed, do they exhibit biting behavior?

A In this situation or in any situation?

Q Well, in general.

A In general, dogs bite for lots of reasons, right? I have seen and been an expert witness on at least a few cases where the dog was startled.

Q Okay.

A Yeah. So that is one situation, but there is a litany of reasons why dogs bite.

Q Okay. Could one of them be the stress of being around a dog in heat?

A So he was incredibly frustrated, incredibly focused, and stressed. He hadn't eaten, and stack that on top of other dogs in the area, and then being startled. Other dogs in the area barking and, you know, he's trying to get to her. He thinks they're trying to get to her, right?

Q So all in all, there are all these factors, it seems, that lead to a dysregulating situation?

A Very dysregulating.

Q Okay.

A Yeah.

Q Talk to me about being startled. Now, you've heard the victim's testimony.

A Um-hum.

Q Ms. Clara Gastelum indicated she thought that she startled him or might have startled him.

A Yes.

Q Okay. If he is -- if the dog -- and I understand we can't get inside Sergeant Snuggles' thought process.

A Sure.

Q But if he is focused on other dogs and on the dog in heat, would it be possible for him to be more easily startled?

A Absolutely.
Q Okay.
A Yeah.
Q And so even though she is walking back and forth around him or near him, and he has to know she's there, the pat on the head or the touch on the head could potentially be a startling event?
A Yes.
Q Okay. So as far as you know, with this situation, is this a unique situation for the like of this dog?
A If Jennifer and her family follow my very strong recommendations to not only get him neutered, but get the female spayed, and -- I haven't even met him, right?
I need to meet the dog. I need to make recommendations about all sorts of things that will affect his general wellbeing and how they interact with him. So I haven't had a chance to do any of that.
Q Right.
A Yeah.
Q Okay. So there can be a behavior plan for Sergeant Snuggles to address the situation?
A Yes. Absolutely.
Q Okay.
A Yeah.
Q And I would think that it's just logical sense that

he would never be around a dog in heat again, correct?
A Yeah. Even neutered.
Q And neutered.
A Yeah. Yeah.
Q And be aware of suddenly startling him.
A Which is true for all of us.
Q Okay.
A Yeah. People included.
Q Given what you know directly from the only person who was there at the attack, was this without warning? How can you help us understand that? The assertion that this fight was without warning, without provocation, was sudden and unexplained?
MS. BYRNE: Your Honor, I have to object here. Doctor Moreno was not present during the attack. So she does not know if there were warnings because she didn't see.
THE COURT: Oh, well -- okay. I'm going to overrule. There's been plenty of testimony on the fact that this was an attack without warning. So I think she can respond to that.
THE WITNESS: The fact that the dog was startled is -- is huge. Because when anyone is startled, you whip around to see what's happening in fear and react sometimes before you've processed what's going on.
BY MS. ALTSCHULER:
Q So dogs have the same startle response as people?

A Yes.
Q Same brain?
A Yes.
Q Okay. So there's been a lot of talk about the pulpectomy, but in terms of a behavior plan of spaying and neutering, we know the dog can't be on a tie-out, but it appears that, on the property, the dogs can be well-contained. Is that something that would be part of the --
A Oh, absolutely. Yeah.
Q And let's address the pulpectomy. Knowing that no one's rushing out to find a dog dentist to start removing teeth and all of that, can you speak to the effectiveness of a pulpectomy?
A I can. And I'd also like to speak to bite pressure.
Q Okay.
A Both things. So with regard to -- it's called dental disarming. The paper that was mentioned in the report talked about non-veterinarians doing procedures without antibiotics, without anesthesia. That's abuse.
Q Yeah.
A Yeah. That's not what we're talking about.
Q Understood.
A Yes. So with regard to the dental disarming, and I've known at least six dogs that I have worked with after the dental disarming, whose lives were able to -- were able to be

saved and the families were able to stay with their dogs because of this procedure.

So the tooth is cut at the level of the gum, a portion of the root is extracted, and then it's filled in with a resin. And so they can't puncture. And in my experience with these dogs that have had partial pulpectomies, it changes their behavior in a positive way.

Q Tell us about the behavior changes with a pulpectomy.

A Can I give you an example?

Q Yes.

A Okay. So I worked long time ago with a family who's had four dogs that had two girls --

MS. BYRNE: Your Honor, I have to object because when the State tried to bring a case that was not disclosed, it was not allowed to.

THE COURT: Sustained.

MS. BYRNE: Thank you.

THE WITNESS: Okay. So the upshot is the dog stopped biting. In fact, in all six of these cases, the dogs -- the people had more -- I don't want to say bravado, but they knew they were safe or safer, and that allowed them to act with more confidence. And then the dog -- oh, okay. I won't be so aggressive.

Q Okay. So you have six instances where the behavior has changed due to a pulpectomy?

A Yes. And as far as I know -- and I stayed in contact with several of these -- they never had tooth problems.

Q Okay.

A After that. They were well-cared for. And I mean, they'd have the same kind of teeth problems that any dog did with age. But not because of the partial pulpectomies.

Q Okay.

A And they were able to chew softer toys. So the dogs were -- were less frustrate -- frustrated. They were better family members.

Q They were still able to experience these five freedoms that were mentioned?

A Yes, absolutely.

Q Okay. Talk to me, then, about bite pressure.

A So bite pressure -- bite inhibition -- is something that's learned as a puppy, right? That's when they can learn it. Most people don't teach their dogs to have bite inhibition because they don't know. But especially with an Anatolian Shepherd with a bite pressure of, what, 750 psi? He could have crushed her skull. He did not. The bite on the arm was two punctures and a release. I'm not saying what he did was good, but I'm saying he could have done so much worse.

Q Are you able to look at the wounds on the groin area, and are you able to determine if it's a nail or if it's a bite from a tooth?

A I mean, they look to me like scratches. I'm not a veterinarian.

Q Okay.

A Yeah. Or doctor.

Q Okay. So with regard to bite pressure and bite inhibition, would you, because of the nature of these injuries, be able to say there is bite inhibition in Sergeant Snuggles?

A Yes.

Q Okay. Okay.

MS. ALTSCHULER: If I could have a second.

THE COURT: Sure.

MS. ALTSCHULER: Okay. We're done.

THE COURT: All right.

Cross?

CROSS-EXAMINATION

BY MS. BYRNE:

Q Good morning. I'm sorry, do you go by Dr. Vanya or Dr. Moreno?

A You can call me Vanya.

Q Okay. So where did you get your PhD? I didn't -- I'm sorry.

A University of Arizona. Here.

Q Okay. All right. And then, just out of curiosity, you said that you are certified as an expert witness or you were certified?

A I am.
Q What does that mean?
A It was -- I don't know exactly. I know I was told that a long time ago when I was working on a case. I could go back and find the paperwork and all that, but --
Q So you have an actual certificate that says that you're an expert witness?
A No. I was told I was an expert witness.
Q Yeah, I never -- I'm just curious.
A And I've worked on -- I -- six or seven cases.
Q Do you ever testify for the defense on death cases where dogs kill people?
A I have never testified on any death case.
Q Okay. All right. Do you guarantee your results?
A Guarantee behavior?
Q Yes.
A There is no guarantee on behavior.
Q Thank you. And in terms of wages, do you -- when somebody engages you for a behavior modification, is that per block of time or is that per hour that you work with the dog and the owner?
A I start with a behavioral consult, which is ninety minutes, and I charge for that. And then I do hour-long sessions, and they can do single sessions or they can do a group of five, in which case I give a discount, or a group of

ten, in which case I give a discount. And I also teach group classes.

Q And can you tell me roughly, what's the average per hour that you charge?

A Average per hour? For a single hour, 160 to 175.

Q Okay.

A I also charge for travel.

Q Okay. Fair enough. You mentioned in your testimony that Sergeant Snuggles did not eat for five days?

A That's what I was told.

Q Did you see it written in any report? Did you read the reports?

A Yes, I read the reports.

Q Did you see it in the report?

A I don't remember that was in the report. No.

Q Okay. Who told you that he didn't eat for five days?

A Jennifer did.

Q Sorry?

A Jennifer did. And her husband.

Q Did they say why?

A Because she was in heat and he was frustrated.

Q So he didn't eat because -- so they offered him food?

A Yes.

Q And he didn't take it.

A Yes.

Q Okay. Thank you.
A Yes.
Q That's what I didn't understand.
A Yeah.
Q So in terms of this event, you say that Sergeant Snuggles was startled. Is that correct?
A I believe so.
Q What do you think startled him?
A When Clara bopped him on the head. When he was looking the other direction and stressed.
Q Okay.
A Yeah.
Q Does their reaction -- the severity of their reaction -- does that concern you at all? Because it was the -- this is how a dog reacts to a startling event?
A When animals are start -- when dogs are startled, they will -- I -- generally, I think, bite down harder.
Q Oh, okay. So you're saying --
A Yeah.
Q Okay.
A Yeah.
Q Did you hear the kids scream outside?
A Yeah.
Q Would you consider this to be a possible startling event to a dog? To Sergeant Snuggles?

A Can I explain? He was put in an incredibly stressful situation by accident. They didn't know.

Q Uh-hum.

A He is incredibly, from what I hear, protective and loving of the children. He doesn't have that same level of loving and protectiveness of everybody, but those children, he really does. So repeat your question?

Q The level of startling --

A Yeah. Yeah, yeah, yeah.

Q -- versus the reaction.

A Yeah.

Q You have any concerns there?

A Well, I don't because we -- if we were worried that he's a dog that startles a lot, which I'm not -- I've met dogs that startle a lot -- then we would manage him in time and space so that if he were to be startled, he would be in a -- in a safe situation.

For example, sleeping in an ex pen or something like that. You know, I've known dogs that get tripped over in the middle of the night, startle, and bite, so they sleep in an ex pen.

Q Um-hum..

A So we keep -- we keep the situation safe.

Q Um-hum.

A That was a dog that had a strong startle response,

though.

Q Okay. So you don't have concerns about the kids being attacked at all is what you're saying? Because he's very protective of them?

A If I did, I wouldn't be here.

Q Okay. So no concerns about the dog attacking --

A I'm not going to say no concerns, but I wholeheartedly believe that he'll be safe with those kids. Otherwise I wouldn't be here.

Q Can you put it on a one hundred percent scale? What's the likeliness of Sergeant Snuggles --

A No. I think that's a silly question.

Q Okay. Thank you --

A You're welcome.

Q -- for complimenting me. When you went with Jennifer to pack --

A Um-hum.

Q -- you asked Sergeant Gagnon about putting Sergeant Snuggles on gabapentin?

A I did.

Q What is that?

A Gabapentin is a medication that can be used as a sedative. It's also a pain reliever. And it is often given to animals that need to be sedated because they've had surgery or are in pain or stressed. And PACC is, despite -- I know you

guys try really hard to make it as less stress as possible. It's still so stressful.

Q So you meant gabapentin just during his duration of stay?
A Yeah.
Q Not at the house?
A Right.
Q Do you think he will need any medication if he's ever back at the home?
A That's one of the reasons I need to meet him and work with him.
Q Can you prescribe medication?
A No. I work with veterinarians to prescribe.
Q Do you have a veterinarian in Tucson you work with?
A I have a lot of veterinarians I work with in Tucson.
Q Any specific clinic?
A PAWS.
Q So when you talked about bite inhibition --
A Um-hum.
Q -- is that teaching -- and I'm just asking, is that teaching a dog to not bite or to bite less powerful? What is it exactly?
A It's -- it can be all of those things.
Q Okay.
A So if you have a Belgian Malinois, for example, that

you're using for police dog sport, you can teach -- I did, my girl, Java -- you can teach that dog the situations in which they bite as hard as possible.

Q Uh-hum.

A In other words, when they're biting the suit, biting the bad guy, and when to have ultimate bite inhibition, which means we don't even break the skin.

Q How early are Belgian Malinois start to be trained to be police? How old are they when they start to be trained?

A Little.

Q And in general, how old does a dog need to be to be effectively trained?

A For bite inhibition? So they lose the ability to learn bite inhibition at five and a half months or so when they get their adult teeth.

They do learn bite inhibition with their mom and the brothers and sisters in the litter.

Q Okay.

A They start -- they start teaching that. And so many people don't know that you can teach bite inhibition. I teach it in my classes right and left because I want dogs to all have bite inhibition and also be so well socialized that they're never, ever going to be put in that situation.

But -- gosh, I just forgot what I was saying. Yeah. Once the puppy is past that point, it's -- I mean, you know, I

guess, it's a bell curve. I'm sure there are some puppies that could learn to do it later, but that's really when the developmental window is.

Q So when you teach bite inhibition in your classes, it's only for puppies? It's not for adult dogs?

A For adult dogs, if I have a client that has a dog that takes the food hard or something like that, I tell them to tell them, easy, gentle before they give them the food. So the dog goes, oh yeah, take it soft.

Q So would that apply if the dog is startled as well?

A No.

Q Okay. And Sergeant Snuggles is not a puppy anymore, right?

A At -- if he's a year old, he's still a puppy. That dog's going to be a puppy till he's about, what, two, two and a half years old.

Q But you did mention the bite inhibition usually is within the first five and a half months?

A Yes. Yes.

Q Okay. You've been in Tucson for a long time, correct?

A Um-hum.

Q Are you familiar with any cases of dogs that killed their owners?

A I've heard of them, but I don't know who they were.

Q Okay. So once you train Sergeant Snuggles, do you expect him to be safe with the general public?

A I can't tell you that until I've worked with him.

Q So you're testifying today to something that you don't know will happen, correct?

A When I work with a dog, I take a -- I take them out a lot. We go to Home Depot, we go to Lowe's, we go all over the place. We're doing environmental agility all over the place, which teaches the dog, I'm a good leader. You can work through anxiety, and all of the things going on around you are okay.

Q Um-hum.

A All the people, all the sounds, all the -- everything. Until -- if I -- if I encounter Sergeant Snuggles and he strikes me as very anxious, very -- then I'm going to try to address those issues and see through the use of a lot of different things where we can get him.

If I notice that he has a strong startle response even after all those things, then my recommendations are going to be different than they would be if he doesn't have a strong startle response. Now, do I think that people should go up and give a strange dog a hug? I do not.

Q Right. No. I'm talking about his behavior, not people's behavior.

A Yes, but people's behavior plays into it a lot.

Q Right.

A And I've had -- I had a rescue that came from a hoarding situation that would absolutely bite people.

Q Um-hum.

A Did I take him out in public? I did, and I was vigilant.

Q Okay.

A Right? Because I'm going to take him out and I'm going to keep him safe. And I'm going to keep everybody else safe. And the -- but I'm a trainer. I'm a behaviorist.

Q Right.

A The owner has to work in their level of what they're comfortable with, right? He is a flock guardian. They have a lot of property around a lot of other farm properties. I know exactly where they live.

Q Uh-hum.

A And -- and there's a ton of flock guardians there. They're not the kind of dogs that people generally take into public much. In fact, when I go -- I do rattlesnake avoidance training -- when I go to those properties, I say, is your dog leash trained? Because we're going to need them on a leash. Well, I've never had them on a leash before. I'm like, that's going to be a problem for the snake avoidance training.

Q Okay.

A Okay?

Q Yeah.

A It's -- it's a certain subset.
Q Uh-hum. How many Anatolian Shepherds have you worked with?
A Gosh. I don't know. Ten? A lot more Great Pyrenees, which -- is he part Great Pyrenees? No, he's all Anatolian. They're very similar.
Q Yeah?
A Yeah.
Q And the pulpectomy. You don't have any concerns about taking a healthy dog's healthy canine teeth away at all?
A Not if it's done properly and if it's done for the well-being of the dog. Like, now you get to live.
Q What kind of life is that?
A It's a wonderful life. I'm not kidding.
MS. BYRNE: No more questions, Your Honor.
Thank you.
THE COURT: All right. Redirect?
MS. ALTSCHULER: Yeah. Judge, I'm going to take a break. If we could take a break, I need to talk to my client, talk to her husband just for five minutes, if that's okay.
THE COURT: That's fine.
MS. ALTSCHULER: Okay.
THE COURT: All right. You can take a five-minute break.
(Recess)

THE CLERK: All rise, please.

THE COURT: Okay. Raise your right hand for me.

BLASE EVANCHO

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE COURT: Go ahead and be seated.

THE WITNESS: (Indiscernible) can figure out this mic situation.

THE COURT: Hopefully we adjusted them.

THE WITNESS: Okay.

DIRECT EXAMINATION

BY MS. ALTSCHULER:

Q Okay. Please share your name, sir.

A Blase Evancho.

Q And Mr. Evancho, you are Jennifer's husband, correct?

A Um-hum.

Q And you have to say yes or no because it's being recorded. So sometimes -- yeah. So how long have you had Sergeant Snuggles?

A Probably approaching a year at this point. We got him at 8 months old, and I think he's about 18 or 20 months old.

Q Okay. Where did he come from?

A He came from a breeder and rancher in Goodyear/Phoenix area.

Q Is he related to your Keoki, your other dog?
A He is not.
Q She came from a different --
A She came from a ranch in Texas.
Q Why Sergeant Snuggles? Why that breed?
A So we have -- we have a four-acre ranch, which we utilize as a farming operation. So we grow produce and we have a poultry and egg operation as well. Over the past year and a half or two years since we started, we've lost several of the chickens to predators. Coyotes and bobcats.
Q And the Anatolian Shepherds are able to prevent -- how do they prevent the predators?
A So they're out with the chickens basically all day long. The chickens are free-range chickens, and they just keep the pasture safe for them.
Q In terms of his dog habits, he's out in the pasture all day? He's not in your living room? Is that --
A Right. He -- yeah, he goes out typically around 6:30 in the morning. Then they come in to eat at about 7 or 8 at night.
Q Does he stay in at night or does he go back out?
A He typically stays in at night. When I'm on the road, he'll go out. It's really whatever Jen's most comfortable with, typically.
Q Is he socialized with the family and the kids?

A Yes. He's been socialized with farm animals and children since he was born. He was in a -- bred into a household of children.

Q Have you seen him interact with your kids?

A Yes, he plays with them every day. His name is Sergeant Snuggles for basically his demeanor. He's a great guard dog. And then as soon as he's around them, he's basically their protector and -- and snuggler. He just wants their pets and to hang out with them.

Q Have you seen your children startle him, like, throw things at him?

A Yes. He's been hit with many balls. Baseballs. I mean, they just jump on him.

Q Do you try to tell your children not to do that?

A Every day, almost. Yes.

Q Okay. And how old are they right now?

A Blazer is 5 and Cole is 3.

Q Okay. And have you ever seen aggression with Sergeant Snuggles?

A No.

Q So we've heard some testimony about other dogs on nearby property. Can you explain that or describe that further?

A Yes. So the -- the neighbor's property, the neighbor -- neighbor's ranch next to us, they have a

six-and-a-half-acre ranch that has open fences. So their dogs kind of meander back and forth from our property, from the one open side, and back over.

There's no -- our pastures are locked up. So they kind of come in and can go around our house where there's no gates, and then they go back, where our dogs are locked in pastures with fences.

Q Okay. So other dogs come on to your property?

A Yeah.

Q Was there a dog that comes onto the property that used to live there or used to live next door?

A Yeah, so our neighbors used to own our house. We bought it from them. And so JJ, the -- one of the neighbor's dogs -- sort of still uses our house as -- as he sees fit.

So he comes over pretty much every morning when they go out to take care of the horses, feed them, and water them. He just usually comes over about 7:00 typically is when I see him.

Q So is JJ pretty punctual and routine?

A Yeah. They have a -- you know, a standard feeding ritual next door. They have -- they board, I think, like eight or -- eight or nine horses. So 7:00 they go out and feed every morning and then he's usually gone by 7:45 or 8.

Q And Sergeant Snuggles being on a tie-out is unusual, correct?

A Yeah.
Q You wouldn't put him on a tie-out?
A He's -- he's never on a tie-out. The only reason he was on a tie-out is because Keoki was in heat.
Q Okay. With regard to Keoki being in heat, did Sergeant Snuggles have difficulty eating in the days leading up to the incident?
A So he was -- I mean, he just wanted to breed. So basically she was probably on -- I -- I don't know, I'd say probably, like, 13 of her heat cycle, like right in -- right in the prime breeding range.
And he stopped eating, I think about five days or four days before that. So he'd been -- yeah, he'd just been following her around basically and just wanted to breed.
Q So he's on the tie-out and hadn't eaten. And JJ's making his rounds?
A Yeah.
Q Okay.
A Pretty much.
Q Okay. Do you know if JJ is intact or not?
A I don't know.
MS. ALTSCHULER: Okay. Fair enough. I don't have any other questions. Oh, you know what? I'm sorry. I do.
BY MS. ALTSCHULER:
Q If Sergeant Snuggles were to come home -- and you

know the full story here, sir.

A Um-hum.

Q Right? Mother-in-law, you're close to her, correct?

A Right.

Q Would you feel comfortable with Sergeant Snuggles coming home?

A So I feel comfortable with Sergeant Snuggles coming home. I don't think they'll be in the same room ever again. But we have -- I mean, multiple chained-in areas. Eventually, the back pasture is going to be their main run, once I secure the fences there.

So I mean, I'm perfectly comfortable with him coming home, but just, you know, be a little -- not -- not with those two in the same sort of situation that they were in last time.

Q Those two meaning your mother-in-law?

A My mother-in-law and Snuggles. Yeah.

MS. ALTSCHULER: Okay. Okay.

I don't have any other questions.

THE COURT: Cross?

CROSS-EXAMINATION

BY MS. BYRNE:

Q I'm sorry. You said that you brought Sergeant Snuggles because of -- to protect the chickens, correct?

A Yeah.

Q How does that work? He barks or, like --

A Well, he's a -- he's a livestock protection dog. So his role in life is to maintain livestock safety and health. So any predators come on or near the property, typically it's a bark or chase off.

They can potentially have an interaction if -- if there was a predator on the -- on the property. But yeah, the chickens are out and they basically just live with them. They -- literally the chickens will jump on the dog. So they just live within the -- in the -- in the herd.

MS. BYRNE: Okay.

No more questions, Your Honor.

Thank you.

MS. ALTSCHULER: I don't have anything else.

THE COURT: All right.

You may step down.

MS. ALTSCHULER: And, Judge, the last witness I have is Mrs. Evancho.

THE COURT: Okay.

Raise your right hand.

JENNIFER EVANCHO

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE COURT: Go ahead and seat. You can sit down.

DIRECT EXAMINATION

BY MS. ALTSCHULER:

Q Please tell us your name, ma'am.
A Jennifer Evancho.
Q Ms. Evancho, you own Sergeant Snuggles, correct?
A Yes.
Q Okay. And obviously, your kiddos are here as well, correct?
A Yes.
Q And ma'am, you engaged with Vanya Moreno in order to address what?
A In order to address -- I -- I wanted her help to get Sergeant Snuggles back, and I wanted to make sure that I was doing the right thing and she felt comfortable with me bringing him back because my kids are my number one safety. I love them more than life itself.
Q And you are are willing to cooperate and work with any potential behavior plan?
A Yes. I'll do whatever it takes to bring him back home.
Q And are you comfortable with Sergeant Snuggles coming back into your home?
A Yes, I am. I've never had any concerns with him. He's always been great with me and the kids. There's never been a growl, snarl. Like my husband said, Blazer threw a baseball at him from me to you, point blank in the head. Put his head down, walked away.

I mean, they're always climbing on him, snuggling with him. They love him. He's a part of our family. He's not just a dog.

Q During the incident when you came outside, was Sergeant Snuggles away from your mom?

A Yeah. My -- my mom was in the grass, holding her head, and Snuggles was on the ground, like, you know, oh, crap. What did I just do?

And I yelled at him, and I said, what did you do? And I went and grabbed Keoki out of the pasture, put her inside the house, put Snuggles in the pasture.

Q Okay.

A Just so you know, medics and everyone could come in, no issues.

Q Understood.

A Okay.

MS. ALTSCHULER: I don't have any questions.

MS. BYRNE: No questions, Your Honor.

THE COURT: All right.

You may step down.

Does the defense have any more witnesses?

MS. ALTSCHULER: No. We're done.

THE COURT: All right.

Closing arguments?

MS. BYRNE: Your Honor, according to the Tucson City

Code, in this specific case, the standard of proof is clear and convincing evidence. According to the Supreme Court in Colorado v. New Mexico, 467 U.S. 310(1984), clear and convincing means that the evidence is highly and substantially more likely to be true than untrue.

In other words, the fact finder must be convinced that the contention is highly probable. This morning, the Court heard testimony from all the people involved, really.

And the State's concern -- while it realizes it cannot control a family and order a family who to bring into their house -- the State's concern is for the safety of the family member, the safety of the kids, the safety of the friends who come over for play date. And the State would contend that it is absolutely impossible to cater to every event.

And that is exactly what happened here for a whole year. There was absolutely no incident. He was thrown bats or whatever. But then, a little old lady pats him on the head and he almost kills her. And the expert that the Defense brings explains that it could have been worse.

The State is here to prevent it from being worse, to prevent it from ever happening again. The State's experience is that dogs are -- even if they are predicted, the environment around them is unpredicted. They hear sounds that humans do not. It is impossible, other than put a dog in a bubble, to

control all the cases that they might encounter.

The State would like to put on the record that the pulpectomy procedure is inhumane, and we honestly believe that the dog should be forfeited to PACC for the safety of everyone involved. Thank you.

THE COURT: All right.

Ms. Altschuler?

MS. ALTSCHULER: Mr. and Mrs. Evancho and Vanya Moreno would not be here if they did not believe that this situation was one Sergeant Snuggles should not have been put into and is highly, highly unique, and was the cause of this fight. It's not accurate and leaves out a lot to say a little old lady patted the dog on the head and, out of the blue, the dog bit. What was happening is an incredibly stressful event for Sergeant Snuggles, where he didn't eat for days before because his pack mate essentially was in heat.

Those dogs should have been spayed and neutered, and the Evanchos didn't want puppies. They're not interested in breeding. They relied on a veterinarian to wait until the dogs were older.

If they were to go back in time, they would likely get the dogs spayed and neutered, and that will happen should you decide to return the dog home, which reduces the risk of this situation ever happening again.

Dog was on a tie-out. A dog that is with the

chickens and walking around and has freedom, although in a contained space. The other dog was in heat. He hadn't eaten and he's on a tie-out. The little old lady, Ms. Claudia [sic], was walking back and forth. No problem.

It was when she -- she believed she startled him -- when she tapped him on the head. You can call it a pat or a tap. I think there's room to talk about that. And then he bit her on the arm.

You heard Ms. Morano talk about bite inhibition. And we didn't present that evidence to say it could have been worse. We presented that evidence to talk about there is some inhibition that you can see in this incident.

And we presented a lot of the information to show you how amenable the Evanchos are to working with a behavior plan. This obviously is very, very serious to them. They've invested time and money to keep this dog because they love the dog and believe in this dog, and are willing to work with somebody like Ms. Moreno to consider things like a pulpectomy.

That's not that they're going to run out and do it. It's one of the things that they are considering to try to help the dog.

Now, obviously Sergeant Snuggles isn't going to go out and pick paint colors at Home Depot. That's not his function in this household.

I think the concern is about him being inside and

being with the children. And yes, he bit, but he was outside. The children weren't around at the time. And that unique situation explains that this wasn't unprovoked. It wasn't unexplained.

There were many, many reasons why this happened. And he was put in a situation that he should not have been put into. One incident under the circumstances where you have caring and loving people willing to work with behaviorists should not keep the dog away, should not result in the dog's death.

The prosecutor, Ms. Byrnes, said highly probable. Highly clear and convincing is highly probable. I don't -- I mean, no one can predict the future here. Any dog can bite, and dogs bite all the time. And any dog with a large jaw can cause bite damage and injury. You cannot predict the future.

And if you're saying, well, he did it before, he's also exhibited tremendously prosocial behavior, especially with the children. It was this unique situation that caused the bite. And it is one that the Evanchos are never, ever going to put Sergeant Snuggles in again if he is allowed to live.

THE COURT: Your garner?

MS. BYRNE: Garner uniqueness of the situation is exactly the State's point, and it is the fact that no one can cater to an abnormal event. And this is the whole point behind the State's case. It is that event that we are trying to

prevent. And this time it was a severe injury.

When and if it happens again, the State would just like to put on the record that it vehemently opposes to return Sergeant Snuggles to his owners. He should be surrendered to PACC, he should be evaluated, and that is the safe thing, not only for him, but for everybody around. Thank you.

THE COURT: All right.

I'm going to take a few minutes to think about it, and then I will be back.

(Recess.)

THE COURT: Okay. All right.

I do find that Sergeant Snuggles, unfortunately, does fall within the category of a dangerous animal -- a vicious or destructive animal -- pursuant to Section 4-7 of Tucson City Code.

He has a propensity to destroy, damage or cause damage. He also is an animal that bites, attempts to bite, or otherwise injures or causes to be injured human beings or other animals.

I do find that he was in a distressed situation. Highly distressed situation. I think the confluence of the tie-out with the situation of being in heat, and the other dogs barking in the neighborhood, and another dog that comes onto the property on a regular basis added to that stress.

I find that it's just with this that the Defense

expert really cannot give any kind of guarantee about the behavior and the ability to modify the behavior of the dog.

I do have concerns. Find that Ms. Gastelum was clearly traumatized by the incident and had continuing ongoing fears of returning to her daughter's home or in fears for her grandchildren if the dog is returned to her home.

Based on the testimony that I heard, I find that these fears are warranted, and I do order that the dog be surrendered for humane destruction.

And I am very, very sorry.

MS. EVANCHO: No. He's going to be just fine. He's not going to be around people. Please, Your Honor, don't.

THE COURT: You can't guarantee that.

MS. EVANCHO: I can.

THE COURT: You can't. You couldn't before. You can't now.

MS. EVANCHO: It was a situation he never should have been in. I'm going to spay and neuter both of them. There's -- there's no way he could be put in that situation again. Never.

THE COURT: I think the risk is too great, and I am very, very sorry.

MS. EVANCHO: I think people around here just don't care about dogs, so no problems. Okay. Happy holidays. Okay.

MS. ALTSCHULER: Judge, may my client step out? I'll

get all the paperwork. Her husband's outside.

THE COURT: Yeah. No. And I am very sorry, Mr. Evancho.

THE COURT: Besides the order for impoundment and destruction, is there anything specific I need to include in the order, Ms. Byrne?

MS. BYRNE: The appeal issue.

THE COURT: We'll go over the appeal and Ms. Altschuler will provide the appeal.

MS. BYRNE: I can give it to the State, Your Honor.

THE COURT: Okay.

MS. ALTSCHULER: So with regard to that, if she chooses to appeal, would there be a stay on his execution?

THE COURT: Yes.

MS. ALTSCHULER: Absolutely?

THE COURT: Yes. Of course.

MS. ALTSCHULER: Okay.

THE COURT: No, there's no point to an appeal without a stay of execution.

MS. ALTSCHULER: Okay.

THE COURT: It's not easy to make these decisions.

(Pause)

THE COURT: Ms. Altschuler, do you want to -- do you happen to know? Do you want me to put a stay in place at this point in time?

MS. ALTSCHULER: I do.

(Pause)

THE COURT: All right. Okay. You'll get information about the right to appeal as well.

MS. BYRNE: Your Honor, there is the matter of the bond that --

THE COURT: Oh. Okay. How does that work?

MS. BYRNE: The order to post -- the owner must post a bond equivalent to 60 days of impoundment costs in order to perfect the owner's appeal. Notice of the amount will be given by the judge, which is $3,600.

THE COURT: Okay.

MS. ALTSCHULER: And that has to be posted in ten days?

MS. BYRNE: No, you have to appeal within ten days.

MS. ALTSCHULER: Okay. Well, I can file the notice of appeal.

MS. BYRNE: Any tier, I think because of special action.

MS. ALTSCHULER: Yeah.

MS. BYRNE: So.

MS. ALTSCHULER: But she has to post the bond at half the $3,600?

THE COURT: Yes.

MS. ALTSCHULER: What's the time frame on that?

MS. BYRNE: I think it would be ten days as well.

MS. ALTSCHULER: Okay.

MS. BYRNE: It's typically ten business days, so obviously we're close to getting the Black Friday for those additional days.

(Indiscernible).

THE COURT: And then the appeal must be filed within ten business days.

MS. BYRNE: Yes.

MS. ALTSCHULER: The notice, right?

MS. BYRNE: No.

MS. ALTSCHULER: Or the actual appeal?

MS. BYRNE: No appeal shall be taken later than ten days after the decision. So to perfect the appeal, you have to pay the bond with the notice of appeal. But the appeal must be filed within ten days.

THE COURT: Oh, it's within ten days, not ten business days.

MS. BYRNE: Ten business days.

THE COURT: Okay. But the holiday would --

MS. BYRNE: Yeah.

THE COURT: Like that.

MS. BYRNE: Yeah.

THE COURT: Okay.

All right. Thank you.

MS. BYRNE: Thank you. Judge.

MS. ALTSCHULER: Thank you.

THE CLERK: (Indiscernible) injustice.

THE COURT: No. Because this is a civil appeal, it's different.

THE CLERK: Yeah, if we have it -- we have it on the minute entry.

THE COURT: The -- Ms. Byrne?

MS. BYRNE: Yes, Your Honor?

THE COURT: The appeal gets filed with City Court?

MS. BYRNE: That is my understanding, yes.

THE COURT: And then it gets -- once it -- and then we would forward that to the Superior Court, correct?

MS. BYRNE: Correct.

THE COURT: Okay.

MS. ALTSCHULER: Thank you.

(Proceedings concluded at 11:44 a.m.)

CERTIFICATE

I, DANA BUETTNER, a court-approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my professional skills and abilities.

/s/

______________________

DANA BUETTNER June 10, 2026
Transcriber